UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ----x

UNITED STATES OF AMERICA       :

      :

      - v -       :     **25-Cr-85 (JSR)**

      :

CARL RINSCH,       :

      :

      Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ----x


## MEMORANDUM OF LAW IN SUPPORT OF CARL RINSCH'S MOTION TO SUPPRESS

ARIEL WERNER
MICHAEL ARTHUS
NEIL P. KELLY
Federal Defenders of New York, Inc.
Attorneys for Defendant
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700

TO:      JAY CLAYTON
       United States Attorney
       Southern District of New York
       26 Federal Plaza, 37th Floor
       New York, New York 10278
       Attn: AUSAs David Markewitz, Timothy Capozzi, and Adam Sowlati

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

I.  INTRODUCTION .................................................................................................................1

II. FACTUAL BACKGROUND ...............................................................................................1

    A.  The lead-up to the searches ............................................................................................1

    B.  The email search warrant ...............................................................................................2

    C.  The warrant to search Mr. Rinsch's electronic devices ..................................................5

III. THE SEARCH WARRANTS WERE ISSUED IN VIOLATION OF THE
       FOURTH AMENDMENT, AND THE COURT SHOULD ORDER
       SUPPRESSION ...................................................................................................................7

    A.  The search warrant applications did not establish probable cause to
         believe Mr. Rinsch's Gmail account and electronic devices would
         contain evidence of a crime ............................................................................................8

    B.  The search warrants were defective ..............................................................................10

        1.  The warrants were overbroad .................................................................................11

        2.  The warrants lacked particularity ..........................................................................13

    C.  The Court should order suppression .............................................................................16

        1.  Suppression would satisfy the purposes of the exclusionary rule ..........................16

        2.  The "good faith exception" cannot rescue the warrants .........................................16

IV. CONCLUSION ..................................................................................................................18

| Cases | Page(s) |
|---|---|

*Arizona v. Gant,*
    556 U.S. 332 (2009) .................................................................. 10

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971) ........................................................ 7, 11, 15

*Elkins v. United States,*
    364 U.S. 206 (1960) .................................................................. 16

*Groh v. Ramirez,*
    540 U.S. 551 (2004) .................................................................. 18

*Illinois v. Gates,*
    462 U.S. 213 (1983) .................................................................... 8

*In re Grand Jury Proceedings,*
    716 F.2d 493 (8th Cir. 1983) ................................................... 12

*Malley v. Briggs,*
    475 U.S. 335 (1986) .................................................................. 17

*Marron v. United States,*
    275 U.S. 192 (1927) .................................................................. 14

*Riley v. California,*
    573 U.S. 373 (2014) ........................................................ 8, 10, 16

*Stanford v. Texas,*
    379 U.S. 476 (1965) .................................................................. 15

*Terry v. Ohio,*
    392 U.S. 1 (1968) ...................................................................... 16

*United States v. Banyan, 25-Cr-208*
    (JSR), 2025 WL 1922025 (S.D.N.Y. July 14, 2025) .................... 10

*United States v. Blake,*
    868 F.3d 960 (11th Cir. 2017) .................................................. 13

*United States v. Buck,*
    813 F.2d 588 (2d Cir. 1987) ................................................ 15, 17

*United States v. Calandra,*
    414 U.S. 338 (1974) .................................................................. 16

*United States v. Clark,*
638 F.3d 89 (2d Cir. 2011) ................................................................ 17

*United States v. Comprehensive Drug Testing, Inc.,*
621 F.3d 1162 (9th Cir. 2010) (en banc) ........................................ 14

*United States v. Diaz,*
841 F.2d 1 (1st Cir. 1998) ........................................................ 11, 12

*United States v. Galpin,*
720 F.3d 445 (2d Cir. 2013) ...................................... 7, 8, 10, 14

*United States v. Ganias,*
824 F.3d 199 (2d Cir. 2016) (en banc) ........................................... 7

*United States v. George,*
975 F.2d 72 (2d Cir. 1992) ...................................... 14, 15, 17, 18

*United States v. Kow,*
58 F.3d 423 (9th Cir. 1995) ..................................................... 12, 17

*United States v. Lazar,*
604 F.3d 230 (6th Cir. 2010) .......................................................... 13

*United States v. Leon,*
468 U.S. 897 (1984) ......................................................................... 17

*United States v. Maxwell,*
920 F.2d 1028 (D.C. Cir. 1990) ..................................................... 11

*United States v. Pabon,*
871 F.3d 164 (2d Cir. 2017) .............................................................. 8

*United States v. Pinto-Thomaz,*
352 F. Supp. 3d 287 (S.D.N.Y. 2018) ............................................. 9

*United States v. Reilly,*
76 F.3d 1271 (1996) ........................................................................ 17

*United States v. Roberts,*
430 F. Supp. 3d 693 (D. Nev. 2019) ............................................. 13

*United States v. Rosa,*
626 F.3d 56 (2d Cir. 2010) .............................................................. 11

*United States v. Shipp,*
392 F. Supp. 3d 300 (E.D.N.Y. 2019) ..................................... 11, 13

*United States v. Silva,*
   2025 WL 2078339 (2d Cir. 2025) ......................................................................... 9

*United States v. Voustianiouk,*
   685 F.3d 206 (2d Cir. 2012) ............................................................................... 7

*United States v. Wey,*
   256 F. Supp. 3d 355 (S.D.N.Y. 2017) ......................................................... 15, 16

*United States v. Winn,*
   79 F. Supp. 3d 904 (S.D. Ill. 2015) ................................................................. 13

*United States v. Zemlyansky,*
   945 F. Supp. 2d 438 (S.D.N.Y. 2013) ............................................................. 18

*VonderAhe v. Howland,*
   508 F.2d 364 (9th Cir. 1974) ........................................................................... 15

**Statutes**
§ 922(g)(1) ............................................................................................................ 13

**Other**
*Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York,*
   11 Misc. 388 (S.D.N.Y. Nov. 14, 2014) ........................................................... 13

U.S. Const. amend. IV ..................................................................................... 7, 13

## I.   <u>INTRODUCTION</u>

Following a *New York Times* article about the troubled production of Carl Rinsch's television show, *White Horse*, the government obtained search warrants to comb through Mr. Rinsch's personal email account and electronic devices in a hunt for evidence of wire fraud. Those warrants – which permitted a free-wheeling search through Mr. Rinsch's digital data – failed to establish a nexus between the charged crimes and the places to be searched, were unconstitutionally overbroad, and lacked sufficient particularity. The Court should suppress the fruits of the government's unlawful searches.

## II.   <u>FACTUAL BACKGROUND.</u>

### A.  The lead-up to the searches.

In 2010, Mr. Rinsch, an award-winning filmmaker, began to develop a short-form science fiction television series called *White Horse*. With funding from production companies and a celebrity investor – and millions of his own dollars – Mr. Rinsch spent several years producing and shooting six episodes of the show and a trailer showing the direction it would take. The episodes and trailer were impressive: the show starred recognizable actors, integrated high-level special effects, and had a novel, complex narrative.

Around 2017, through his production company, Home VFX, Mr. Rinsch began shopping *White Horse* to streaming companies. A bidding war ensued and Netflix emerged victorious. In November 2018, Netflix and Home VFX executed a term sheet, by which Netflix secured the rights to stream *White Horse* in exchange for paying Mr. Rinsch and his investors for the money they had already spent and funding the completion of the show's 110- to 120-minute first season. Among the deal's terms, Netflix agreed to make various payments to Home VFX at certain contractual milestones, including $11.218 million upon completion of principal photography.

Throughout 2018 and 2019, Mr. Rinsch continued to work on *White Horse*. He shot on location in South America and Europe, made several adjustments to the script including an expansion

of the plot arc, and negotiated with Netflix about additional funding to film content beyond the 110-120 minutes contemplated under the term sheet. Eventually, Mr. Rinsch notified Netflix that principal photography on the show's first season had been completed – triggering Netflix's obligation to pay him $11.218 million – and that he required payment to move forward with filming beyond the first season. Negotiations ensued, resulting in Netflix agreeing to pay Mr. Rinsch $11 million on March 5, 2020.

A few weeks later, the COVID-19 pandemic brought most entertainment production to a screeching halt. Then, over the next several months, Netflix executives became concerned about Mr. Rinsch's mental health, which they believed had drastically decompensated. In the fall of 2020, after a change in corporate leadership, Netflix decided to write off *White Horse* as a loss for tax purposes and stopped supporting the production. Meanwhile, Mr. Rinsch's wife and co-producer filed for divorce, and Mr. Rinsch brought an arbitration proceeding against Netflix to recover the $218,000 he was still owed for completing principal photography on the first season. In November 2023, the saga of *White Horse*'s production was published in the *New York Times*.

After reading that account, the U.S. Attorney's Office for the Southern District of New York began investigating Mr. Rinsch for wire fraud – despite the situation having no conceivable connection to the District – on the theory that Mr. Rinsch had promised to spend the $11 million he received in March 2020 on *White Horse* but instead used the money for investments and luxury purchases.

### B. The email search warrant.

On February 26, 2024, FBI Special Agent Nicholas DiMarino applied for a warrant to search Mr. Rinsch's Gmail account, which DiMarino speculated would contain evidence of a "wire fraud and wire fraud conspiracy for a scheme to defraud Netflix out of funds that were purportedly for the

purpose of producing a television show." Ex. A [Gmail warrant affidavits], ¶ 3.[1] DiMarino asserted that there was probable cause to believe Mr. Rinsch "stole approximately $20 million of the funds that Netflix provided to Home VFX by transferring them to his personal bank accounts, and Home VFX never provided Netflix with a completed television show." *Id.* ¶¶ 10-11.

DiMarino relied on three sets of records to support his claim that there was probable cause to believe Mr. Rinsch had committed wire fraud. First, DiMarino cited internal Netflix records, including 2019 email exchanges describing Mr. Rinsch's requests for more funding to keep *White Horse* afloat; an email in February 2020 in which Mr. Rinsch requested payment for completing principal photography; and the March 2020 email exchange in which Netflix purportedly "agree[d] to pay Rinsch $11 million more for *White Horse.*" *Id.* ¶ 12. Second, DiMarino relied on records from Mr. Rinsch's divorce proceeding, in which Mr. Rinsch filed declarations documenting the development of *White Horse*; testified about his spending in 2021 after Netflix declined to further support the production, including on "props, wardrobe, [and] furniture for the production"; agreed that some production funds had been invested in cryptocurrency, but had been "earmarked to delivering the product"; and acknowledged certain obligations to Netflix and the production. *Id.* ¶¶ 15-16. And third, DiMarino referenced bank records detailing the movement of funds between various accounts. *Id.* ¶¶ 17-23.

DiMarino next asserted that there was probable cause to believe Mr. Rinsch's Gmail account would contain evidence of wire fraud. Conceding that Mr. Rinsch's primary email account was with a service called Runbox, DiMarino stated that he knew from a "review of publicly available material"

---

[1] The Gmail warrants and accompanying affidavits were captioned 24-Mag-832 and 24-Mag-854. Exhibit A to this motion contains both affidavits, and Exhibit B contains both warrants. The warrant affidavits were identical in all respects except the second was submitted to correct a typographical error, and were separated by one day, and Mr. Rinsch is moving to suppress the fruits of both warrants. In addition to Mr. Rinsch's Gmail account, the warrants authorized searches of email accounts associated with other individuals. Mr. Rinsch is moving to suppress the fruits of the warrants to search his Gmail account only.

that Runbox was "located abroad and unlikely to comply with a search warrant." *Id.* ¶ 24. He therefore demanded to search Mr. Rinsch's Gmail account, "an alternate account." *Id.* The only support DiMarino offered for his belief that Mr. Rinsch's "alternate account" would contain evidence of wire fraud was that Mr. Rinsch asked Netflix to copy his Gmail account on an email in July 2020 because the Runbox server was down that day; the Gmail account was copied on an email chain in the "summer and fall of 2020" regarding a potential actor for *White Horse*; the Gmail account was copied on an email Netflix sent to the Runbox account in November 2020; and the Gmail account was copied on an April 2021 email sent from the Runbox account discussing the possibility of a lawsuit. *Id.* ¶ 25. Aside from being copied on a few discrete emails in late 2020, DiMarino provided no factual connection between Mr. Rinsch's Gmail account and the suspected crimes.

Nevertheless, based on his "training and experience," DiMarino declared that a "sophisticated and long-running fraud" like the one alleged "would necessarily have involved the use of email." *Id.* ¶ 29. Therefore, according to DiMarino, Mr. Rinsch's alternate Gmail account would be expected to contain "representations made by Rinsch to Netflix and others about *White Horse* in order to obtain funds"; "internal communications between Rinsch and his associates revealing the true status of the *White Horse* production and Rinsch's intentions as to the funds"; and "information about how Rinsch spent the funds he obtained from Netflix." *Id.* ¶ 29. Moreover, even though the Gmail account was only occasionally copied on emails in the summer and fall of 2020, DiMarino demanded permission to search the account for all emails between August 2017 and July 2022. DiMarino claimed August 22, 2017, was the appropriate starting point because that was three months before "a talent agency pitched *White Horse* to Netflix on Rinsch's behalf on or about November 22, 2017." *Id.* ¶ 30. Meanwhile, July 26, 2022, would be an appropriate endpoint because that was "the date on which counsel for Rinsch transmitted a demand for payment to Netflix that appears to have turned into an arbitration." *Id.*

DiMarino informed the magistrate that the government would undertake a "cursory inspection of all emails" in Mr. Rinsch's Gmail account, since "keyword searches and similar methods are typically inadequate to detect all information subject to seizure." *Id.* ¶ 34. He requested permission to search for: (1) "communications regarding the television series known as 'White Horse' or 'Conquest'"; (2) "communications regarding the disposition of funds provided by Netflix"; and (3) the location of "other evidence (e.g. emails reflecting registration of other online accounts potentially containing relevant evidence)." *Id.* ¶ 32.

Magistrate Judge James Cott issued the requested warrant. In addition to email content between August 22, 2017, and July 26, 2022, the warrant permitted a search of all "Google Services information," "including Google Drive, Google Docs, Google Photos, Google Calendar, Google Chats, Google Hangouts, Google Photos, Web and Search History, and Google Payments"; address book information; subscriber and payment information; transactional records; customer correspondence; and preserved or backup records. Ex. B.

### C. The warrant to search Mr. Rinsch's electronic devices.

On March 18, 2025, federal agents executed a search warrant at Mr. Rinsch's California home. They seized two iPhones, two MacBook laptops, and three hard drives. Ex. C [device warrant affidavit], ¶ 3. On April 2, 2025, DiMarino applied for a warrant to search those devices for evidence of wire fraud, money laundering, and engaging in monetary transactions in property derived from specific unlawful activity. *Id.* ¶ 6.

DiMarino asserted that there was probable cause to believe that evidence of the charged crimes would be found on the devices. *Id.* ¶ 15. As to the cell phones, DiMarino conceded that Mr. Rinsch was "now using a different cellphone than he used in 2020." *Id.* ¶ 16 n.2. He averred, however, that based on his "training and experience" he knew "that many people back up files from their cellphone or laptop and can upload those files to a new device." *Id.* ¶ 16(a). DiMarino declared in conclusory

fashion that there was "reason to believe" Mr. Rinsch may have backed up or synced data from his older iPhone either to his new phones or his laptops. *Id.* ¶ 16(b).

Further, DiMarino insisted that even if data had not been backed up, "it is possible that one or more of the Subject Devices are logged into online accounts that Rinsch was using while committed [sic] the Subject Offenses." *Id.* ¶ 16(c). Specifically, Mr. Rinsch's Runbox email address was still associated with his Apple and Google accounts – including being the recovery email address for the Google account. *Id.* Without producing any evidence that Mr. Rinsch had ever used the specific laptops or cell phones at issue to log into his Runbox account, or providing any information about the last time that account was accessed, DiMarino instead stated that his "training and experience" taught him that people use their cellphones and laptops to send and receive messages. *Id.* Therefore, according to DiMarino, it was possible that one of the devices might be logged into the Runbox account, and that messages from that account might still be accessible on the devices. *Id.*

Finally, as to the hard drives, DiMarino – without even citing any training or experience – simply declared that "these are the sorts of devices on which people will often store large files, such as video files, including video files that are in the process of being edited." *Id.* ¶ 17. According to DiMarino, that "could include footage that Rinsch shot of *White Horse* but never delivered to Netflix," including work done after the March 2020 wire transfer. *Id.*

DiMarino thus requested a warrant to search the electronic devices, conceding that a "complete review of all the ESI from" the devices might be necessary. *Id.* ¶ 22. He again claimed that "keyword searches" would be insufficient and, instead, each file on each device might need to be opened. *Id.* ¶¶ 21-22.

Magistrate Judge Barbara Moses issued the warrant. The warrant permitted a broad search through all the files on the electronic devices to find potential evidence, including: "evidence concerning Carl Rinsch's communications, representations, and omissions with respect to his

contractual relationship with Netflix regarding *White Horse*"; "evidence of any work or lack of work performed on *White Horse*, including but not limited to audio or video footage, photography, sketches or drawings, costumes, props, storyboarding, or records of payments to actors, artists, and crew members"; and "evidence concerning fraudulent purchases Carl Rinsch made with the money received from Netflix in or about March 2020." Ex. D.

### III. THE SEARCH WARRANTS WERE ISSUED IN VIOLATION OF THE FOURTH AMENDMENT, AND THE COURT SHOULD ORDER SUPPRESSION.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. That amendment was adopted to combat the "specific evil" of the "'general warrant' abhorred by the colonists," and to prevent the government from engaging in a "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). As a result, the constitutional "requirements regarding search warrants are not formalities." *United States v. Voustianiouk*, 685 F.3d 206, 210 (2d Cir. 2012) (citations omitted). They are, rather, central to the very concept of liberty.

Adherence to the Fourth Amendment is particularly important when it comes to searches of digital data, which, in modern society, often contain the most intimate details of a person's life. The Second Circuit has acknowledged that such searches "can give the government possession of a vast trove of personal information . . . much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (en banc). As such, there is an "enormous" "potential for privacy violations occasioned by an unbridled, exploratory search" of digital data, a "threat [that] is compounded by the nature of digital storage." *United States v. Galpin*, 720 F.3d 445, 447 (2d Cir. 2013).

Searches of cell phones and computers are especially problematic. As the Supreme Court has acknowledged, "a cell phone search would typically expose to the government far *more* than the most

exhaustive search of a house. A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." *Riley v. California*, 573 U.S. 373, 396-97 (2014). Such searches "implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 393. In the digital realm, the mandates of the Fourth Amendment, such as the particularity requirement, "assume[ ] even greater importance." *See Galpin*, 720 F.3d at 446.

Here, the government was given permission to conduct a roving search through Mr. Rinsch's personal email account, cell phones, computers, and hard drives. Each search warrant the magistrates issued lacked a nexus to the charged offenses, was hopelessly overbroad, and contained no meaningful boundaries on its execution. The Court should, therefore, grant suppression.

A. **The search warrant applications did not establish probable cause to believe Mr. Rinsch's Gmail account and electronic devices would contain evidence of a crime.**

The first, and most basic, requirement of the Fourth Amendment is that a search warrant must be supported by probable cause. A "determination of probable cause to search is not the same as a determination that there is, at the same time, probable cause to arrest, or vice versa." *United States v. Pabon*, 871 F.3d 164, 181 (2d Cir. 2017). Instead, to obtain a search warrant, the government must establish a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Here, DiMarino's affidavits failed to establish probable cause to believe there would be evidence of the suspected offenses in Mr. Rinsch's Gmail account or on his personal electronic devices. First, as to the Gmail account, DiMarino conceded that Mr. Rinsch's primary email account was on a different server, Runbox. He provided no evidence that Mr. Rinsch ever directly emailed Netflix from his Gmail account, conducted business from his Gmail account, or used the Gmail account as anything other than an alternative account that was copied on a few emails in late 2020.

Even in DiMarino's exhaustive accounting of emails sent by Mr. Rinsch's ex-wife and personal assistants, he identified only one email on which Mr. Rinsch's Gmail account was even *copied*: an email in late 2020 with a talent agent about a potential actor for *White Horse*. Ex. A, ¶ 25(c)(i). All told, while DiMarino's affidavit would certainly have provided probable cause to search Mr. Rinsch's Runbox account, it was woefully insufficient to establish that Mr. Rinsch's rarely used, alternative Gmail account would contain evidence of fraud or Mr. Rinsch's use of funds.[2]

DiMarino's application for a warrant to search Mr. Rinsch's devices fared no better. DiMarino conceded that Mr. Rinsch was not using the same cell phone he had owned at the time of the suspected offenses. DiMarino nevertheless baldly asserted that, based on his "training and experience," it was possible Mr. Rinsch had backed up the data from his old iPhone either to his new phone or his laptops. And DiMarino continued to speculate that it was possible Mr. Rinsch's devices were logged into relevant accounts because DiMarino's "training and experience" taught him that people use their devices to send messages. "Training and experience," however, can only support a probable cause determination "where it is combined with enough other specific, factual allegations that tend to link the alleged criminal conduct to the place to be searched." *United States v. Silva*, 2025 WL 2078339, at *4 (2d Cir. 2025). DiMarino provided no factual allegations linking Mr. Rinsch's alleged wire fraud from several years ago to Mr. Rinsch's current phones or laptops, other than the common knowledge that *some* people *sometimes* back up their devices and send messages from them. Such an "insipid generalization [was] hardly sufficient" to support the wholesale search of Mr. Rinsch's cell phones or

---

[2] This places Mr. Rinsch's Gmail account – and the likelihood it would contain any evidence of wrongdoing – in a far different category than the account belonging to the defendant in *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018). Unlike in *Pinto-Thomaz*, there was no evidence averred in DiMarino's affidavit that Mr. Rinsch's Gmail account was actually used to conduct any suspected criminal activity, rather than merely being copied on the occasional innocuous communication with a different account.

computers.  *See United States v. Banyan*, 25-Cr-208 (JSR), 2025 WL 1922025, at *5 (S.D.N.Y. July 14, 2025).

As to the hard drives seized from Mr. Rinsch's home, DiMarino did not even bother citing any "training and experience."  Instead, he stated in conclusory fashion that hard drives could contain video files, and therefore "could include footage that Rinsch shot of *White Horse* but never delivered to Netflix." Ex. C, ¶ 17.  Of course, however, the government's entire wire fraud theory was that Mr. Rinsch did *not* continue to work on *White Horse*, so it is unclear why undelivered *White Horse* footage would constitute evidence of a crime.  In any event, DiMarino's affidavit contained no case-specific factual allegations supporting the inference that Mr. Rinsch possessed undelivered film footage, much less stored it on retail-size hard drives in his apartment.  DiMarino's affidavit was instead "based on broad generalizations, gross speculations, and hunches untethered to any actual evidence, and thus there was no substantial basis for the finding of probable cause." *Banyan*, 2025 WL 1922025, at *6 (citations omitted).

In sum, DiMarino failed to provide case-specific factual allegations demonstrating that Mr. Rinsch's Gmail account or electronic devices potentially contained evidence of wire fraud.  The Court should, therefore, grant suppression.

### B.  The search warrants were defective.

"[G]eneral warrants" were the "chief evil that prompted the framing and adoption of the Fourth Amendment." *Galpin*, 720 F.3d at 445.  Opposition to such warrants was "in fact one of the driving forces behind the Revolution itself." *Riley*, 573 U.S. at 403.  As a result, the Framers designed the Fourth Amendment to prohibit general warrants, which the British had used to exercise "unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009).  To accomplish this, the Fourth Amendment requires that warrants satisfy two distinct

limitations: they must not be overbroad and they must be sufficiently particularized. *Coolidge*, 403 U.S. at 467.

The warrants at issue in Mr. Rinsch's case suffered from both defects the Fourth Amendment was adopted to avoid. They were wildly overbroad, permitting a broad-ranging search through all of the contents of Mr. Rinsch's Gmail account and electronic devices, without meaningful limitation. And they lacked sufficient particularity, leaving it to the government to determine what was and was not subject to seizure. Suppression must therefore be granted.

### 1. The warrants were overbroad.

"In determining whether a warrant is overbroad, courts must focus on whether there exists probable cause to support the breadth of the search that was authorized." *United States v. Shipp*, 392 F. Supp. 3d 300, 307 (E.D.N.Y. 2019) (citations omitted). Especially in the digital context, warrants allowing far-reaching searches of all of an individual's data are insufficient to "link that evidence to the criminal activity supported by probable cause." *United States v. Rosa*, 626 F.3d 56, 62 (2d Cir. 2010). Similarly, warrants authorizing the seizure and search of records generated outside the time range of the alleged criminal activity are unconstitutional. *See, e.g.*, *United States v. Diaz*, 841 F.2d 1, 4-5 (1st Cir. 1998) (warrant authorizing seizure of records that predated first incident of criminality cited in affidavit was overbroad). And the scope of any search must be narrowly tailored; mere "references to broad statutes realistically constitute no limitation at all on the scope of an otherwise overbroad warrant and therefore cannot save it." *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990).

Here, both the Gmail warrant and the device warrant were hopelessly overbroad. Both warrants allowed searches that far exceeded any reasonable temporal limitations. The Gmail warrant, for instance, permitted the government to review of all of Mr. Rinsch's emails from August 22, 2017 to July 26, 2022 – a period beginning three months before *White Horse* was first pitched to Netflix and ending when Mr. Rinsch initiated an arbitration to recover funds Netflix had improperly withheld.

Ex. B.  DiMarino's affidavits, however, provided no support for such a broad-ranging and arbitrary time frame.  The alleged fraudulent misrepresentation did not happen until March 5, 2020, and DiMarino provided no explanation for why there would be probable cause to think emails from years earlier might contain evidence of wire fraud.  Indeed, by all accounts, Mr. Rinsch was actively working on *White Horse* prior to March 5, 2020, and DiMarino provided no evidence other than base speculation to believe that Mr. Rinsch's alternative Gmail account would contain any evidence of planning, lack of work, or misuse of funds prior to that date.  Likewise, the separate device warrant contained practically no temporal limitation at all, and for certain categories of evidence permitted the government to review all of Mr. Rinsch's electronic data on his cell phones, laptops, and hard drives from *any* date.[3]  Such broad warrants simply cannot withstand constitutional scrutiny.  *See, e.g., United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (warrant improperly allowed seizure of records without limitation to time period when criminal activity took place); *Diaz*, 841 F.2d at 4-5 (warrant that authorized seizure of records predating first incident of criminality was overbroad); *In re Grand Jury Proceedings*, 716 F.2d 493, 499 (8th Cir. 1983) (fraud in two financial transactions could not support warrant covering entire seven years of bail bondsman's records).

The warrants were also overbroad because they permitted free-wheeling searches of locations where relevant evidence could not possibly be found.  For example, the Gmail warrant permitted law enforcement to read every single email in Mr. Rinsch's account in the time frame listed, based purely on DiMarino's assertion that keyword searches might not work.  Gmail Warr. ¶ 34.  It is, however, hard to conceive of a situation where a keyword search would be more likely to suffice than a search

---

[3] The only delineated date limitation in the device warrant was the provision that three of the ten permissible categories of evidence – the misuse of funds, fraudulent purchases, and efforts to conceal detection – had to post-date March 2020.  Ex. D.

through emails.[4]  The Gmail warrant further permitted the government to peruse Mr. Rinsch's photographs, calendars, Google drive account, and web and search history – locations where relevant evidence about "communications . . . regarding 'White Horse'" could not conceivably exist.  Ex. B. And the device warrant permitted the government to review every piece of data contained on Mr. Rinsch's cell phones, laptops, and hard drives.

Since DiMarino's affidavits failed to provide any nexus between the unlimited locations to be searched and the kind of evidence to be seized, the warrants were flatly overbroad.  *See, e.g.*, *United States v. Roberts*, 430 F. Supp. 3d 693, 717 (D. Nev. 2019) (cell phone warrant overbroad when no time limitation, no connection between burglaries and cell phone, and no safeguard to prevent seizure of information outside scope of criminal activity); *United States v. Winn*, 79 F. Supp. 3d 904, 919-20 (S.D. Ill. 2015) (warrant overbroad when it allowed seizure of all files on cell phone, since no explanation in warrant application of how files like calendars and GPS history connected to criminal activity).  That the warrants could have been narrowly tailored, but were not, constitutes *prima facie* evidence of overbreadth.  *See Shipp*, 392 F. Supp. 3d at 309-10 (disapproving of warrant to search through every aspect of Facebook for evidence of § 922(g)(1) violation); *see also United States v. Blake*, 868 F.3d 960, 966-67 (11th Cir. 2017) (warrant requiring Facebook to turn over all data was overbroad); *United States v. Lazar*, 604 F.3d 230 (6th Cir. 2010) (warrant to search physician's records overbroad because did it not reference specific patients, transactions, or time frame).

### 2.  The warrants lacked particularity.

In addition to being narrowly tailored, a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  To satisfy the

---

[4] Notably, for years, the model electronic discovery order promulgated by the United States District Court for the Southern District of New York for use in complex civil cases specifically commended keyword searches as a preferred method for the review of electronically storied information. *See* Standing Order, *In re. Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York*, 11 Misc. 388 (LAP) (S.D.N.Y. Nov. 14, 2014).

particularity requirement, a warrant must identify the specific offense for which probable cause exists, describe the place to be searched, and specify the items to be seized in relation to the designated crime. *Galpin*, 720 F.3d at 445-46. This requirement is designed to make "general searches . . . impossible and prevent[] the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927). A "failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992). Put differently, "as to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron*, 275 U.S. at 196.

Warrants to rummage through digital data raise grave particularity concerns. Given the sensitivity of personal information stored online, the "potential for privacy violations occasioned by an unbridled, exploratory search" of such data is "enormous." *Galpin*, 720 F.3d at 446-47. That "threat is compounded by the nature of digital storage," since, unlike in searches of homes or similar locations, the limitations imposed by the physical dimensions of places where evidence can be found "are largely absent" in the digital realm. *Id.* at 447. This creates the "serious risk that every warrant for electronic information will become, in effect, a general warrant." *Id.* (quoting *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010) (en banc)). The Second Circuit has held that "[t]his threat demands a heightened sensitivity to the particularity requirement in the context of digital searches." *Galpin*, 720 F.3d at 447.

Measured by that standard, the warrants issued here lacked sufficient particularity. The Gmail warrant, for instance, permitted a search for *any* "communications" regarding *White Horse*, regardless of their content; "communications regarding the disposition of funds provided by Netflix," regardless of date or purpose; and broadly the "location of other evidence," without definition. Ex. B. The device warrant was even less specific: law enforcement was authorized to search for evidence of Mr.

Rinsch's communications about his "contractual relationship with Netflix" and evidence of his "omissions" regarding that relationship, without defining either the relationship or what would constitute an omission; "evidence of any work or lack of work performed on *White Horse*," without defining what work Mr. Rinsch was required to perform, setting a date range, or defining what would constitute "work or lack of work"; and "evidence concerning fraudulent purchases Carl Rinsch made with the money received from Netflix in or about March 2020," without defining what a "fraudulent purchase" would be and which purposes were purportedly permissible and non-fraudulent. Ex. D.

These were, therefore, the very definition of general warrants: warrants containing a clause granting the government unbridled discretion to conduct a broad, exploratory search for anything it considered to be of evidentiary value. *See United States v. Buck*, 813 F.2d 588, 591-92 (2d Cir. 1987) (warrant impermissible when it only described charged crimes but gave no limitation on kinds of evidence sought); *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974) (probable cause to believe certain documents establishing tax fraud might be found could not authorize search of all books and records of dental practice, along with personal and private papers); *United States v. Wey*, 256 F. Supp. 3d 355, 386 (S.D.N.Y. 2017) (warrant containing no practical guidance for agents to distinguish between materials of evidentiary value and those obviously devoid of it constituted a general warrant); *see also Stanford v. Texas*, 379 U.S. 476, 511-12 (1965) (particularity "is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain"). And the mere fact that the warrants referenced a "broad criminal statute" – wire fraud – was insufficient guidance for Fourth Amendment purposes. *George*, 975 F.2d at 75-76.

\* \* \*

The Supreme Court has interpreted the Fourth Amendment to mean that "searches deemed necessary should be as limited as possible." *Coolidge*, 403 U.S. at 467. The warrants issued here did not meet that basic constitutional requirement. Suppression should be ordered.

### C. The Court should order suppression.

#### 1. *Suppression would satisfy the purposes of the exclusionary rule.*

The exclusionary rule, which permits the suppression of evidence obtained pursuant to an unconstitutional search, is designed to serve three purposes. First, it is meant to deter police misconduct. *Elkins v. United States*, 364 U.S. 206, 217 (1960). Second, it protects judicial integrity by preventing the courts from becoming parties to lawless invasions of a citizen's constitutional rights. *Terry v. Ohio*, 392 U.S. 1, 13 (1968). And third, it promotes public trust by assuring the public that the government cannot profit from unlawful behavior. *United States v. Calandra*, 414 U.S. 338, 357 (1974) (Brennan, J., dissenting).

Here, suppression would serve all three purposes. From a deterrence perspective, suppression is necessary to ensure that law enforcement never again engages in the kind of broad, unconstitutional search of the most intimate details of a person's life like they have engaged in here. The government obtained overbroad search warrants to peruse Mr. Rinsch's emails and comb through his digital data. "These are precisely the sort of circumstances, rare or not, that call for blanket suppression." *Wey*, 256 F. Supp. 3d at 410.

Likewise, suppression would ensure that the court system is not made a party to such blanket invasions of privacy. And it would reassure the public, who are the "potential victims" of such misbehavior, that the government cannot profit from its actions here. *See Calandra*, 414 U.S. at 357 (Brennan, J., dissenting). Given that, in modern society, nearly everyone has an email account and digital devices, it is critical for the Court to reassure members of the public that their most intimate and personal information will not be subject to unlawful searches like those conducted here. *See Riley*, 573 U.S. at 385 (cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy").

#### 2. *The "good faith exception" cannot rescue the warrants.*

The government cannot rely on the "good faith exception" to sustain these warrants. Under that (much-criticized) rule, suppression is considered inappropriate when an officer acts in "reasonable reliance on a search warrant issued by a detached and neutral magistrate." *United States v. Leon*, 468 U.S. 897, 900 (1984). "Good faith," however, "is not a magic lamp for police officers to rub whenever they find themselves in trouble." *United States v. Reilly*, 76 F.3d 1271, 1280 (1996). The exception is, instead, wholly inapplicable in several situations, all of which are present in Mr. Rinsch's case.

First, the exception does not apply when a warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (citations omitted). Here, as discussed earlier, DiMarino's affidavits contained practically no basis for probable cause. As such, no FBI agent could have relied on the resulting warrants in good faith. *See Malley v. Briggs*, 475 U.S. 335, 345-46 (1986) (officer could not rely on good faith exception when he knew he lacked probable cause to make warrant application); *United States v. Clark*, 638 F.3d 89, 103-04 (2d Cir. 2011) (good faith inapplicable when officer filed barebones affidavit that was "almost calculated to mislead") (quotations omitted).

Second, the good faith exception does not apply when a "warrant is so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. Prior cases have repeatedly condemned warrants containing language of the type at issue in this case. For instance, it is well-settled that it is unconstitutional to issue warrants allowing for the analysis of all documents, *Kow*, 58 F.3d at 428-29; warrants containing catch-all descriptions of evidence to be seized, *Buck*, 813 F.2d at 593 n.2 ("with respect to searches conducted hereafter, police officers may no longer invoke the reasonable-reliance exception . . . [to salvage] the fruits of searches undertaken on the basis of warrants containing only a catch-all description of the property to be seized"); warrants permitting searches for evidence of crimes defined only by references to broad criminal statutes, *George*, 975 F.2d at 77 ("it

was quite clear when this warrant was executed that 'limits' to a search consisting only of a broad criminal statute were invalid"); and warrants lacking meaningful temporal or content-based limitations, *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 465, 472 (S.D.N.Y. 2013) (finding deterrence necessary given obvious overbreadth of warrant; "the good faith exception should not be read so as to 'swallow the exclusionary rule'" (citations omitted)).

Under the circumstances, neither DiMarino nor any other reasonably-trained FBI agent could believe that warrants of the type issued here – to probe all digital data, with no particularity or meaningful time limitation – were valid. Accordingly, no reasonable officer could possibly have relied upon these warrants, and the good faith exception is inapplicable. *See Groh v. Ramirez*, 540 U.S. 551, 563-64 (2004).

## IV.   <u>CONCLUSION</u>

The government has engaged in a broad-ranging search of all of Mr. Rinsch's emails and digital data, utilizing defective warrants. The Constitution and circumstances demand suppression. Accordingly, the Court should suppress the fruits of the unlawful searches of Mr. Rinsch's Gmail account and digital devices.

Dated: August 18, 2025
     New York, New York

Respectfully submitted,

\_\_\_\_\_/s/_____

Ariel Werner
Michael Arthus
Neil P. Kelly
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8700