# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 832

In the Matter of a Warrant for All
Content and Other Information
Associated with Email Accounts ███████
████████████████████ ████
████████████████████
███████████████████ aintained at
Premises Controlled by Google LLC or
Yahoo Inc., USAO Reference No.
2023R01207

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK  )

NICHOLAS DIMARINO, Federal Bureau of Investigation, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation and am currently assigned to a squad investigating complex financial crimes. I have been a Special Agent since approximately September 2021. I have participated in investigations into criminal offenses involving wire fraud and money laundering and am familiar with the means and methods used to commit such offenses. During the course of these investigations, I have participated in the execution of search warrants involving emails and other forms of electronic evidence.

### B. The Providers, the Subject Accounts and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email accounts ██

USAO_RINSCH_00042533

████████████ (the "Rinsch Gmail Account:"); (2)████████████ (the "Weiner Gmail Account"); (3)████████████ (the "Skotnikova Gmail Account"); and (4)████████████ (the "Roses Yahoo Account," and together with the Rinsch Gmail Account, the Weiner Gmail Account, and the Skotnikova Gmail Accounts, the "Subject Accounts"). The Rinsch Gmail Account, Weiner Gmail Account, and Skotnikova Gmail Account are maintained and controlled by Google LLC ("Google"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The Roses Yahoo Account is maintained and controlled by Yahoo, Inc. ("Yahoo," and, together with Google, the "Providers"), headquartered at 391 San Antonio Road, 5th Floor, Mountain View, CA 94040. The information to be searched is described in the following paragraphs and in two Attachments A to the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud and wire fraud conspiracy for a scheme to defraud Netflix out of funds that were purportedly for the purpose of producing a television show), (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## C. Services and Records of the Provider

4. I have learned the following about Google:

2

████████

a.      Google offers to the public a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications using a username and password.  Once logged into a Google account, a user can connect to Google's full suite of services offered to the general public.

b.      In particular, as relevant here, Google offers free, web-based email services to the public.  Specifically, Google allows subscribers to maintain email accounts through Gmail under the domain gmail.com and other domain names chosen by the user or an enterprise.  A subscriber using Google's services can access his or her email account from any computer connected to the Internet.

c.      Google maintains the following records and information with respect to every Google account that has email services:

i.      *Email contents*.  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Google's servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Google's computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.  Google also allows users to send emails in "confidential" mode, which enables a user to set an expiration date for messages or revoke access at any time, and recipients of the confidential message will be unable to forward, copy, print, and download the message.

ii.      *Subscriber and billing information*.  Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, recovery and alternate email addresses, and sign-in

3

USAO_RINSCH_00042535

phone numbers. A recovery email address, which can be associated with more than one Gmail account, is used to regain access to an account if a password has been forgotten or a user has been locked out of their account. An alternate email address is a non-Gmail account that a user has provided that can be used to sign into a Gmail account. A sign-in phone number is a phone number that can be used as a primary/additional login identifier to access an account. Google also maintains records concerning the date on which the account was created, the Internet protocol ("IP") [1] address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of Google services utilized by the subscriber. Finally, Google maintains records regarding (1) fetching and forwarding email addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (2) email aliases, domain aliases or separate domains associated with the account, which are means by which accounts with other domain names or other email addresses can be associated with a primary Google account; (3) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (4) other email accounts that are associated with the primary Google account.

        iii.     *Device Information.* Google may also collect and maintain information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

---

[1] Based on my training and experience, each electronic device connected to the Internet must be assigned a unique IP address so that communications from or directed to that electronic device are routed properly.

09.20.2021

4

Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

         iv.     *Cookie Data.*  Google typically uses features to track the activity of users of its accounts, including whether or not the user of an account accesses other accounts at Google using the same computer or device, or accesses accounts maintained by other companies while logged into an account. One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

         v.     *Transactional information.*  Google also typically retains certain transactional information about the use of each account on its system, including records of login and logout events relating to Google accounts, including user IP addresses and dates and timestamps.

         vi.     *Customer correspondence.*  Google also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

         vii.     *Preserved and backup records.*  Google also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). Google may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

         d.     Google also maintains records with respect to other Google services, which it stores in connection with a Google account and includes the following:

09.20.2021

USAO_RINSCH_00042537

i. *Google Contacts.* Google provides an address book for Google accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Google preserves contacts indefinitely, unless the user deletes them.

ii. *Google Calendar.* Google provides users with the ability to create and maintain online calendars, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices. Users can share their calendars with other users, allowing the maintenance of joint calendars. Google preserves appointments indefinitely, unless the user deletes them.

iii. *Google Messaging Content.* Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user has not disabled that feature or deleted the messages.

iv. *Google Drive content.* Google Drive is a cloud storage service automatically created for each Google account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage

USAO_RINSCH_00042538

limit.  Google provides users with a certain amount of free storage, currently 15 gigabytes, and users can purchase a storage plan through Google to store additional content.  A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet.  Users can also share files stored on Google Drive with others and grant those with access the ability to edit or comment.  Google maintains a record of who made changes and when to documents edited in Google applications.  Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

v.      *Google Maps*.  Google Maps is service which can be searched for addresses or points of interest.  Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates.  Users can share their real-time location with others through Google Maps by using the Location Sharing feature.  If users log into their Google account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps.  Google stores Maps data indefinitely, unless the user deletes it.

vi.     *Google Photos*.  Google Photos is a cloud-based photo and video storage service through which users can share or receive photos and videos with others.  Users have the option to sync their mobile phone or device photos to Google Photos.  Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google Photos if that data is included by the user as part of the upload.  This metadata includes what is known as

09.20.2021

USAO_RINSCH_00042539

exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

vii.    *Google Voice*. Google Voice is a service through which a Google account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

viii.    *Location History data*. Google collects and retains data about the location at which Google account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. This location data may be associated with the Google account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google account, such as Location History or Web & App Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

ix.    *Chrome Browser and "My Activity" Data*. Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google account on Chrome and has the appropriate

09.20.2021

USAO_RINSCH_00042540

settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google account in a record called My Activity. My Activity also collects and retains data about searches that users conduct within their own Google account or using the Google Internet search engine available at http://www.google.com while logged into their Google account.

          x.      *YouTube.* YouTube is a video platform that offers Google accounts the ability to upload videos and share them with others. Users can create a YouTube channel where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like videos, share videos with others, and save videos to watch later. YouTube may keep track of a user's searches, likes, comments, and change history to posted videos. YouTube also may keep limited records of the IP addresses used to access particular videos posted on the service. For accounts created before June 2020, YouTube Watch History is stored indefinitely, unless the user manually deletes. For accounts created after June 2020, YouTube Watch History is stored for three years, unless the user manually deletes it.

    5.  I have learned the following about Yahoo:

        a.  Yahoo offers email services to the public. In particular, Yahoo allows subscribers to maintain email accounts under the domain name yahoo.com. A subscriber using Yahoo's services can access his or her email account from any computer connected to the Internet.

        b.  Yahoo maintains the following records and information with respect to every subscriber account:

          i.      *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Yahoo's servers unless and until the subscriber deletes the

09.20.2021

9

email.  If the subscriber does not delete the email, it can remain on Yahoo's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Yahoo's servers for a certain period of time.

           ii.    *Address book.*  Yahoo also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

           iii.    *Subscriber and billing information.*  Yahoo collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. Yahoo also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber.  Additionally, for paying subscribers, Yahoo maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

           iv.    *Transactional information.*  Yahoo also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through Yahoo's website).

           v.    *Customer correspondence.*  Yahoo also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

           c.    *Preserved and backup records.*  Yahoo also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).  The Provider may

09.20.2021

USAO_RINSCH_00042542

also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy

6. As explained herein, information stored in connection with a Google or Yahoo account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Google or Yahoo user's stored electronic communications, IP logs, and other data retained by Google or Yahoo, can indicate who has used or controlled the Google or Yahoo account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email content, and stored documents and photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Google or Yahoo account at a relevant time. Further, Google or Yahoo account activity can show how and when the account was accessed or used. For example, as described herein, Google and Yahoo log the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime(s) under investigation. Such information allows investigators to understand the geographic and chronological context of Google or Yahoo access, use, and events relating to the crime under investigation. Finally, Google or Yahoo account activity may provide relevant insight into the Google or Yahoo account owner's state of mind as it relates to the offense under investigation. For example, information stored in the Google or Yahoo account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting information in an

09.20.2021

USAO_RINSCH_00042543

effort to conceal evidence from law enforcement).  Search history, which Google maintains, can also provide important evidence of identity, state of mind, or criminal activity (*e.g.*, by indicating a search for how to dispose of or delete evidence).  Similarly, information stored in Google Drive, Google Docs, Google Photos, Google Calendar, Google Chats, Google Hangouts, Google Photos, Web and Search History, and Google Payments can provide important evidence of identity, state of mind, or criminal activity by, for example, logging payment activity which demonstrates the dissemination of fraud proceeds, recording communications, meetings, or photos with co-conspirators, and storing documents used in relation to the offenses.

**D. Jurisdiction and Authority to Issue Warrant**

7.    Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

8.    A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

9.    When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant.  18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

12

USAO_RINSCH_00042544

**II.Probable Cause**

  **A.  Probable Cause Regarding the Subject Offenses**

<u>**Overview**</u>

  10. In approximately 2018, Netflix committed approximately $60 million to a company called Home VFX in tranches, based on Home VFX meeting certain production milestones, to create a science fiction television show that was called both "White Horse" and "Conquest." CARL ERIK RINSCH was the CEO of Home VFX and exercised control of it.  At various times during the production of White Horse, RINSCH demanded additional funds from Netflix in order to create White Horse.  However, RINSCH in fact stole approximately $20 million of the funds that Netflix provided to Home VFX by transferring them to his personal bank accounts, and Home VFX never provided Netflix with a completed television show.

  11. The evidence in this case and relied upon below is based upon, among other things, (i) records provided by Netflix detailing the negotiations and terms between RINSCH and Netflix as regards White Horse; (ii) records from a divorce proceeding between RINSCH and his wife GABRIELLA ROSES,[2] who was a producer on White Horse; and (iii) bank records showing how RINSCH spent the funds Netflix sent him for the production of White Horse.

<u>**Records Provided by Netflix**</u>

  12. I know the following from my review of documents provided by Netflix in response to a subpoena, set forth in sum and substance, and in part:

    a.   I have reviewed a term sheet (the "Term Sheet") dated November 12, 2018:

---

[2] The divorce records refer to her as "Gabriella Rinsch," but she appears to typically go by "Gabriella Roses," and this application uses that name to refer to her.

USAO_RINSCH_00042545

        i.     The Term Sheet is between a subsidiary of Netflix and a company called Home VFX.

        ii.    CARL ERIK RINSCH signed the Term Sheet as CEO-President of Home VFX.

        iii.   The Term Sheet sets forth that the Netflix subsidiary committed $61,224,000 to purchase the rights to and fund the production of White Horse. The Term Sheet further provides that some of those funds were to be transferred to settle the claims of previous investors in White Horse; the funds were to be transferred in tranches based on various milestones.

        iv.   The Term Sheet noted that the Netflix subsidiary had already transferred $2,023,066.23 to Home VFX prior to the signing of the Term Sheet.

    b.  I have reviewed an email sent by a contractor for RINSCH to a Netflix executive dated March 28, 2019, in which the contractor stated that he quit the White Horse project because, "the fact that there is no accountant on the show does not allow me to do my job professionally."

    c.  I have reviewed an email sent by RINSCH to a Netflix executive copying the Roses Yahoo Account dated September 10, 2019, stating that he needed more funding from Netflix to complete White Horse, and if he did not receive that money, "It is stomach turning to know that we could easily find ourselves in a position, if not addressed now, of having made considerable commitments to service companies and cast/crew but have an empty bank account."

    d.  I have reviewed an internal chat between two Netflix executives dated September 20, 2019, in which one of the executives writes, "Carl [RINSCH] needs 8-9m more to finish. His lawyer claims."

14

USAO_RINSCH_00042546

e. I have reviewed an email from the Roses Yahoo Account to a Netflix executive dated October 12, 2019, in which ROSES attaches a "funding grid" for White Horse that purports to show that $15,167,745 will be required to complete the show.

f. I have reviewed an email from counsel for RINSCH to a Netflix executive dated October 31, 2019, attaching a written proposal for next steps.[3]  The document stated that it was designed to "provide immediate support and prevent collapse of production" and demanding that Netflix transfer $6.1 million in the immediate future.

g. I have reviewed an email response from the Netflix executive to counsel for RINSCH, also dated October 31, 2019, in which the Netflix executive wrote, "We spoke to Carl [RINSCH] this morning.  He agreed that he would leave 50% of what he has cash flowed thus far (i.e., 800k) in the production, Netflix would then accelerate $5.3M of our next installment to cover the remaining Hungary cash flow."

h. I have reviewed an email from RINSCH to Netflix executives, copying the Roses Yahoo Account, dated February 4, 2020, in which RINSCH attaches a letter demanding that he be paid $11,218,000 because principal photography on White Horse has been completed.

i. I have reviewed an email chain between counsel for RINSCH and Netflix executives dated March 4 and 5, 2020, in which Netflix agrees to pay RINSCH $11 million more for White Horse.

j. I have reviewed an email chain between Netflix executives dated September 16, 2020, showing that Netflix had spent at that point approximately $53 million on White Horse.

---

[3] The email is part of a chain, and I have only reviewed the reply by the Netflix executive, which attaches the written proposal. However, I understand from the context of the exchange that the executive was reattaching a proposal originally sent by RINSCH.

09.20.2021

USAO_RINSCH_00042547

k.  I know from my review of the emails produced by Netflix that RINSCH failed to deliver anything resembling a completed television show to Netflix.

13. I know from law enforcement communications with Netflix that Netflix and RINSCH are engaged in an arbitration about White Horse.

**Records from the Divorce Proceeding Between RINSCH and ROSES**

14. I have reviewed a divorce petition filed by ROSES against RINSCH on or about July 31, 2020.  While I understand that the documents filed in that divorce suit are publicly available, the documents I have reviewed from that suit were provided to law enforcement by Netflix in response to a subpoena.

15. I have reviewed a declaration filed by RINSCH in that divorce proceeding dated May 5, 2022, which states the following, set forth in substance and in part:

a.  RINSCH stated that he and ROSES "separated onn [sic] or about November 2018."[4]

b.  RINSCH stated that he founded the company Home VFX, Inc., formerly named "C.E. Rinsch, Inc." in 2010.

c.  RINSCH stated that, "Netflix provided the funding for the entire production budget for 'White Horse' up-front, and there are no other funds remaining with which to complete my 'White Horse' television series.  Netflix is not providing any further funds for production

---

[4] "The Second Circuit, like many other circuits, has adopted the view that permanent separation vitiates the marital communications privilege because society's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search for truth." *United States v. Etkin*, No. 07-CR-913(KMK), 2008 WL 482281, at *2 (S.D.N.Y. Feb. 20, 2008), (*citing In re Witness Before Grand Jury*, 791 F.2d 234, 238 (2d Cir. 1986)).

09.20.2021

USAO_RINSCH_00042548

expenses, so the project has effectively been shelved. I am not entitled to receive any further funds from Netflix in connection with the production of my 'White Horse' project."

        d. RINSCH stated that, "I developed the concept of 'White Horse' solely on my own, four (4) years before I had ever married Gabriela [ROSES]. I created the entire world in which 'White Horse' exists, as well as a design for the series, while I was still in production of the film 47 Ronin in 2010. I continued working on my 'White Horse' series from 2010-2011, researching and writing the series during this period. While in post-production for 47 Ronin, on or about 2011, I began to hire and employ third parties to work on my 'White Horse' series. In 2012, I began shooting material for my 'White Horse' series. Between 2012-2014, I continued filming material for my 'White Horse' series project. At the time of my marriage to Gabriela in 2014, I was already heavily invested in my 'White Horse' project. By 2014, I had already invested approximately $4.85 Million that I had inherited when my father passed away prior to my marriage to Gabriela. As the project progressed, I realized that I could not afford to continue financing the entirety of my 'White Horse' project on my own. As a result, I started looking for other investors in 2014 and eventually entered into the contract with Netflix described herein above. I initially employed a third party to work as a producer for my 'White Horse' television series project, but after marrying Gabriela [ROSES] in 2014, I hired her to work as a producer."

16. I have reviewed the following testimony of RINSCH provided in his divorce proceeding against ROSES on or about May 18, 2022:

| Q | And isn't it also true, Mr. Rinsch, that in April of 2021, you received a letter from Rochelle Gershon—by the way, do you know who Michelle Gershon is? |
|---|---|
| A | Yes |
| Q | Who is Ms. Rochelle Gershon, to your understanding? |
| A | She's the head of business affairs. |

09.20.2021

USAO_RINSCH_00042549

| Q | Yes. And Rochelle Gershon wrote to you, telling you, "Netflix is declining to support any further production efforts on your part, financial or otherwise." Do you recall receiving that letter? |
|---|---|
| A | Very much so, yes. |
| Q | Now, after April of 2021, you had monies that originally were received by you as production funds for the White Horse project, correct? |
| A | Yes, of course. |
| Q | And after April of 2021, after receiving Ms. Gershon's letter, you went out and bought, from those funds, various luxury automobiles, correct? |
| A | Among other things, yes. |
| Q | You titled those automobiles in your personal name, correct? |
| A | I'm under contract to -- |
| Q | Yes or no, sir |
| A | And—yes, sir. |
| Q | Okay |
| A | However, I would like to say that I am under contract with Netflix. Those are picture vehicles for the production and I've made that clear to your offices with support. |
| Q | Sir, you-- |
| A | And this is along the line of other, you know, props, wardrobe, furniture, for the production as per the last written agreement I have. |
| Q | But sir, you purchased those vehicles after you already received notification from Netflix that they were not—they were declining to support any further production efforts on your part. Isn't that true? Yes or no? |
| A | I mean, yes. |
|  | [] |
| A | I'm doing the best I can to fulfill my obligations and honor the deal with Netflix. I am concerned, always, that production funding should be used for production, as I am liable to my contract. |
|  | [] |
| COURT | Sir, Mr. Rinsch, so I think you said, well, did you say, sir, that the crypto that you acquired was from production funds as well? |
| A | Yes, sir. I received $41,302,000 from Netflix, and I received that money between 2018 and 2020. All of those funds are earmarked to delivering the product and that is my obligation. |

18

09.20.2021

**Bank Records**[5]

17. I know from my review of bank records produced in response to subpoenas that Netflix transferred approximately $41,302,000 to a bank account in the name of Home VFX ("VFX Bank Account-1") in the following transactions:

      a.    On or about June 29, 2018, Netflix transferred approximately $450,000 to VFX Bank Account-1.

      b.    Between on or about July 9, 2018, and September 18, 2018, Netflix sent 11 wires to VFX Bank Account-1 totaling approximately $1,573,066.23.

      c.    On or about December 5, 2018, Netflix transferred approximately $8,002,000 to VFX Bank Account-1.

      d.    On or about February 21, 2019, Netflix transferred approximately $5,000,000 to VFX Bank Account-1.

      e.    On or about August 12, 2019, Netflix transferred approximately $9,976,933.77 to VFX Bank Account-1.

      f.    On or about October 31, 2019, Netflix transferred approximately $5,300,000 to VFX Bank Account-1.

      g.    On or about March 6, 2020, Netflix transferred approximately $11,000,000 to VFX Bank Account-1.

---

[5] This investigation is ongoing, and law enforcement is still in the process of obtaining all relevant bank records.  In addition, in some instances, there have been subsequent payments going the opposite direction of the payments described in this section.  For example, this section describes large payments from VFX Bank Account-1 to Rinsch Bank Account-1.  In some instances, Rinsch Bank Account-1 also transferred funds to VFX Bank Account-1.

09.20.2021

USAO_RINSCH_00042551

18. I further know from my review of bank records for VFX Bank Account-1 that RINSCH and ROSES are the only two signatories for VFX Bank Account-1. RINSCH is listed as "President/Secretary" and ROSES is listed as "Secretary."

19. I further know from my review of bank records produced in response to subpoenas that VFX Bank Account-1 made the following four transfers to a bank account in the name of RINSCH personally ("Rinsch Bank Account-1")[6] totaling approximately $19,500,000:

a. On or about December 6, 2018, VFX Bank Account-1 wired approximately $2,000,000 to Rinsch Bank Account-1. VFX Bank Account-1 had received approximately $8,002,000 from Netflix approximately one day earlier.

b. On or about December 10, 2018, VFX Bank Account-1 wired approximately $2,000,000 to a bank account in the name of RINSCH. VFX Bank Account-1 had received approximately $8,002,000 from Netflix approximately five days earlier.

c. On or about March 25, 2019, VFX Bank Account-1 wired approximately $5,000,000 to a bank account in the name of RINSCH. VFX Bank Account-1 had received approximately $5,000,000 from Netflix approximately one month earlier.

d. On or about March 9, 2020, VFX Bank Account-1 wired approximately $10,500,000 to a brokerage account in the name of RINSCH ("Rinsch Broker Account-1").[7] VFX

---

[6] I am still awaiting a subpoena return for the bank at which Rinsch Bank Account-1 is held. Without that information, I cannot be sure whether the transfers were to a single account at that bank in the name of RINSCH or to multiple accounts at that bank, each in the name of RINSCH, but I refer to that account (or accounts) as Rinsch Bank Account-1 here.

[7] The bank records I have reviewed for VFX Account-1 show that approximately $10,500,000 was transferred out of the account on or about March 9, 2020, but do not show which account they were transferred to. I have further reviewed bank records for Rinsch Brokerage Account-1 that show that approximately $10,5000,000 was deposited into the brokerage account on or about March 30, 2020, but does not show which account they were transferred from. Because the amounts are identical, the dates are close in time, and both accounts are controlled by RINSCH, however, I submit there is probable cause to believe that the funds were transferred from VFX

20

USAO_RINSCH_00042552

Bank Account-1 had received approximately $11,000,000 from Netflix approximately three days earlier.

20. I know from my review of records produced in response to subpoena that on or about February 4, 2021, RINSCH opened an account at a cryptocurrency exchange in his name ("Rinsch Crypto Account-1"). Between approximately February 22, 2021, and May 3, 2021, cryptocurrency with a value of approximately $4,750,000 was deposited into Rinsch Crypto Account-1.

21. I further know from my review of records produced by the cryptocurrency exchange for Rinsch Crypto Account-1 in response to subpoena, that RINSCH made substantial profits trading cryptocurrency in that account after the $4,750,000 was deposited.[8]

22. I know from my review of bank records produced in response to subpoena that between on or about June 28, 2021, and July 5, 2023, Rinsch Crypto Account-1 transferred approximately $13,756,008.02 to a bank account in RINSCH's name ("Rinsch Bank Account-2") in approximately 47 separate transactions.

23. I know from my review of bank records and records from counterparties produced in response to subpoenas that RINSCH then used Rinsch Bank Account-2 to spend millions of dollars on luxury goods and other benefits to himself. In particular:

a. RINSCH opened Rinsch Bank Account-2 on or about June 25, 2021. When he opened Rinsch Bank Account-2, it had a balance of zero dollars, and within a few days, it was funded with hundreds of thousands of dollars from Rinsch Crypto Account-1.

---

Account-1 to Rinsch Brokerage Account-1, although they appear to have passed through an intermediary account first.

[8] In fact, at one point in July 2021, Rinsch Crypto Account-1 had a balance worth approximately $72 million.

09.20.2021

USAO_RINSCH_00042553

b.   Between approximately August 2, 2021, and September 27, 2023, Rinsch Bank Account-2 transferred approximately $1,212,061.14 in payments for charges on an American Express card.

c.   Between approximately August 9, 2021, and May 16, 2022, Rinsch Bank Account-2 transferred approximately $1,797,342 in payments for luxury cars.  In particular:

i.   Between approximately October 1, 2021, and May 16, 2022, Rinsch Bank Account-2 transferred approximately $490,522 to purchase a Ferrari and make additional payments on that Ferrari.

ii.   Between approximately September 14, 2021, and December 6, 2021, Rinsch Bank Account-2 transferred approximately $1,261,678 to purchase three Rolls-Royces.

iii.   Between approximately August 19, 2021, and August 27, 2021, Rinsch Bank Account-2 transferred approximately $345,141.58 to purchase an additional Rolls-Royce.

d.   Between approximately September 8, 2021, and approximately November 4, 2021, Rinsch Bank Account-2 transferred approximately $1,807,662 to purchase art and luxury furniture.

e.   Between approximately February 10, 2022, and June 1, 2023, Rinsch Bank Account-2 transferred approximately $1,073,020.59 to attorneys.

f.   Between approximately November 12, 2021, and August 24, 2023, Rinsch Bank Account-2 transferred approximately $392,177.80 to rentals of luxury properties or hotel rooms.

g.   Between approximately July 30, 2021 and November 3, 2021, Rinsch Bank Account-2 transferred approximately $637,630 to providers of antiques and jewelry.

09.20.2021

USAO_RINSCH_00042554

**B. Probable Cause Regarding the Subject Accounts**

24. I know from my review of emails produced by Netflix in response to subpoena that RINSCH primarily uses the email address ███████████ (the "Rinsch Runbox Account"). However, I know from my review of publicly available material that the internet service provider that hosts the Rinsch Runbox Account is located abroad and unlikely to comply with a search warrant. This warrant seeks authorization to search four other email accounts associated with the Subject Offenses ("the Subject Accounts"). The Rinsch Gmail Account is an alternate account used by RINSCH, the Weiner Gmail Account and the Skotnikova Gmail Account are used by assistants of RINSCH, and the Roses Yahoo Account is used by ROSES, the ex-wife of RINSCH and a producer of White Horse.

25. As to probable cause for the Rinsch Gmail Account, I know the following from my review of documents produced by Netflix in response to subpoena:

    a.  I have reviewed a July 14, 2020, email from the Rinsch Runbox Account to a Netflix executive that states, "Please email me at ████████████ [i.e., the Rinsch Gmail Account] as the run box server is currently down." I understand this email to mean that RINSCH was also using the Rinsch Gmail Account at the same time he was committing the Subject Offenses.

    b.  I further recognize that the email address of the Rinsch Gmail Account and the Rinsch Runbox Account are identical except for the domain name, further indicating that RINSCH uses both accounts.

    c.  I have reviewed a number of emails related to the Subject Offenses and Netflix's purchase and funding of White Horse that were sent to the Rinsch Gmail Account or on which the Rinsch Gmail Account was copied, although I have not reviewed any emails sent by the Rinsch Gmail Account. For example:

09.20.2021

USAO_RINSCH_00042555

i.    I have reviewed an email chain between a talent agency, the Roses Yahoo Account, and the Rinsch Gmail Account from the summer and fall of 2020 about a potential actor for White Horse.  On or about September 14, 2020, the Roses Yahoo Account forwarded that email chain to a Netflix executive, and later that day, a Netflix executive replied to set up a call. The Rinsch Gmail Account was copied on earlier emails in the chain.

ii.    I have reviewed an email from a Netflix executive to the Rinsch Runbox Account dated November 12, 2020, that copies the Rinsch Gmail Account.  The Netflix executive wrote that, "With regard to continuing production on CONQUEST, I do think it is accurate to say we have come to the end of the road in terms of supporting any extension or additonal [sic] production beyond the scope of the original contract. I understand there have been prior conversations about giving you the ability to take the project elsewhere, which we are totally on board with."

iii.    I have reviewed an email chain between a Netflix executive and the Rinsch Runbox Account from in or about April 2021 in which RINSCH threatens to sue Netflix over White Horse.  The Rinsch Gmail Account is copied on that email chain.

26. As to probable cause for the Weiner Gmail Account, I know the following from my review of documents produced by Netflix in response to subpoena:

a.    A search through the production of Netflix emails about White Horse for the Weiner Gmail Account returns approximately 854 results, demonstrating Weiner's frequent sending and receipt of emails about White Horse.

b.    The  email  address  of  the  Weiner  Gmail  Account  is █████████████.  I recognize this email address to be the name of ETHAN WEINER, followed by RINSCH's initials (CER).  I therefore understand that this email address was created

USAO_RINSCH_00042556

in order for WEINER to do work on behalf of RINSCH, which makes it highly likely that it contains communications regarding White Horse and the Subject Offenses.

       c.   I have further reviewed emails in which the signature block of the Weiner Gmail Account says, "Ethan Weiner, Office of Carl E. Rinsch," which again makes it highly likely that it contains communications regarding White Horse and the Subject Offenses.

       d.   I have reviewed a number of emails sent to the Weiner Gmail Account that relate to White Horse and/or the Subject Offenses.  For example:

          i.   On or about September 12, 2018, the Roses Yahoo Account emailed an invoice from Home VFX to a Netflix employee, and copied the Weiner Gmail Account.

         ii.   On or about August 6, 2019, a Netflix executive emailed the Weiner Gmail Account and the Roses Yahoo Account asking if RINSCH wanted to set up a payment schedule for upcoming payments Netflix owed for White Horse.  ROSES responded from the Roses Yahoo Account, copying the Weiner Gmail Account, asking to keep the existing schedule.

        iii.   On or about October 16, 2019, the Roses Yahoo Account emailed a budget for White Horse to a Netflix executive, and copied the Weiner Gmail Account.

        iv.   In or about November 2019, a Netflix executive emailed the Weiner Gmail Account about how to provide access to the "dailies" for White Horse's shooting to Netflix.[9]

   27. As to probable cause for the Skotnikova Gmail Account, I know the following from my review of documents produced by Netflix in response to subpoena:

---

[9] I know from publicly available information that "dailies" refer to unedited footage of a movie or television show that is collected at the end of each shooting day.

09.20.2021

USAO_RINSCH_00042557

a.  A search through the production of Netflix emails about White Horse for the Skotnikova Gmail Account returns approximately 96 results, demonstrating Skotnikova's frequent sending and receipt of emails about White Horse.

b.  I have reviewed emails in which SKOTNIKOVA's email signature states, "Maria Skotnikova, HOME VFX."  As described above, Home VFX is RINSCH's company that he used to create White Horse.

c.  I have reviewed a number of emails sent to and from the Skotnikova Gmail Account that relate to White Horse and/or the Subject Offenses.  For example

i.  On or about December 3, 2019, the Skotnikova Gmail Account emailed the Rinsch Runbox Account, the Roses Yahoo Account, and a Netflix executive a budget document for White Horse.

ii.  On or about May 4, 2021, the Rinsch Runbox Account emailed a number of individuals, including the Skotnikova Gmail Account and the Roses Yahoo Account, a direction that SKOTNIKOVA coordinate the retrieval of White Horse property stored in Budapest.

iii.  On or about August 3, 2021, the Rinsch Runbox Account sent an email to a number of individuals, including the Skotnikova Gmail Account and a Netflix executive, that appears to be about potential next steps as to Netflix's involvement in White Horse.

iv.  On or about March 7, 2022, the Rinsch Runbox Account emailed two Netflix executives regarding Netflix reviewing RINSCH's accounting on White Horse, and copied the Skotnikova Gmail Account.

28. As to probable cause for the Roses Yahoo Account, I know the following from my review of documents produced by Netflix in response to subpoena:

09.20.2021

USAO_RINSCH_00042558

a.  A search through the production of Netflix emails about White Horse for the Roses Yahoo Account returns approximately 1,060 results, demonstrating ROSES's frequent sending and receipt of emails about White Horse.

b.  As described above, RINSCH identified ROSES as a producer on White Horse.

c.  As described elsewhere in this application, the Roses Yahoo Account frequently communicated about White Horse and/or the Subject Offenses.

29. I know from my training and experience and involvement in the investigation that a sophisticated and long-running fraud such as the Subject Offenses would necessarily have involved the use of email.  In particular, I submit there is probable cause to believe that the Subject Accounts contain (i) representations made by RINSCH to Netflix and others about White Horse in order to obtain funds; (ii) internal communications between RINSCH and his associates revealing the true status of the White Horse production and RINSCH's intentions as to the funds; and (iii) information about how RINSCH spent the funds he obtained from Netflix.

30. I have reviewed an email produced by Netflix in which a talent agency pitched White Horse to Netflix on RINSCH's behalf on or about November 22, 2017.  I further know that, as described above, RINSCH said in a declaration that he began searching for other investors in or about 2014.  As to all the Subject Accounts, this application therefore seeks information from August 22, 2017—three months before the email to Netflix—onwards.  The end period for the Subject Accounts is July 26, 2022, which is the date on which counsel for RINSCH transmitted a demand for payment to Netflix that appears to have turned into an arbitration.

## C. Evidence, Fruits and Instrumentalities

31. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain

09.20.2021

USAO_RINSCH_00042559

evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

32. In particular, I submit there is probable cause to search the Subject Accounts for the following information:

- Communications regarding the television series known as "White Horse" or "Conquest";

- Communications regarding the disposition of funds provided by Netflix;

- Location of other evidence (e.g., emails reflecting registration of other online accounts potentially containing relevant evidence).

### III. Review of the Information Obtained Pursuant to the Warrant

33. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

34. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper

09.20.2021

USAO_RINSCH_00042560

evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV.  Request for Non-Disclosure and Sealing Order**

35. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. In particular, I have learned that RINSCH travels frequently and may currently reside in Spain. If RINSCH or others were to become prematurely aware of the existence of the investigation, they might flee abroad or refuse to travel back to the United States. *See* 18 U.S.C. § 2705(b)(2), (5). In addition, as set forth above, much of the evidence in this case is likely to be electronic evidence, which could easily be destroyed or tampered with if RINSCH or others became prematurely aware of the existence of the investigation. In fact, the key email account in the case, the Rinsch Runbox Account, is located abroad and accordingly cannot be ordered preserved by law enforcement. *See* 18 U.S.C. § 2705(b)(3).

09.20.2021

USAO_RINSCH_00042561

36. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

37. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**V. Conclusion**

38. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

09.20.2021

USAO_RINSCH_00042562

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.


/s/Nicholas DiMarino, with permission
NICHOLAS DIMARINO
Special Agent
Federal Bureau of Investigation


Sworn to by reliable electronic means
this 26th day of February, 2024


_____
JAMES L. COTT
United States Magistrate Judge


31

09.20.2021

USAO_RINSCH_00042563

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 854

In the Matter of a Warrant for All
Content and Other Information
Associated with Email Accounts
███████████████████████████
███████████████████████████
███████████████████████ Maintained at
Premises Controlled by Google LLC or
Yahoo Inc., USAO Reference No.
2023R01207

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK        )
                         ) ss.
COUNTY OF NEW YORK    )

NICHOLAS DIMARINO, Federal Bureau of Investigation, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1.  I am a Special Agent with the Federal Bureau of Investigation and am currently assigned to a squad investigating complex financial crimes. I have been a Special Agent since approximately September 2021. I have participated in investigations into criminal offenses involving wire fraud and money laundering and am familiar with the means and methods used to commit such offenses. During the course of these investigations, I have participated in the execution of search warrants involving emails and other forms of electronic evidence.

### B. The Providers, the Subject Accounts and the Subject Offenses

2.  I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email accounts (1)

USAO_RINSCH_00042493

███████████████ (the "Rinsch Gmail Account:"); (2) ███████████████████ (the "Weiner Gmail Account"); (3) ██████████████████ (the "Skotnikova Gmail Account"); and (4)████████████████ (the "Roses Yahoo Account," and together with the Rinsch Gmail Account, the Weiner Gmail Account, and the Skotnikova Gmail Accounts, the "Subject Accounts"). The Rinsch Gmail Account, Weiner Gmail Account, and Skotnikova Gmail Account are maintained and controlled by Google LLC ("Google"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043. The Roses Yahoo Account is maintained and controlled by Yahoo, Inc. ("Yahoo," and, together with Google, the "Providers"), headquartered at 391 San Antonio Road, 5th Floor, Mountain View, CA 94040. The information to be searched is described in the following paragraphs and in two Attachments A to the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud and wire fraud conspiracy for a scheme to defraud Netflix out of funds that were purportedly for the purpose of producing a television show), (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## C. Services and Records of the Provider

4. I have learned the following about Google:

09.20.2021

USAO_RINSCH_00042494

a.      Google offers to the public a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications using a username and password.  Once logged into a Google account, a user can connect to Google's full suite of services offered to the general public.

b.      In particular, as relevant here, Google offers free, web-based email services to the public.  Specifically, Google allows subscribers to maintain email accounts through Gmail under the domain gmail.com and other domain names chosen by the user or an enterprise.  A subscriber using Google's services can access his or her email account from any computer connected to the Internet.

c.      Google maintains the following records and information with respect to every Google account that has email services:

i.      *Email contents*.  In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Google's servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on the Google's computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.  Google also allows users to send emails in "confidential" mode, which enables a user to set an expiration date for messages or revoke access at any time, and recipients of the confidential message will be unable to forward, copy, print, and download the message.

ii.      *Subscriber and billing information.*  Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, recovery and alternate email addresses, and sign-in

09.20.2021

USAO_RINSCH_00042495

phone numbers.  A recovery email address, which can be associated with more than one Gmail account, is used to regain access to an account if a password has been forgotten or a user has been locked out of their account.  An alternate email address is a non-Gmail account that a user has provided that can be used to sign into a Gmail account.  A sign-in phone number is a phone number that can be used as a primary/additional login identifier to access an account.  Google also maintains records concerning the date on which the account was created, the Internet protocol ("IP")[1] address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of Google services utilized by the subscriber.  Finally, Google maintains records regarding (1) fetching and forwarding email addresses, which are email accounts from which the primary account receives emails and forwards emails, respectively; (2) email aliases, domain aliases or separate domains associated with the account, which are means by which accounts with other domain names or other email addresses can be associated with a primary Google account; (3) other Google accounts that have access to the primary account, which access can be granted by the user of the primary account; and (4) other email accounts that are associated with the primary Google account.

        iii.     *Device Information.*  Google may also collect and maintain information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

---

[1] Based on my training and experience, each electronic device connected to the Internet must be assigned a unique IP address so that communications from or directed to that electronic device are routed properly.

09.20.2021

USAO_RINSCH_00042496

Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

           iv.    *Cookie Data.*  Google typically uses features to track the activity of users of its accounts, including whether or not the user of an account accesses other accounts at Google using the same computer or device, or accesses accounts maintained by other companies while logged into an account.  One of the ways they do that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits its site or logs into an account.

           v.    *Transactional information.*  Google also typically retains certain transactional information about the use of each account on its system, including records of login and logout events relating to Google accounts, including user IP addresses and dates and timestamps.

           vi.    *Customer correspondence.*  Google also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

           vii.    *Preserved and backup records*.  Google also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). Google may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

           d.    Google also maintains records with respect to other Google services, which it stores in connection with a Google account and includes the following:

5

USAO_RINSCH_00042497

   i.      *Google Contacts.*  Google provides an address book for Google accounts through Google Contacts.  Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products.  Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group.  Google preserves contacts indefinitely, unless the user deletes them.

   ii.      *Google Calendar.*  Google provides users with the ability to create and maintain online calendars, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices.  Users can share their calendars with other users, allowing the maintenance of joint calendars.  Google preserves appointments indefinitely, unless the user deletes them.

   iii.      *Google Messaging Content.*  Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat.  These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts.  Google may retain a user's messages if the user has not disabled that feature or deleted the messages.

   iv.      *Google Drive content.*  Google Drive is a cloud storage service automatically created for each Google account.  Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides (Google's presentation program).  Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage

6

USAO_RINSCH_00042498

limit.  Google provides users with a certain amount of free storage, currently 15 gigabytes, and users can purchase a storage plan through Google to store additional content.  A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet.  Users can also share files stored on Google Drive with others and grant those with access the ability to edit or comment.  Google maintains a record of who made changes and when to documents edited in Google applications.  Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

v.     *Google Maps*.  Google Maps is service which can be searched for addresses or points of interest.  Google Maps can provide users with turn-by-turn directions from one location to another using a range of transportation options (driving, biking, walking, etc.) and real-time traffic updates.  Users can share their real-time location with others through Google Maps by using the Location Sharing feature.  If users log into their Google account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps.  Google stores Maps data indefinitely, unless the user deletes it.

vi.     *Google Photos*.  Google Photos is a cloud-based photo and video storage service through which users can share or receive photos and videos with others.  Users have the option to sync their mobile phone or device photos to Google Photos.  Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google Photos if that data is included by the user as part of the upload.  This metadata includes what is known as

USAO_RINSCH_00042499

exchangeable image file format (or "Exif") data, and can include GPS location information for where a photo or video was taken.

vii.    *Google Voice*.  Google Voice is a service through which a Google account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline.  Google Voice also includes a voicemail service.  Records are stored indefinitely, unless the user deletes them.

viii.    *Location History data*.  Google collects and retains data about the location at which Google account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use.  This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device.  This location data may be associated with the Google account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google account, such as Location History or Web & App Activity tracking.  Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it.  Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

ix.    *Chrome Browser and "My Activity" Data*.  Google offers a free web browser service called Google Chrome which facilitates access to the Internet.  Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access.  If a user is logged into their Google account on Chrome and has the appropriate

09.20.2021

USAO_RINSCH_00042500

settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google account in a record called My Activity. My Activity also collects and retains data about searches that users conduct within their own Google account or using the Google Internet search engine available at http://www.google.com while logged into their Google account.

x.      *YouTube.* YouTube is a video platform that offers Google accounts the ability to upload videos and share them with others. Users can create a YouTube channel where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like videos, share videos with others, and save videos to watch later. YouTube may keep track of a user's searches, likes, comments, and change history to posted videos. YouTube also may keep limited records of the IP addresses used to access particular videos posted on the service. For accounts created before June 2020, YouTube Watch History is stored indefinitely, unless the user manually deletes. For accounts created after June 2020, YouTube Watch History is stored for three years, unless the user manually deletes it.

5.  I have learned the following about Yahoo:

a.  Yahoo offers email services to the public. In particular, Yahoo allows subscribers to maintain email accounts under the domain name yahoo.com. A subscriber using Yahoo's services can access his or her email account from any computer connected to the Internet.

b.  Yahoo maintains the following records and information with respect to every subscriber account:

i.      *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Yahoo's servers unless and until the subscriber deletes the

9

USAO_RINSCH_00042501

email.  If the subscriber does not delete the email, it can remain on Yahoo's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Yahoo's servers for a certain period of time.

        ii.   *Address book.*  Yahoo also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

        iii.   *Subscriber and billing information.*  Yahoo collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. Yahoo also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber.  Additionally, for paying subscribers, Yahoo maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

        iv.   *Transactional information.*  Yahoo also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through Yahoo's website).

        v.   *Customer correspondence.*  Yahoo also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

        c.   *Preserved and backup records*.  Yahoo also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).  The Provider may

09.20.2021

USAO_RINSCH_00042502

also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy

6.    As explained herein, information stored in connection with a Google or Yahoo account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Google or Yahoo user's stored electronic communications, IP logs, and other data retained by Google or Yahoo, can indicate who has used or controlled the Google or Yahoo account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email content, and stored documents and photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Google or Yahoo account at a relevant time.  Further, Google or Yahoo account activity can show how and when the account was accessed or used.  For example, as described herein, Google and Yahoo log the IP addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime(s) under investigation.  Such information allows investigators to understand the geographic and chronological context of Google or Yahoo access, use, and events relating to the crime under investigation.  Finally, Google or Yahoo account activity may provide relevant insight into the Google or Yahoo account owner's state of mind as it relates to the offense under investigation.  For example, information stored in the Google or Yahoo account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting information in an

09.20.2021

USAO_RINSCH_00042503

effort to conceal evidence from law enforcement). Search history, which Google maintains, can also provide important evidence of identity, state of mind, or criminal activity (*e.g.*, by indicating a search for how to dispose of or delete evidence). Similarly, information stored in Google Drive, Google Docs, Google Photos, Google Calendar, Google Chats, Google Hangouts, Google Photos, Web and Search History, and Google Payments can provide important evidence of identity, state of mind, or criminal activity by, for example, logging payment activity which demonstrates the dissemination of fraud proceeds, recording communications, meetings, or photos with co-conspirators, and storing documents used in relation to the offenses.

### D. Jurisdiction and Authority to Issue Warrant

7. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

8. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

9. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

12

09.20.2021

USAO_RINSCH_00042504

**II. Probable Cause**

    **A.  Probable Cause Regarding the Subject Offenses**

<u>Overview</u>

    10. In approximately 2018, Netflix committed approximately $60 million to a company called Home VFX in tranches, based on Home VFX meeting certain production milestones, to create a science fiction television show that was called both "White Horse" and "Conquest." CARL ERIK RINSCH was the CEO of Home VFX and exercised control of it.  At various times during the production of White Horse, RINSCH demanded additional funds from Netflix in order to create White Horse.  However, RINSCH in fact stole approximately $20 million of the funds that Netflix provided to Home VFX by transferring them to his personal bank accounts, and Home VFX never provided Netflix with a completed television show.

    11. The evidence in this case and relied upon below is based upon, among other things, (i) records provided by Netflix detailing the negotiations and terms between RINSCH and Netflix as regards White Horse; (ii) records from a divorce proceeding between RINSCH and his wife GABRIELLA ROSES,[2] who was a producer on White Horse; and (iii) bank records showing how RINSCH spent the funds Netflix sent him for the production of White Horse.

<u>**Records Provided by Netflix**</u>

    12. I know the following from my review of documents provided by Netflix in response to a subpoena, set forth in sum and substance, and in part:

        a.   I have reviewed a term sheet (the "Term Sheet") dated November 12, 2018:

---

[2] The divorce records refer to her as "Gabriella Rinsch," but she appears to typically go by "Gabriella Roses," and this application uses that name to refer to her.

09.20.2021

USAO_RINSCH_00042505

       i.    The Term Sheet is between a subsidiary of Netflix and a company called Home VFX.

       ii.    CARL ERIK RINSCH signed the Term Sheet as CEO-President of Home VFX.

       iii.    The Term Sheet sets forth that the Netflix subsidiary committed $61,224,000 to purchase the rights to and fund the production of White Horse.  The Term Sheet further provides that some of those funds were to be transferred to settle the claims of previous investors in White Horse; the funds were to be transferred in tranches based on various milestones.

       iv.    The Term Sheet noted that the Netflix subsidiary had already transferred $2,023,066.23 to Home VFX prior to the signing of the Term Sheet.

    b.  I have reviewed an email sent by a contractor for RINSCH to a Netflix executive dated March 28, 2019, in which the contractor stated that he quit the White Horse project because, "the fact that there is no accountant on the show does not allow me to do my job professionally."

    c.  I have reviewed an email sent by RINSCH to a Netflix executive copying the Roses Yahoo Account dated September 10, 2019, stating that he needed more funding from Netflix to complete White Horse, and if he did not receive that money, "It is stomach turning to know that we could easily find ourselves in a position, if not addressed now, of having made considerable commitments to service companies and cast/crew but have an empty bank account."

    d.  I have reviewed an internal chat between two Netflix executives dated September 20, 2019, in which one of the executives writes, "Carl [RINSCH] needs 8-9m more to finish. His lawyer claims."

14

USAO_RINSCH_00042506

e. I have reviewed an email from the Roses Yahoo Account to a Netflix executive dated October 12, 2019, in which ROSES attaches a "funding grid" for White Horse that purports to show that $15,167,745 will be required to complete the show.

f. I have reviewed an email from counsel for RINSCH to a Netflix executive dated October 31, 2019, attaching a written proposal for next steps.[3] The document stated that it was designed to "provide immediate support and prevent collapse of production" and demanding that Netflix transfer $6.1 million in the immediate future.

g. I have reviewed an email response from the Netflix executive to counsel for RINSCH, also dated October 31, 2019, in which the Netflix executive wrote, "We spoke to Carl [RINSCH] this morning. He agreed that he would leave 50% of what he has cash flowed thus far (i.e., 800k) in the production, Netflix would then accelerate $5.3M of our next installment to cover the remaining Hungary cash flow."

h. I have reviewed an email from RINSCH to Netflix executives, copying the Roses Yahoo Account, dated February 4, 2020, in which RINSCH attaches a letter demanding that he be paid $11,218,000 because principal photography on White Horse has been completed.

i. I have reviewed an email chain between counsel for RINSCH and Netflix executives dated March 4 and 5, 2020, in which Netflix agrees to pay RINSCH $11 million more for White Horse.

j. I have reviewed an email chain between Netflix executives dated September 16, 2020, showing that Netflix had spent at that point approximately $53 million on White Horse.

---

[3] The email is part of a chain, and I have only reviewed the reply by the Netflix executive, which attaches the written proposal. However, I understand from the context of the exchange that the executive was reattaching a proposal originally sent by RINSCH.

09.20.2021

USAO_RINSCH_00042507

k.   I know from my review of the emails produced by Netflix that RINSCH failed

to  deliver anything resembling a completed television show to Netflix.

13. I know from law enforcement communications with Netflix that Netflix and RINSCH

are engaged in an arbitration about White Horse.

**Records from the Divorce Proceeding Between RINSCH and ROSES**

14. I have reviewed a divorce petition filed by ROSES against RINSCH on or about July

31, 2020.  While I understand that the documents filed in that divorce suit are publicly available,

the documents I have reviewed from that suit were provided to law enforcement by Netflix in

response to a subpoena.

15. I have reviewed a declaration filed by RINSCH in that divorce proceeding dated May

5, 2022, which states the following, set forth in substance and in part:

a.   RINSCH stated that he and ROSES "separated onn [sic] or about November

2018."[4]

b.   RINSCH stated that he founded the company Home VFX, Inc., formerly named

"C.E. Rinsch, Inc." in 2010.

c.   RINSCH stated that, "Netflix provided the funding for the entire production

budget for 'White Horse' up-front, and there are no other funds remaining with which to complete

my 'White Horse' television series.  Netflix is not providing any further funds for production

---

[4] "The Second Circuit, like many other circuits, has adopted the view that permanent separation
vitiates the marital communications privilege because society's interest in protecting the
confidentiality of the relationships of permanently separated spouses is outweighed by the need to
secure evidence in the search for truth." *United States v. Etkin*, No. 07-CR-913(KMK), 2008 WL
482281, at *2 (S.D.N.Y. Feb. 20, 2008), (*citing In re Witness Before Grand Jury*, 791 F.2d 234,
238 (2d Cir. 1986)).

09.20.2021

USAO_RINSCH_00042508

expenses, so the project has effectively been shelved.  I am not entitled to receive any further funds from Netflix in connection with the production of my 'White Horse' project."

       d.  RINSCH stated that, "I developed the concept of 'White Horse' solely on my own, four (4) years before I had ever married Gabriela [ROSES].  I created the entire world in which 'White Horse' exists, as well as a design for the series, while I was still in production of the film 47 Ronin in 2010.  I continued working on my 'White Horse' series from 2010-2011, researching and writing the series during this period.  While in post-production for 47 Ronin, on or about 2011, I began to hire and employ third parties to work on my 'White Horse' series. In 2012, I began shooting material for my 'White Horse' series.  Between 2012-2014, I continued filming material for my 'White Horse' series project.  At the time of my marriage to Gabriela in 2014, I was already heavily invested in my 'White Horse' project.  By 2014, I had already invested approximately $4.85 Million that I had inherited when my father passed away prior to my marriage to Gabriela.  As the project progressed, I realized that I could not afford to continue financing the entirety of my 'White Horse' project on my own. As a result, I started looking for other investors in 2014 and eventually entered into the contract with Netflix described herein above.  I initially employed a third party to work as a producer for my 'White Horse' television series project, but after marrying Gabriela [ROSES] in 2014, I hired her to work as a producer."

16. I have reviewed the following testimony of RINSCH provided in his divorce proceeding against ROSES on or about May 18, 2022:

| Q | And isn't it also true, Mr. Rinsch, that in April of 2021, you received a letter from Rochelle Gershon—by the way, do you know who Michelle Gershon is? |
|---|---|
| A | Yes |
| Q | Who is Ms. Rochelle Gershon, to your understanding? |
| A | She's the head of business affairs. |

USAO_RINSCH_00042509

| Q | Yes.  And Rochelle Gershon wrote to you, telling you, "Netflix is declining to support any further production efforts on your part, financial or otherwise."  Do you recall receiving that letter? |
|---|---|
| A | Very much so, yes. |
| Q | Now, after April of 2021, you had monies that originally were received by you as production funds for the White Horse project, correct? |
| A | Yes, of course. |
| Q | And after April of 2021, after receiving Ms. Gershon's letter, you went out and bought, from those funds, various luxury automobiles, correct? |
| A | Among other things, yes. |
| Q | You titled those automobiles in your personal name, correct? |
| A | I'm under contract to -- |
| Q | Yes or no, sir |
| A | And—yes, sir. |
| Q | Okay |
| A | However, I would like to say that I am under contract with Netflix.  Those are picture vehicles for the production and I've made that clear to your offices with support. |
| Q | Sir, you-- |
| A | And this is along the line of other, you know, props, wardrobe, furniture, for the production as per the last written agreement I have. |
| Q | But sir, you purchased those vehicles after you already received notification from Netflix that they were not—they were declining to support any further production efforts on your part.  Isn't that true?  Yes or no? |
| A | I mean, yes. |
| | [] |
| A | I'm doing the best I can to fulfill my obligations and honor the deal with Netflix.  I am concerned, always, that production funding should be used for production, as I am liable to my contract. |
| | [] |
| COURT | Sir, Mr. Rinsch, so I think you said, well, did you say, sir, that the crypto that you acquired was from production funds as well? |
| A | Yes, sir.  I received $41,302,000 from Netflix, and I received that money between 2018 and 2020.  All of those funds are earmarked to delivering the product and that is my obligation. |

09.20.2021

USAO_RINSCH_00042510

**Bank Records[5]**

17. I know from my review of bank records produced in response to subpoenas that Netflix transferred approximately $41,302,000 to a bank account in the name of Home VFX ("VFX Bank Account-1") in the following transactions:

      a.  On or about June 29, 2018, Netflix transferred approximately $450,000 to VFX Bank Account-1.

      b.  Between on or about July 9, 2018, and September 18, 2018, Netflix sent 11 wires to VFX Bank Account-1 totaling approximately $1,573,066.23.

      c.  On or about December 5, 2018, Netflix transferred approximately $8,002,000 to VFX Bank Account-1.

      d.  On or about February 21, 2019, Netflix transferred approximately $5,000,000 to VFX Bank Account-1.

      e.  On or about August 12, 2019, Netflix transferred approximately $9,976,933.77 to VFX Bank Account-1.

      f.  On or about October 31, 2019, Netflix transferred approximately $5,300,000 to VFX Bank Account-1.

      g.  On or about March 6, 2020, Netflix transferred approximately $11,000,000 to VFX Bank Account-1.

---

[5] This investigation is ongoing, and law enforcement is still in the process of obtaining all relevant bank records. In addition, in some instances, there have been subsequent payments going the opposite direction of the payments described in this section. For example, this section describes large payments from VFX Bank Account-1 to Rinsch Bank Account-1. In some instances, Rinsch Bank Account-1 also transferred funds to VFX Bank Account-1.

09.20.2021

USAO_RINSCH_00042511

18. I further know from my review of bank records for VFX Bank Account-1 that RINSCH and ROSES are the only two signatories for VFX Bank Account-1. RINSCH is listed as "President/Secretary" and ROSES is listed as "Secretary."

19. I further know from my review of bank records produced in response to subpoenas that VFX Bank Account-1 made the following four transfers to a bank account in the name of RINSCH personally ("Rinsch Bank Account-1")[6] totaling approximately $19,500,000:

a. On or about December 6, 2018, VFX Bank Account-1 wired approximately $2,000,000 to Rinsch Bank Account-1. VFX Bank Account-1 had received approximately $8,002,000 from Netflix approximately one day earlier.

b. On or about December 10, 2018, VFX Bank Account-1 wired approximately $2,000,000 to a bank account in the name of RINSCH. VFX Bank Account-1 had received approximately $8,002,000 from Netflix approximately five days earlier.

c. On or about March 25, 2019, VFX Bank Account-1 wired approximately $5,000,000 to a bank account in the name of RINSCH. VFX Bank Account-1 had received approximately $5,000,000 from Netflix approximately one month earlier.

d. On or about March 9, 2020, VFX Bank Account-1 wired approximately $10,500,000 to a brokerage account in the name of RINSCH ("Rinsch Broker Account-1").[7] VFX

---

[6] I am still awaiting a subpoena return for the bank at which Rinsch Bank Account-1 is held. Without that information, I cannot be sure whether the transfers were to a single account at that bank in the name of RINSCH or to multiple accounts at that bank, each in the name of RINSCH, but I refer to that account (or accounts) as Rinsch Bank Account-1 here.

[7] The bank records I have reviewed for VFX Account-1 show that approximately $10,500,000 was transferred out of the account on or about March 9, 2020, but do not show which account they were transferred to. I have further reviewed bank records for Rinsch Brokerage Account-1 that show that approximately $10,5000,000 was deposited into the brokerage account on or about March 30, 2020, but does not show which account they were transferred from. Because the amounts are identical, the dates are close in time, and both accounts are controlled by RINSCH, however, I submit there is probable cause to believe that the funds were transferred from VFX

USAO_RINSCH_00042512

Bank Account-1 had received approximately $11,000,000 from Netflix approximately three days earlier.

20. I know from my review of records produced in response to subpoena that on or about February 4, 2021, RINSCH opened an account at a cryptocurrency exchange in his name ("Rinsch Crypto Account-1"). Between approximately February 22, 2021, and May 3, 2021, cryptocurrency with a value of approximately $4,750,000 was deposited into Rinsch Crypto Account-1.

21. I further know from my review of records produced by the cryptocurrency exchange for Rinsch Crypto Account-1 in response to subpoena, that RINSCH made substantial profits trading cryptocurrency in that account after the $4,750,000 was deposited.[8]

22. I know from my review of bank records produced in response to subpoena that between on or about June 28, 2021, and July 5, 2023, Rinsch Crypto Account-1 transferred approximately $13,756,008.02 to a bank account in RINSCH's name ("Rinsch Bank Account-2") in approximately 47 separate transactions.

23. I know from my review of bank records and records from counterparties produced in response to subpoenas that RINSCH then used Rinsch Bank Account-2 to spend millions of dollars on luxury goods and other benefits to himself. In particular:

    a. RINSCH opened Rinsch Bank Account-2 on or about June 25, 2021. When he opened Rinsch Bank Account-2, it had a balance of zero dollars, and within a few days, it was funded with hundreds of thousands of dollars from Rinsch Crypto Account-1.

---

Account-1 to Rinsch Brokerage Account-1, although they appear to have passed through an intermediary account first.

[8] In fact, at one point in July 2021, Rinsch Crypto Account-1 had a balance worth approximately $72 million.

09.20.2021

USAO_RINSCH_00042513

b.   Between approximately August 2, 2021, and September 27, 2023, Rinsch Bank Account-2 transferred approximately $1,212,061.14 in payments for charges on an American Express card.

c.   Between approximately August 9, 2021, and May 16, 2022, Rinsch Bank Account-2 transferred approximately $1,797,342 in payments for luxury cars.  In particular:

i.    Between approximately October 1, 2021, and May 16, 2022, Rinsch Bank Account-2 transferred approximately $490,522 to purchase a Ferrari and make additional payments on that Ferrari.

ii.   Between approximately September 14, 2021, and December 6, 2021, Rinsch Bank Account-2 transferred approximately $1,261,678 to purchase three Rolls-Royces.

iii.  Between approximately August 19, 2021, and August 27, 2021, Rinsch Bank Account-2 transferred approximately $345,141.58 to purchase an additional Rolls-Royce.

d.   Between approximately September 8, 2021, and approximately November 4, 2021, Rinsch Bank Account-2 transferred approximately $1,807,662 to purchase art and luxury furniture.

e.   Between approximately February 10, 2022, and June 1, 2023, Rinsch Bank Account-2 transferred approximately $1,073,020.59 to attorneys.

f.   Between approximately November 12, 2021, and August 24, 2023, Rinsch Bank Account-2 transferred approximately $392,177.80 to rentals of luxury properties or hotel rooms.

g.   Between approximately July 30, 2021 and November 3, 2021, Rinsch Bank Account-2 transferred approximately $637,630 to providers of antiques and jewelry.

09.20.2021

USAO_RINSCH_00042514

### B.  Probable Cause Regarding the Subject Accounts

24. I know from my review of emails produced by Netflix in response to subpoena that RINSCH primarily uses the email address ███████████ (the "Rinsch Runbox Account"). However, I know from my review of publicly available material that the internet service provider that hosts the Rinsch Runbox Account is located abroad and unlikely to comply with a search warrant.  This warrant seeks authorization to search four other email accounts associated with the Subject Offenses ("the Subject Accounts").  The Rinsch Gmail Account is an alternate account used by RINSCH, the Weiner Gmail Account and the Skotnikova Gmail Account are used by assistants of RINSCH, and the Roses Yahoo Account is used by ROSES, the ex-wife of RINSCH and a producer of White Horse.

25. As to probable cause for the Rinsch Gmail Account, I know the following from my review of documents produced by Netflix in response to subpoena:

   a.   I have reviewed a July 14, 2020, email from the Rinsch Runbox Account to a Netflix executive that states, "Please email me at ███████████ [i.e., the Rinsch Gmail Account] as the run box server is currently down."  I understand this email to mean that RINSCH was also using the Rinsch Gmail Account at the same time he was committing the Subject Offenses.

   b.   I further recognize that the email address of the Rinsch Gmail Account and the Rinsch Runbox Account are identical except for the domain name, further indicating that RINSCH uses both accounts.

   c.   I have reviewed a number of emails related to the Subject Offenses and Netflix's purchase and funding of White Horse that were sent to the Rinsch Gmail Account or on which the Rinsch Gmail Account was copied, although I have not reviewed any emails sent by the Rinsch Gmail Account.  For example:

23

09.20.2021

i.    I have reviewed an email chain between a talent agency, the Roses Yahoo Account, and the Rinsch Gmail Account from the summer and fall of 2020 about a potential actor for White Horse.  On or about September 14, 2020, the Roses Yahoo Account forwarded that email chain to a Netflix executive, and later that day, a Netflix executive replied to set up a call. The Rinsch Gmail Account was copied on earlier emails in the chain.

ii.    I have reviewed an email from a Netflix executive to the Rinsch Runbox Account dated November 12, 2020, that copies the Rinsch Gmail Account.  The Netflix executive wrote that, "With regard to continuing production on CONQUEST, I do think it is accurate to say we have come to the end of the road in terms of supporting any extension or additonal [sic] production beyond the scope of the original contract. I understand there have been prior conversations about giving you the ability to take the project elsewhere, which we are totally on board with."

iii.    I have reviewed an email chain between a Netflix executive and the Rinsch Runbox Account from in or about April 2021 in which RINSCH threatens to sue Netflix over White Horse.  The Rinsch Gmail Account is copied on that email chain.

26. As to probable cause for the Weiner Gmail Account, I know the following from my review of documents produced by Netflix in response to subpoena:

a.  A search through the production of Netflix emails about White Horse for the Weiner Gmail Account returns approximately 854 results, demonstrating Weiner's frequent sending and receipt of emails about White Horse.

b. The    email    address    of    the    Weiner    Gmail    Account    is ███████████████████ I recognize this email address to be the name of ETHAN WEINER, followed by RINSCH's initials (CER).  I therefore understand that this email address was created

USAO_RINSCH_00042516

in order for WEINER to do work on behalf of RINSCH, which makes it highly likely that it contains communications regarding White Horse and the Subject Offenses.

   c. I have further reviewed emails in which the signature block of the Weiner Gmail Account says, "Ethan Weiner, Office of Carl E. Rinsch," which again makes it highly likely that it contains communications regarding White Horse and the Subject Offenses.

   d. I have reviewed a number of emails sent to the Weiner Gmail Account that relate to White Horse and/or the Subject Offenses.  For example:

     i. On or about September 12, 2018, the Roses Yahoo Account emailed an invoice from Home VFX to a Netflix employee, and copied the Weiner Gmail Account.

     ii. On or about August 6, 2019, a Netflix executive emailed the Weiner Gmail Account and the Roses Yahoo Account asking if RINSCH wanted to set up a payment schedule for upcoming payments Netflix owed for White Horse.  ROSES responded from the Roses Yahoo Account, copying the Weiner Gmail Account, asking to keep the existing schedule.

     iii. On or about October 16, 2019, the Roses Yahoo Account emailed a budget for White Horse to a Netflix executive, and copied the Weiner Gmail Account.

     iv. In or about November 2019, a Netflix executive emailed the Weiner Gmail Account about how to provide access to the "dailies" for White Horse's shooting to Netflix.[9]

  27. As to probable cause for the Skotnikova Gmail Account, I know the following from my review of documents produced by Netflix in response to subpoena:

---

[9] I know from publicly available information that "dailies" refer to unedited footage of a movie or television show that is collected at the end of each shooting day.

09.20.2021

USAO_RINSCH_00042517

a.  A search through the production of Netflix emails about White Horse for the Skotnikova Gmail Account returns approximately 96 results, demonstrating Skotnikova's frequent sending and receipt of emails about White Horse.

b.  I have reviewed emails in which SKOTNIKOVA's email signature states, "Maria Skotnikova, HOME VFX."  As described above, Home VFX is RINSCH's company that he used to create White Horse.

c.  I have reviewed a number of emails sent to and from the Skotnikova Gmail Account that relate to White Horse and/or the Subject Offenses.  For example

i.  On or about December 3, 2019, the Skotnikova Gmail Account emailed the Rinsch Runbox Account, the Roses Yahoo Account, and a Netflix executive a budget document for White Horse.

ii.  On or about May 4, 2021, the Rinsch Runbox Account emailed a number of individuals, including the Skotnikova Gmail Account and the Roses Yahoo Account, a direction that SKOTNIKOVA coordinate the retrieval of White Horse property stored in Budapest.

iii.  On or about August 3, 2021, the Rinsch Runbox Account sent an email to a number of individuals, including the Skotnikova Gmail Account and a Netflix executive, that appears to be about potential next steps as to Netflix's involvement in White Horse.

iv.  On or about March 7, 2022, the Rinsch Runbox Account emailed two Netflix executives regarding Netflix reviewing RINSCH's accounting on White Horse, and copied the Skotnikova Gmail Account.

28. As to probable cause for the Roses Yahoo Account, I know the following from my review of documents produced by Netflix in response to subpoena:

09.20.2021

USAO_RINSCH_00042518

a.  A search through the production of Netflix emails about White Horse for the Roses Yahoo Account returns approximately 1,060 results, demonstrating ROSES's frequent sending and receipt of emails about White Horse.

b.  As described above, RINSCH identified ROSES as a producer on White Horse.

c.  As described elsewhere in this application, the Roses Yahoo Account frequently communicated about White Horse and/or the Subject Offenses.

29. I know from my training and experience and involvement in the investigation that a sophisticated and long-running fraud such as the Subject Offenses would necessarily have involved the use of email.  In particular, I submit there is probable cause to believe that the Subject Accounts contain (i) representations made by RINSCH to Netflix and others about White Horse in order to obtain funds; (ii) internal communications between RINSCH and his associates revealing the true status of the White Horse production and RINSCH's intentions as to the funds; and (iii) information about how RINSCH spent the funds he obtained from Netflix.

30. I have reviewed an email produced by Netflix in which a talent agency pitched White Horse to Netflix on RINSCH's behalf on or about November 22, 2017.  I further know that, as described above, RINSCH said in a declaration that he began searching for other investors in or about 2014.  As to all the Subject Accounts, this application therefore seeks information from August 22, 2017—three months before the email to Netflix—onwards.  The end period for the Subject Accounts is July 26, 2022, which is the date on which counsel for RINSCH transmitted a demand for payment to Netflix that appears to have turned into an arbitration.

## C. Evidence, Fruits and Instrumentalities

31. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain

09.20.2021

USAO_RINSCH_00042519

evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

32. In particular, I submit there is probable cause to search the Subject Accounts for the following information:

- Communications regarding the television series known as "White Horse" or "Conquest";

- Communications regarding the disposition of funds provided by Netflix;

- Location of other evidence (e.g., emails reflecting registration of other online accounts potentially containing relevant evidence).

### III. Review of the Information Obtained Pursuant to the Warrant

33. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

34. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper

09.20.2021

USAO_RINSCH_00042520

evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Request for Non-Disclosure and Sealing Order**

35. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  In particular, I have learned that RINSCH travels frequently and may currently reside in Spain.  If RINSCH or others were to become prematurely aware of the existence of the investigation, they might flee abroad or refuse to travel back to the United States.  *See* 18 U.S.C. § 2705(b)(2), (5).  In addition, as set forth above, much of the evidence in this case is likely to be electronic evidence, which could easily be destroyed or tampered with if RINSCH or others became prematurely aware of the existence of the investigation.  In fact, the key email account in the case, the Rinsch Runbox Account, is located abroad and accordingly cannot be ordered preserved by law enforcement.  *See* 18 U.S.C. § 2705(b)(3).

09.20.2021

USAO_RINSCH_00042521

36. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

37. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

38. On or about February 26, 2024, the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, authorized a warrant for the Subject Accounts. However, that warrant contained a typographical error in the name of one of the Subject Accounts,[10] and this updated application is submitted to correct that error.

**V. Conclusion**

39. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

---

[10] In particular, the application correctly identified the email address of the Rinsch Gmail Account as ███████████, but the warrant to Google listed the Rinsch Gmail Account as erinsch@gmail.com.

09.20.2021

30

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.


/s/ Nicholas DiMarino, with permission
NICHOLAS DIMARINO
Special Agent
Federal Bureau of Investigation


Sworn to by reliable electronic means
27th day of February, 2024


JAMES L. COTT
United States Magistrate Judge

31

09.20.2021

USAO_RINSCH_00042523