UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CARL ERIK RINSCH,

Defendant.

25 Cr. 85 (JSR)

**THE GOVERNMENT'S OPPOSITION
TO THE DEFENDANT'S PRE-TRIAL MOTIONS**

JAY CLAYTON
United States Attorney
Southern District of New York

Timothy V. Capozzi
David A. Markewitz
Adam Sowlati
Assistant United States Attorneys
 - *Of Counsel* -

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 1

ARGUMENT ................................................................................................................ 3

I. Rinsch's Venue-Related Challenges are Meritless ................................................. 4

    A. Venue .............................................................................................................. 4

        1.    Law Applicable to Motions to Dismiss ................................................... 4

        2.    General Principles of Venue ..................................................................... 5

        3.    Discussion ................................................................................................ 7

    B. Transfer ......................................................................................................... 11

        1.    Applicable Law ...................................................................................... 12

        2.    Discussion .............................................................................................. 13

II. The Court Should Deny Rinsch's Vagueness Motion ......................................... 19

    A. Applicable Law .............................................................................................. 19

    B. Discussion ..................................................................................................... 20

III. The Motion for a Bill of Particulars Should be Denied ..................................... 26

    A. Applicable Law .............................................................................................. 27

    B. Discussion ..................................................................................................... 29

IV. The Search Warrants Should be Upheld ............................................................. 34

    A. Background of the Warrants ........................................................................... 34

        1.    The Google Warrant ............................................................................... 34

        2.    The Electronic Devices Warrant ............................................................ 36

    B. The Warrants Were Amply Supported by Probable Cause ............................ 39

        1.    Applicable Law ...................................................................................... 40

        2.    Discussion .............................................................................................. 42

    C. The Warrants Were Sufficiently Particular .................................................... 45

        1.    Applicable Law ...................................................................................... 45

        2.    Discussion .............................................................................................. 47

    D. The Warrants Were Not Overbroad ............................................................... 51

        1.    Applicable Law ...................................................................................... 51

        2.    Discussion .............................................................................................. 52

    E. The Warrants Were Executed in Good Faith ................................................. 56

        1.    Applicable Law ...................................................................................... 56

        2.    Discussion .............................................................................................. 58

CONCLUSION..........................................................................................................................59

**<u>TABLE OF AUTHORITIES</u>**

**Pages**

**<u>Cases</u>**

*Andresen v. Maryland*,
   427 U.S. 463 (1976)...................................................................................................... 55

*Boyce Motor Lines, Inc. v. United States*,
   342 U.S. 337 (1952)................................................................................................... 4, 24

*District of Columbia v. Wesby*,
   138 S. Ct. 577 (2018)...................................................................................................... 40

*Golino v. City of New Haven*,
   950 F.2d 864 (2d Cir. 1991)........................................................................................... 57

*Herring v. United States*,
   555 U.S. 135 (2009)........................................................................................................ 57

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)...................................................................................................... 20, 24

*Illinois v. Gates*,
   462 U.S. 238 (1983)................................................................................................... 40, 41

*In re Google Warrant*,
   33 F. Supp. 3d 386 (S.D.N.Y. 2014)............................................................................. 52

*Kolender v. Lawson*,
   461 U.S. 352 (1983)................................................................................................... 19, 24

*Messerschmidt v. Millender*,
   565 U.S. 535 (2012)........................................................................................................ 45

*Platt v. Minnesota Mining & Manufacturing Co.*,
   376 U.S. 240 (1964)................................................................................................... 12, 13

*Schmuck v. United States*,
   489 U.S. 705 (1989)........................................................................................................ 10

*United States v. Akhavan*,
   No. S3 20-CR-188 (JSR), 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ............................... 32

*United States v. Alfonso*,
   143 F.3d 772 (2d Cir. 1998)............................................................................................. 5

*United States v. Amer*,
   110 F.3d 873 (2d Cir. 1997)...................................................................................... 20, 23

*United States v. Avenatti*,
   No. 19 Cr. 374 (JMF), 2019 WL 4640232 (S.D.N.Y. Sept. 24, 2019)................................... 16

*United States v. Bajakajian*,
   524 U.S. 321 (1998)........................................................................................................ 26

*United States v. Baker*,
   19 F.3d 605 (11th Cir. 1994) ..................................................................................... 20, 22

*United States v. Barrett*,
   153 F. Supp. 3d 552 (E.D.N.Y. 2015) ................................................ 32

*United States v. Bazazpour*,
   690 F.3d 796 (6th Cir. 2012) ......................................................... 20

*United States v. Beech-Nut Nutrition Corp.*,
   871 F.2d 1181 (2d Cir. 1989) ......................................................... 6

*United States v. Bellomo*,
   263 F. Supp. 2d 561 (E.D.N.Y. 2003) ................................................ 28

*United States v. Bin Laden*,
   92 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................................. 29

*United States v. Blakstad*,
   No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) .................. 15, 52

*United States v. Blarek*,
   Nos. 98-1291, 98-1292, 1998 WL 907429,
   166 F.3d 1202 (2d Cir. Dec. 23, 1998) ....................................... 20, 21, 25

*United States v. Blondet*,
   No. 16 Cr. 387 (JMF), 2019 WL 5690711 (S.D.N.Y. Nov. 4, 2019) .................... 13

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987) ......................................................... 27

*United States v. Brooks*,
   No. 08 Cr. 35 (PKL), 2008 WL 2944626 (S.D.N.Y. July 31, 2008) ................ 17, 18

*United States v. Buck*,
   813 F.2d 588 (2d Cir. 1987) ......................................................... 50

*United States v. Buyer*,
   No. 23-7202-cr, 2025 WL 855773 (2d Cir. Mar. 19, 2025) ............................ 11

*United States v. Cabrales*,
   524 U.S. 1 (1998) .................................................................... 6

*United States v. Calk*,
   No. 19 Cr. 366 (LGS), 2020 WL 703391 (S.D.N.Y. Feb. 12, 2020) ................. 12, 17

*United States v. Canale*,
   No. 14 Cr. 713 (KBF), 2015 WL 3767147 (S.D.N.Y. June 17, 2015) .................... 17

*United States v. Cancelmo*,
   64 F.3d 804 (2d Cir. 1995) .......................................................... 58

*United States v. Carey*,
   152 F. Supp. 2d 415 (S.D.N.Y. 2001) ................................................ 17

*United States v. Chalmers*,
   410 F. Supp. 2d 278 (S.D.N.Y. 2006) .............................................. 8, 27

*United States v. Chocron*,
   No. 20 Cr. 400 (JSR), 2021 WL 3005086 (S.D.N.Y. July 14, 2021) .......... 5, 7, 8, 10

*United States v. Chow*,

iv

993 F.3d 125 (2d Cir. 2021)...................................................................................... 11

*United States v. Christian*,
No. 12 Cr. 41 (KBF), 2012 WL 1134035 (S.D.N.Y. Apr. 2, 2012) ............................ 13, 16, 18

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011).......................................................................................... 54

*United States v. Connolly*,
No. S1 16-CR-00370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017) ......................... 33

*United States v. Cordones*,
No. 11 Cr. 205 (AKH), 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022).............................. 27

*United States v. Coriaty*,
No. 99 Cr. 1251 (DAB), 2000 WL 1099920 (S.D.N.Y. Aug. 7, 2000) .......................... 13

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021)...................................................................................... 4, 5

*United States v. Dupigny*,
No. S1 18 Cr. 528 (JMF), 2019 WL 2327697 (S.D.N.Y. May 30, 2019) ................................ 5

*United States v. Ebbers*,
No. 02 Cr. 1144 (BSJ), 2004 WL 2346154 (S.D.N.Y. Oct. 18, 2004)............................ 15, 17

*United States v. Elcock*,
No. 07 Cr. 582 (CM), 2008 WL 123842 (S.D.N.Y. Jan. 10, 2008)............................................ 8

*United States v. Estrada*,
880 F. Supp. 2d 478 (S.D.N.Y. 2012)....................................................................... 14

*United States v. Folks*,
No. 20-3267-cr, 2021 WL 5987009 (2d Cir. Dec. 17, 2021) ............................................ 46, 50

*United States v. Gabriele*,
63 F.3d 61 (1st Cir. 1995) ........................................................................................ 20

*United States v. Galpin*,
720 F.3d 436 (2d Cir. 2013)......................................................................... 46, 47, 48, 51

*United States v. Garlick*,
No. 22-CR-540 (VEC), 2023 WL 2575664 (S.D.N.Y. Mar. 20, 2023)................................. 56

*United States v. George*,
975 F.2d 72 (2d Cir. 1992).......................................................................... 47, 50, 51

*United States v. Gibson*,
175 F. Supp. 2d 532 (S.D.N.Y. 2001)....................................................................... 28

*United States v. Goldberg*,
756 F.2d 949 (2d Cir. 1985)........................................................................................ 4

*United States v. Gotti*,
459 F.3d 296 (2d Cir. 2006)........................................................................................ 6

*United States v. Graziano*,
558 F. Supp. 2d 304 (E.D.N.Y. 2008) ...................................................................... 55

*United States v. Hanratty*,

No. 24 CR. 153 (LGS), 2024 WL 4892742 (S.D.N.Y. Nov. 26, 2024) ................................. 33

*United States v. Henry*,
861 F. Supp. 1190 (S.D.N.Y. 1994)........................................................................... 28

*United States v. Hernandez*,
No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010) ............................ 54

*United States v. Holloway*,
No. 20-578, 2022 WL 453370 (2d Cir. Feb. 15, 2022),
*cert. denied*, 143 S. Ct. 255 (2022) ........................................................................ 25

*United States v. Houtar*,
980 F.3d 268 (2d Cir. 2020)...................................................................................... 19

*United States v. Jacobson*,
4 F. Supp. 3d 515 (E.D.N.Y. 2014) .......................................................... 47, 49, 54

*United States v. Jones*,
No. 21 Cr. 59 (LAP), 2021 WL 3500806 (S.D.N.Y. Aug. 5, 2021)........................ 14

*United States v. Juncal*,
No. 97 Cr. 1162 (JFK), 1998 WL 473949 (S.D.N.Y. Aug. 7, 1998)........................ 15

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) ..................................................................... 32

*United States v. Kim*,
246 F.3d 186 (2d Cir. 2001)........................................................................................ 6

*United States v. Kirk Tang Yuk*,
885 F.3d 57 (2d Cir. 2018)............................................................................. 7, 11, 12

*United States v. Kolfage*,
No. 20 Cr. 412 (AT), 2020 WL 7342796 (S.D.N.Y. Dec. 14, 2020) .......... 14, 15, 16, 17

*United States v. Lane*,
474 U.S. 438 (1986)............................................................................................... 9, 10

*United States v. Larsen*,
No. 13 Cr. 688 (JMF), 2014 WL 177411 (S.D.N.Y. Jan. 16, 2014)........................ 12

*United States v. Layne*,
No. 05 Cr. 87 (HB), 2005 WL 1009765 (S.D.N.Y. May 2, 2005) ........................... 17

*United States v. Leon*,
468 U.S. 897 (1984)........................................................................................... passim

*United States v. Levy*,
No. 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013) ................... 46, 54

*United States v. Lira*,
No. 22 Cr. 151 (LGS), 2022 WL 17417129 (S.D.N.Y. Dec. 5, 2022) ...................... 7

*United States v. Liu*,
239 F.3d 138 (2d Cir. 2000)................................................................................. 46, 50

*United States v. Lustyik*,
57 F. Supp. 3d 213 (S.D.N.Y. 2014)..................................................................... 46, 49

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)..................................................................... 13

*United States v. Mandell*,
   710 F. Supp. 2d 368 (S.D.N.Y. 2010)........................................ 27, 28, 31

*United States v. McDarrah*,
   351 F. App'x 558 (2d Cir. 2009) ............................................................ 47

*United States v. Mendoza*,
   734 F. Supp. 2d 281 (E.D.N.Y. Aug. 26, 2010) .................................. 14, 15

*United States v. Milton*,
   No. 21 Cr. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021) ........ 8

*United States v. Mitlof*,
   165 F. Supp. 2d 558 (S.D.N.Y. 2001)..................................................... 28

*United States v. Moore*,
   968 F.2d 216 (2d Cir. 1992)............................................................. 57, 58

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016)....................................................... 7

*United States v. Murphy*,
   No. 21 Cr. 280 (AKH), 2022 WL 1270958 (S.D.N.Y. Apr. 28, 2022) ... 27, 34

*United States v. Nadirashvili*,
   655 F.3d 114 (2d Cir. 2011)................................................................... 19

*United States v. Naranjo*,
   14 F.3d 145 (2d Cir. 1994)..................................................................... 11

*United States v. Nejad*,
   436 F. Supp. 3d 707 (S.D.N.Y. 2020)..................................................... 52

*United States v. Ohle*,
   678 F. Supp. 2d 215 (S.D.N.Y. 2010)............................................... 5, 7, 8

*United States v. Paduch*,
   No. 23 Cr. 181 (RA), 2024 WL 778938 (S.D.N.Y. Feb. 26, 2024)...... 5, 7, 8

*United States v. Panza*,
   750 F.2d 1141 (2d Cir. 1984)........................................................... 28, 31

*United States v. Parris*,
   No. 13 Cr. 17 (DAB), 2014 WL 2745332 (S.D.N.Y. June 17, 2014) ...... 27

*United States v. Pastore*,
   No. 17 Cr. 343 (NSR), 2018 WL 395490 (S.D.N.Y. Jan. 11, 2018) ........ 14

*United States v. Percoco*,
   No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017)...... 18

*United States v. Peterson*,
   357 F. Supp. 2d 748 (S.D.N.Y. 2005)....................................................... 5

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y. 2018)..................................................... 29

*United States v. Posner,*
    549 F. Supp. 475 (S.D.N.Y. 1982)...................................................................... 12, 13

*United States v. Pugh,*
    No. 15 Cr. 116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015) .................................. 49

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020)............................................................... 45, 46, 47

*United States v. Quinn,*
    401 F. Supp. 2d 80 (D.D.C. 2005) ................................................................. 13

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005) ......................................................................... 6

*United States v. Raniere,*
    No. 18 Cr. 2041 (NGG), 2019 WL 1984026 (E.D.N.Y. May 3, 2019) .................................. 55

*United States v. Ray,*
    541 F. Supp. 3d 355 (S.D.N.Y. 2021)........................................................... passim

*United States v. Raymonda,*
    780 F.3d 105 (2d Cir. 2015 ........................................................................ 57

*United States v. Redzepagic,*
    No. 17 Cr. 228 (DRH), 2020 WL 5232066 (E.D.N.Y. Sep. 2, 2020) ................................. 52

*United States v. Reed,*
    773 F.2d 477 (2d Cir. 1985)........................................................................ 6

*United States v. Requena,*
    980 F.3d 30 (2d Cir. 2020)........................................................ 19, 20, 23, 24

*United States v. Rigas,*
    258 F. Supp. 2d 299 (S.D.N.Y. 2003) ........................................................ 28, 31

*United States v. Riley,*
    906 F.2d 845 (2d Cir. 1990)................................................................ 46, 49, 52

*United States v. Riley,*
    No. 13 Cr. 339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan. 7, 2014)..................................... 5

*United States v. Rittweger,*
    259 F. Supp. 2d 275 (S.D.N.Y. 2003) ............................................................. 27

*United States v. Rosa,*
    11 F.3d 315 (2d Cir. 1993) ........................................................................ 41

*United States v. Rosa,*
    626 F.3d 56 (2d Cir. 2010)........................................................................ 57

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015).................................................................. 6, 9, 10

*United States v. Sarnelli,*
    No. 22 Cr. 116 (NRB), 2023 WL 199659 (S.D.N.Y. Jan. 17, 2023).............................. 5, 7

*United States v. Scott,*
    979 F.3d 986 (2d Cir. 2020) ...................................................................... 19

*United States v. Shea*,
No. 20 Cr. 412 (AT), 2022 WL 4298704 (S.D.N.Y. Sept. 19, 2022)..................... 12

*United States v. Silva*,
146 F.4th 183 (2d Cir. 2025) ........................................................... 40, 41, 43, 44

*United States v. Silver*,
117 F. Supp. 3d 461 (S.D.N.Y. 2015)................................................................ 33

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017)................................................................................ 22

*United States v. Slevin*,
106 F.3d 1086 (2d Cir. 1996)........................................................................... 9, 10

*United States v. Smith*,
9 F.3d 1007 (2d Cir. 1993)................................................................................... 41

*United States v. Sosa*,
379 F. Supp. 3d 217 (S.D.N.Y. 2019)................................................................. 40

*United States v. Spy Factory, Inc.*,
951 F. Supp. 450 (S.D.N.Y. 1997)................................................. 12, 14, 15, 18

*United States v. Stacy*,
802 F. App'x 611 (2d Cir. 2020) ........................................................................ 59

*United States v. Stein*,
429 F. Supp. 2d 633 (S.D.N.Y. 2006)................................................................... 5

*United States v. Stokes*,
733 F.3d 438 (2d Cir. 2013)................................................................................ 57

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013).................................................................................. 4

*United States v. Svoboda*,
347 F.3d 471 (2d Cir. 2003)................................................................................ 11

*United States v. Thomas*,
No. 22-1508, 2025 WL 2202512 (2d Cir. Aug. 4, 2025) ................................... 23

*United States v. Travisano*,
724 F.2d 341 (2d Cir. 1983)................................................................................ 41

*United States v. Tzolov*,
642 F.3d 314 (2d Cir. 2011)............................................................................ 7, 11

*United States v. Ulbricht*,
14 Cr. 68 (KBF), 2014 WL 5090039 (S.D.N.Y. Oct. 10, 2014),
*aff'd*, 858 F.3d 71 (2d Cir. 2017) ................................................................. 52, 55

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017)............................................................................ 46, 48

*United States v. Vaid*,
No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017)................... 33

*United States v. Van Hise*,

No. 12 Cr. 847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013)...................................... 7

*United States v. Ventresca*,
380 U.S. 102 (1965)............................................................................................... 41

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013).................................................................................... 4

*United States v. Wagner*,
989 F.2d 69 (2d Cir. 1993)........................................................................... 41, 45

*United States v. Wallace*,
No. 24 Cr. 411 (MKV), 2025 WL 1435066 (S.D.N.Y. May 19, 2025)................................. 54

*United States v. Wey*,
256 F. Supp. 3d 355 (S.D.N.Y. 2017)................................................................ 51

*United States v. Wey*,
No. 15-CR-611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)................... 33, 34

*United States v. Yannotti*,
541 F.3d 112 (2d Cir. 2008)................................................................................ 4

*United States v. Young*,
745 F.2d 733 (2d Cir. 1984).............................................................................. 46

*VonderAhe v. Howland*,
508 F.2d 364 (9th Cir. 1974) ........................................................................... 51

## Statutes

18 U.S.C. § 1956 ................................................................................................... 6, 19

18 U.S.C. § 1957 ............................................................................................. 6, 19, 23

18 U.S.C. § 1961 ....................................................................................................... 19

18 U.S.C. § 3006A .................................................................................................... 14

18 U.S.C. § 3237 ......................................................................................................... 6

18 U.S.C. § 4285 ....................................................................................................... 14

## Rules

FED. R. CRIM. P. 21 .................................................................................................. 12

FED. R. CRIM. P. 7 ............................................................................................... 4, 27

**INTRODUCTION**

The Government respectfully submits this memorandum in opposition to defendant Carl Erik Rinsch's pretrial motions to (1) dismiss the indictment for lack of venue or transfer the proceedings; (2) dismiss certain counts under the theory that 18 U.S.C. § 1957 is unconstitutionally vague; (3) require the Government to provide a bill of particulars; and (4) suppress evidence seized pursuant to search warrants issued for Rinsch's email account and electronic devices. (Dkts. 22–29).

The Court should deny each of those motions. The indictment adequately alleges venue, and the costs of transferring this case would far exceed any efficiencies gained through that transfer; Section 1957 is plainly constitutional, especially when applied to a defendant like Rinsch who both committed the underlying offense and laundered its proceeds; Rinsch is not entitled to a bill of particulars because he already has far more information than needed to prepare a defense; and the challenged search warrants are amply supported by probable cause, properly particularized and tailored, and were executed in good faith. In short, there is no merit to any of Rinsch's arguments.

**FACTUAL BACKGROUND**

Carl Rinsch is a film and television creator. (*See* Dkt. 2 (the "Indictment" or "Ind.")). In or about 2018, Rinsch, through his production company, entered into an agreement with Streaming Company-1 to give Streaming Company-1 the rights to a science-fiction television show he was creating called *White Horse*.[1] (Ind. ¶¶ 1, 6–7). As *White Horse* was only partially shot at that point, the parties' contract required Rinsch to complete the show's production. (Ind. ¶¶ 1, 6–8). In exchange, Streaming Company-1 agreed to pay Rinsch tens of millions of dollars. (Ind. ¶¶ 1, 8).

---

[1] Capitalized terms not defined in this filing adopt the meanings used in the Indictment.

Starting around the end of 2019, Rinsch began claiming that he needed additional money from Streaming Company-1 to finish the show. (Ind. ¶ 9). That demand kicked off weeks of negotiations between the parties. (*Id.*). During those discussions, Streaming Company-1 made clear that if it agreed to give Rinsch more money, he could not simply use that additional funding as he saw fit—say, to give himself a larger salary. (*Id.*). Rinsch would instead need to promise to use the money only for certain enumerated production-related tasks, including editing footage that he'd already shot. (*Id.*). Rinsch agreed. (*Id.*). And so, on or about March 6, 2020, Streaming Company-1 wired approximately $11 million to a bank account in the name of Rinsch's production company (the "March Payment").[2] (Ind. ¶¶ 9, 10).

Unfortunately, Rinsch was lying. He had no intention of using the March Payment to fund *White Horse*. Almost immediately after Streaming Company-1 wired the funds, Rinsch routed the March Payment through a series of different bank accounts until he eventually collected the money in a personal brokerage account. (Ind. ¶ 10.). Rinsch then spent millions of that money gambling on speculative securities investments, including options contracts. (Ind. ¶ 11; *see also, e.g.*, Ind. ¶¶ 22, 24, 26). Within a matter of weeks, he had lost more than half of Streaming Company-1's money. (Ind. ¶ 11).

But Rinsch didn't stop there. Rather than come clean about his scheme, Rinsch continued to lie. (Ind. ¶ 12). He spent the next few months sending executives at Streaming Company-1 various rosy updates about *White Horse*'s status, including claiming (falsely) that everything was "awesome and moving forward really well." (*Id.*). His goal was clear: to reassure Streaming

---

[2] Rinsch makes certain claims in his motions regarding the completion of principal photography, Streaming Company-1's obligation to pay him additional funds under the parties' contract, and the relationship between the March Payment and a supposed second season of *White Horse*. (*See, e.g.*, Dkt. 23 at 7). Although none of those assertions are relevant to the motions pending before the Court, they are all inaccurate.

Company-1 and conceal his fraud. (*Id.*).

While Rinsch continued to maintain this ruse, he switched investment tactics. In early 2021, he took what remained of his fraud proceeds and invested the money in cryptocurrencies. (Ind. ¶ 13). Unlike his previous investment, this one proved profitable. (*Id.*) But even so, Rinsch still refused to use those earnings to fund *White Horse* or return the money he'd stolen from Streaming Company-1. Instead, he went on a spending spree. (Ind. ¶ 14). Between in or about June 2021 and in or about November 2022, Rinsch spent roughly $10 million on personal expenses and luxury items, including millions of dollars on high-end cars and furniture. (*Id.*)

Rinsch never completed *White Horse*, and he never returned the March Payment to Streaming Company-1. (Ind. ¶ 15).

In or about March 2025, a grand jury in this District indicted Rinsch for his scheme to defraud Streaming Company-1 and his laundering of the fraud proceeds. Specifically, the Indictment charges Rinsch with one count of wire fraud tied to the various false statements he made to Streaming Company-1 in order to obtain and retain the March Payment (Ind. ¶¶ 1–16), one count of money laundering related to the steps Rinsch took to move and conceal his fraud proceeds (Ind. ¶¶ 17–18), and five counts of engaging in monetary transactions with those proceeds (Ind. ¶¶ 19–28).

## ARGUMENT

Rinsch has filed four pre-trial motions seeking various forms of relief. *First*, Rinsch moves either to dismiss the Indictment for lack of venue or to transfer the prosecution to his home district, the Central District of California. (Dkts. 28–29). *Second*, Rinsch moves to dismiss Counts Three through Seven under the theory that 18 U.S.C. § 1957 is unconstitutionally vague. (Dkts. 24–25). *Third*, Rinsch asks the Court to order the Government to prepare a bill of particulars. (Dkts. 26–27). *Fourth*, Rinsch seeks to suppress evidence from search warrants the Government obtained for

his email account and several electronic devices seized during a search of his residence. (Dkts. 22–23). The Court should deny each of Rinsch's motions in their entirety.

## I. Rinsch's Venue-Related Challenges are Meritless

### A. Venue

Rinsch's motion to dismiss based on venue should be denied. Each count in the Indictment alleges that the charged conduct occurred "in the Southern District of New York and elsewhere." That is all that is required at this stage. And even if it were not, the Indictment and the facts set forth in this submission make clear that the Government will establish that venue is proper at trial.

#### 1. Law Applicable to Motions to Dismiss

Federal rules require that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Vilar*, 729 F.3d 62, 80 n.16 (2d Cir. 2013) (quoting FED. R. CRIM. P. 7(c)(1)). "An indictment is sufficient as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021) (cleaned up). That is not a difficult standard to meet. "[L]ittle more" is needed than for an indictment "to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008); *see also United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).

Should an indictment satisfy these requirements, that is enough to call for a trial. After all, summary judgment proceedings "do[] not exist in federal criminal procedure." *Dawkins*, 999 F.3d at 780. Courts must treat the allegations in an indictment as true, *see Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985), and a facially valid indictment is not subject to challenge based on the quality or

quantity of evidence, *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). Trial—not a pre-trial motion—is the appropriate mechanism for weighing and testing evidence. *See Dawkins*, 999 F.3d at 780.

These general rules are no different when it comes to challenges regarding venue. "To survive a motion to dismiss for lack of venue, the prosecution need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information." *United States v. Chocron*, No. 20 Cr. 400 (JSR), 2021 WL 3005086, at *1 (S.D.N.Y. July 14, 2021); *see also United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005) (Chin, *J.*) (similar); *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (similar). In practice, that means "the mere allegation that an offense occurred 'in the Southern District [of New York] and elsewhere' is sufficient to overcome a pretrial motion to dismiss." *United States v. Paduch*, No. 23 Cr. 181 (RA), 2024 WL 778938, at *1 (S.D.N.Y. Feb. 26, 2024) (quoting *United States v. Riley*, No. 13 Cr. 339 (RPP) 2014 WL 53440, at *3 (S.D.N.Y. Jan. 7, 2014)); *see also United States v. Sarnelli*, No. 22 Cr. 116 (NRB), 2023 WL 199659, at *7 (S.D.N.Y. Jan. 17, 2023) (explaining that "innumerable courts in this District have held" that such general allegations are "sufficient to support venue at this stage" (quoting *United States v. Dupigny*, No. S1 18 Cr. 528 (JMF), 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019)). "The ultimate question of whether there is sufficient evidence to support" those venue allegations is a matter "left for trial." *Paduch*, 2024 WL 778938, at *2 (quoting *Ohle*, 678 F. Supp. 2d at 231); *see also United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) (same).

### 2. General Principles of Venue

A criminal defendant "has the right to be tried in the 'district wherein the crime shall have been committed.'" *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d

Cir. 1989). That does not mean, however, that the prosecution of every crime is constrained to "a single exclusive venue." *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985). For instance, a continuing offense may be prosecuted in any district in which the offense occurred, even if only in part. *See United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005); *see also* 18 U.S.C. § 3237(a) (stating that venue for a continuing crime is proper "in any district in which such offense was begun, continued, or completed").

This case involves charges of wire fraud and money laundering. As to wire fraud, venue "lies [in any district] where a wire in furtherance of [the] scheme begins its course, continues[,] or ends." *United States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015). So long as that requirement is met, the defendant himself need not be in the district where the wire was sent to or from, nor need he have personally sent the wire. *See United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001). As for money laundering under either 18 U.S.C. §§ 1956 or 1957, venue is proper in any district in which "the financial or monetary transaction is conducted."[3] 18 U.S.C. § 1956(i)(A); *see also United States v. Cabrales*, 524 U.S. 1, 8 (1998) (acknowledging that venue can be appropriate in two different districts if the money laundering transaction occurred in both). The mere receipt of funds is sufficient to constitute participation in a financial transaction for purposes of the money laundering statutes. *See United States v. Gotti*, 459 F.3d 296, 335 (2d Cir. 2006) ("[W]hen a person accepts a transfer or delivery of funds, he has participated in the conclusion of that transfer or delivery, and has therefore conducted a transaction.").

---

[3] The venue analysis for a money laundering charge is distinct from venue for the specified unlawful activity that generated the criminal proceeds. *See United States v. Cabrales*, 524 U.S. 1, 6–7 (1998) (remarking, when analyzing a question of venue, that money laundering counts "interdict only the financial transactions . . . , not the anterior criminal conduct that yielded the funds allegedly laundered").

Courts in this district have occasionally supplemented the standard venue inquiry with a "substantial contacts" test. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018). That test considers numerous factors, including the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the venue for accurate factfinding. *Kirk Tang Yuk*, 885 F.3d at 70. But where the defendant's own actions in furtherance of the crime occur in the charging district, the test is satisfied. *See, e.g.*, *United States v. Tzolov*, 642 F.3d 314, 321 (2d Cir. 2011) ("Though *Reed* refers to a 'substantial contacts rule' for determining venue[,] it is clear that the court regarded the locale of the defendant's acts as a sufficient basis for establishing venue." (cleaned up)); *see also Kirk Tang Yuk*, 885 F.3d at 70 ("When an overt act in furtherance of a criminal conspiracy has been committed in the district, . . . th[e] supplemental inquiry has no relevance.").

### 3.     Discussion

The Indictment in this case is not subject to dismissal based on venue. It alleges that each offense occurred "in the Southern District of New York and elsewhere." (*See* Ind. ¶¶ 16, 18, 20, 22, 24, 26, 28). That alone is enough to overcome Rinsch's motion. *See, e.g.*, *Paduch*, 2024 WL 778938, at *1 ("[T]he mere allegation that an offense occurred 'in the Southern District [of New York] and elsewhere' is sufficient to overcome a pretrial motion to dismiss."); *Sarnelli*, 2023 WL 199659, at *7 (same); *United States v. Lira*, No. 22 Cr. 151 (LGS), 2022 WL 17417129, at *1–2 (S.D.N.Y. Dec. 5, 2022) (same); *Chocron*, 2021 WL 3005086, at *1 (same); *United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) (same); *United States v. Van Hise*, No. 12 Cr. 847 (PGG), 2013 WL 6877319, at *6–7 (S.D.N.Y. Dec. 31, 2013) (same); *Ohle*, 678 F. Supp. 2d at 231 (same); *United States v. Elcock*, No. 07 Cr. 582 (CM), 2008 WL 123842, at *3 (S.D.N.Y.

Jan. 10, 2008) (same). Whether the evidence supports those allegations is a question left for trial. *See Paduch*, 2024 WL 778938, at *2 (quoting *Ohle*, 678 F. Supp. 2d at 231).

Accordingly, the Court need go no further in its analysis. It can—and, indeed, should—deny Rinsch's motion to dismiss based on the allegations in the Indictment alone. Rinsch's arguments to the contrary are based on the incorrect assertion that the Indictment must allege with specificity precisely how the charged conduct connects to this district. (Dkt. 29 at 8–9). That is not the law. *United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328, at *4 (S.D.N.Y. Nov. 15, 2021) (rejecting the idea that "the indictment . . . [must] indicate which specific criminal acts were committed in this district as [that is] premature at the pre-trial motion to dismiss stage"); *United States v. Chalmers*, 474 F. Supp. 2d 555, 574–75 (S.D.N.Y. 2007) (similar). As this Court has previously acknowledged, all that is needed are general allegations "that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information." *Chocron*, 2021 WL 3005086, at *1.

While not a proper consideration at this stage, the evidence the Government expects to present at trial will satisfy the venue requirements. *Chalmers*, 474 F. Supp. 2d at 575 (discussing a proffered preview of venue evidence the Government expected to introduce at trial). Specifically, as to each count, Rinsch committed at least part of the charged crime in the Southern District of New York.[4]

As to the wire fraud charged in Count One, the Government expects to prove at trial that Rinsch sent various communications in furtherance of his fraudulent scheme to Streaming

---

[4] The Government does not intend for this submission to contain a full proffer of the evidence that it expects to present concerning venue, and the Government reserves its right to introduce additional or different bases for venue at trial. *See, e.g.*, *Chalmers*, 474 F. Supp. 2d at 575 (explaining that "the proffered 'preview' from the Government does not constitute the whole of its evidence supporting venue").

Company-1 executives who were located in the Southern District of New York. Those communications were sent both (i) before Rinsch obtained the March Payment, and were intended to convince Streaming Company-1 to send Rinsch that money, and (ii) after Rinsch received and willfully misused those funds, and were intended to "lull [Streaming Company-1] into a false sense of security," *United States v. Lane*, 474 U.S. 438, 451 (1986), and preserve Rinsch's business relationship with his victim, *United States v. Slevin*, 106 F.3d 1086, 1089–90 (2d Cir. 1996).[5]

For example, the Government expects to introduce evidence showing that in or about December 2019, Rinsch messaged a senior executive at Streaming Company-1 ("Executive-1"), who was then located in this District, to set up a "state of the union" to discuss *White Horse* and its future. This message was one of the original steps Rinsch took to convince Streaming Company-1 to send him the March Payment. Indeed, when Rinsch later sent Streaming Company-1 a written request expressly asking for additional funding, he supported that ask with a document he titled "State of the Union"—drawing a clear link between his outreach in December 2019, and the negotiations surrounding the March Payment. Rinsch's decision to send a wire into this District in furtherance of his scheme to defraud Streaming Company-1 clearly satisfies venue.[6] *See Rutigliano*, 790 F.3d at 397.

Likewise, the Government expects to introduce various messages Rinsch sent to Executive-

---

[5] Both categories of false statements are alleged in the Indictment, and the Indictment makes clear that Rinsch's false statements were sent to and from this District, among other locations. (*See* Ind. ¶ 9 (alleging that Rinsch made various statements to convince Streaming Company-1 to send him the March Payment); *id.* ¶ 12 (alleging that Rinsch continued to "conceal his fraud" from Streaming Company-1 based on false statements he made after receiving the March Payment); *id.* ¶ 16 (alleging that Rinsch sent and caused others to send "emails and other electronic communications to and from the Southern District of New York" in furtherance of his fraud)).

[6] The Government expects to prove that Executive-1's presence in this District was foreseeable to Rinsch through, among other evidence, Rinsch's own message to Executive-1, which referenced speaking further in person once Executive-1 was "back from NYC."

1 between in or about July and August 2020, stating, in substance, that he wanted to discuss next steps for *White Horse*'s production, as well as emails and a call that Rinsch exchanged with a senior member of Streaming Company-1's legal department ("Executive-2") in or about November 2020, to discuss the state of the parties' ongoing relationship. The Government expects to prove that Executive-1 and Executive-2 were in this District during those exchanges, and that Rinsch's messages were intended, at least in part, to further his fraudulent scheme by preserving his relationship with Streaming Company-1 and preventing Streaming Company-1 from discovering his fraud.[7] *See Lane*, 474 U.S. at 451 (explaining that lulling messages can further a fraudulent scheme); *Rutigliano*, 790 F.3d at 396–97 (same); *Slevin*, 106 F.3d at 1089–90 (same); *see also Schmuck v. United States*, 489 U.S. 705, 711–12 (1989) (reasoning that "[a] rational jury could have concluded that the success of [the defendant's] venture depended upon his continued harmonious relations with, and good reputation among," the victims of his fraudulent scheme).

As to the various money laundering charges in Counts Two through Seven, the Government expects to prove that each count involved transactions that occurred, at least in part, in this District. For instance, the Government expects to prove that as to Counts Two and Three, certain of the banks through which Rinsch transferred his fraud proceeds were based in Manhattan. That includes a bank that helped to facilitate an approximately $8.5 million transfer into Rinsch's brokerage account on or about March 30, 2020. (Ind. ¶¶ 18, 20); *Chocron*, 2021 WL 3005086, at *2 (commenting on the "'substantial jurisdictional act' of laundering funds through a Manhattan bank account"). And with respect to Counts Four through Seven, the Government expects to prove that, for each transaction, either Rinsch's counterparty or the stock exchange over which the

_____

[7] Again, the Government expects to prove that the executives' presence in this District—where Streaming Company-1 has an office—was foreseeable to Rinsch through, among other facts, Executive-2's express statement to Rinsch over email that he/she was "in NY" at the time.

transaction was conducted was based in Manhattan. That is enough to satisfy venue.[8] *See, e.g.*, *United States v. Buyer*, No. 23-7202-cr, 2025 WL 855773, at *5 (2d Cir. Mar. 19, 2025) (summary order) (concluding, in the context of a securities fraud count, that the fraudulent transaction had occurred in this district because, among other proof, "[t]he government [] offered evidence that Buyer traded on the New York Stock Exchange . . . , [which is] headquartered in SDNY"); *United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021) (similar).

The foregoing indicates not only that the Constitutional venue requirements are met, but that the substantial contacts test has no additional relevance here. After all, Rinsch himself caused both wires in furtherance of his fraudulent scheme *and* money laundering transactions to occur in this District. The substantial contacts test is therefore satisfied. *See, e.g.*, *Kirk Tang Yuk*, 885 F.3d at 70; *Tzolov*, 642 F.3d at 321. Indeed, far less would be sufficient. For instance, in *United States v. Naranjo*, the substantial contacts test was met for a defendant who was charged in this District because her *co-conspirator*—rather than the defendant herself—placed calls into the district in furtherance of the conspiracy. 14 F.3d 145, 147 (2d Cir. 1994).

In sum, the Indictment should not be dismissed for lack of venue. Any factual challenges that Rinsch wishes to mount on this topic are appropriately left for trial.

## B.     Transfer

Rinsch separately asks the Court to transfer this prosecution to the Central District of California, where he lives. (Dkt. 29 at 10–11). But far from streamlining proceedings, such a transfer would serve only to increase costs, delay trial, and require yet another replacement of

---

[8] The Government expects to prove that it was foreseeable to Rinsch that these securities transactions would occur in the Southern District of New York given Rinsch's knowledge about stock and option trading, which Rinsch himself described as "extensive." *See, e.g.*, *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (reasoning that a savvy investor could foresee that a securities transaction may be executed on a Manhattan-based exchange).

Rinsch's attorneys. The Court should deny this request.

### 1. Applicable Law

"As a general rule[,] a criminal prosecution should [remain] in the original district" where the case was charged. *United States v. Shea*, No. 20 Cr. 412 (AT), 2022 WL 4298704, at *4 (S.D.N.Y. Sept. 19, 2022); *see also Kirk Tang Yuk*, 885 F.3d at 74 n.5 (same); *United States v. Posner*, 549 F. Supp. 475, 477 (S.D.N.Y. 1982) (same). A court may, however, transfer a case in certain circumstances. Such transfers are governed by Rule 21(b), which provides that, "for the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to that defendant or any one or more of the counts thereof to another district." FED. R. CRIM. P. 21(b). The burden of justifying transfer rests on the defendant. *United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 464 (S.D.N.Y. 1997).

It is "not often" that a defendant is able to meet this substantial burden. *United States v. Larsen*, No. 13 Cr. 688 (JMF), 2014 WL 177411, at *2 (S.D.N.Y. Jan. 16, 2014). To do so, a defendant must show that trial in the original district "would be so unduly burdensome that fairness requires the transfer to another district." *Id.*; *see also United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 703391, at *2 (S.D.N.Y. Feb. 12, 2020) (same). In *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240 (1964), the Supreme Court set forth a list of factors that courts routinely consult when analyzing a defendant's motion to transfer: (1) location of defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district involved; and (10) any other special elements that might affect the transfer. *Spy Factory*, 951 F. Supp. at 455 (citing *Platt*, 376 U.S. at 244). "No one

of these considerations is dispositive, and it remains for the court to try to strike a balance and determine which factors are of greatest importance." *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990) (cleaned up).

Generally speaking, "there has been a 'trend in recent years away from granting transfers.'" *United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL 5690711, at *2 (S.D.N.Y. Nov. 4, 2019) (quoting *United States v. Quinn*, 401 F. Supp. 2d 80, 85–86 (D.D.C. 2005) (citing cases and treatises)). And for good reason. Since *Platt* was decided in 1964, "the massive expansion of technology and the relative decline in costs for long-distance travel over the past few decades" have greatly reduced the circumstances where transfer is justified. *Blondet*, 2019 WL 5690711, at *2 (quoting *Quinn*, 401 F. Supp. 2d at 86).

### 2. Discussion

None of the *Platt* factors justify deviating from the "general rule" that this prosecution should proceed where originally charged. *See Posner*, 549 F. Supp. at 477. Each is either neutral or counsels in favor of keeping the case in the Southern District of New York.

***Residence of the Defendant.*** While there is no dispute that Rinsch resides in the Central District of California (Dkt. 29 at 11), this factor is at most neutral. It is well-established that a defendant's residence "has no independent significance in determining whether transfer to [a different] district would be 'in the interest of justice." *United States v. Christian*, No. 12 Cr. 41 (KBF), 2012 WL 1134035, at *1 (S.D.N.Y. Apr. 2, 2012) (quoting *Platt*, 376 U.S at 245). Simply put, "the inconvenience of having to stand trial outside of one's home district, without more, is insufficient to warrant a transfer." *United States v. Coriaty*, No. 99 Cr. 1251 (DAB), 2000 WL 1099920, at *2 (S.D.N.Y. Aug. 7, 2000) (cleaned up). And there is no "more" here.

The principal complaint that Rinsch raises is that he is unable to meet regularly with his

counsel in person. (Dkt. 29 at 12). But that is not a reason to uproot this prosecution and ship it off to another district. As numerous courts have already concluded when considering this precise argument, any efficiencies gained by transferring the case would be accompanied by the significant cost of appointing new counsel in the transferee district, who would be unfamiliar with the case. *See United States v. Jones*, No. 21 Cr. 59 (LAP), 2021 WL 3500806, at *5 (S.D.N.Y. Aug. 5, 2021); *United States v. Pastore*, No. 17 Cr. 343 (NSR), 2018 WL 395490, at *5 (S.D.N.Y. Jan. 11, 2018). And courts have also remarked—albeit, in the context of other *Platt* factors—that the need for in-person meetings has waned in light of the advances made to remote technologies like videoconferencing software and telephones. *See Jones*, 2021 WL 3500806, at *3 (discussing witness preparation); *United States v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796, at *5 (S.D.N.Y. Dec. 14, 2020) (discussing business disruption); *United States v. Estrada*, 880 F. Supp. 2d 478, 484 (S.D.N.Y. 2012) (same); *Spy Factory*, 951 F. Supp. at 458 (same).

Rinsch also argues that his financial situation will make it difficult for him to attend trial in New York. (Dkt. 29 at 13). But various mechanisms exist to fund Rinsch's travel and presence at trial. Indeed, based on flight records and Rinsch's attendance at several pre-trial conferences, it appears that he has traveled to this District at least three separate times since the Indictment was unsealed in March 2025—nearly once every two months. And going forward, Rinsch's reasonable travel and lodging expenses can continue to be paid for using the travel funding authorized by 18 U.S.C. § 4285, as well as the funding provided under 18 U.S.C. § 3006A, *see United States v. Mendoza*, 734 F. Supp. 2d 281, 286 (E.D.N.Y. Aug. 26, 2010). Indeed, in *United States v. Mendoza*, the court refused to transfer an approximately two-week trial from the Eastern District of New York to the defendant's home district in California despite the defendant not only claiming similar financial difficulties to Rinsch but also acting as a single parent to a young child. 734 F.

Supp. 2d at 282–83.

In sum, while Rinsch may prefer to be tried in California, none of the issues he cites call for the extraordinary remedy of transferring this prosecution to a new district.

***Location of Witnesses***. The location of witnesses does not weigh in favor of transfer. To rely on this factor, a defendant must "specifically describe how particular witnesses would be *entirely prevented* from testifying at trial in the Southern District of New York." *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at \*4 (S.D.N.Y. Oct. 9, 2020) (emphasis added); *see also Spy Factory*, 951 F. Supp. at 456 (similar). Put differently, the "naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice." *Spy Factory*, 951 F. Supp. at 456 (internal quotation marks and citation omitted). A defendant instead must make "a specific proffer of testimony from specific witnesses to allow the court to make an informed decision about the importance of these witnesses to [the defendant's] case." *United States v. Juncal*, No. 97 Cr. 1162 (JFK), 1998 WL 473949, \*5 (S.D.N.Y. Aug. 7, 1998). Moreover, "in this age of easy air travel, this factor is generally much less relevant than it was in 1964, when the Supreme Court decided *Platt*." *United States v. Ebbers*, No. 02 Cr. 1144 (BSJ), 2004 WL 2346154, at \*1 (S.D.N.Y. Oct. 18, 2004).

Rinsch repeatedly references the fact that many of the *Government's* expected trial witnesses (but not his own witnesses) live in California.[9] (Dkt. 29 at 13). But he identifies no witness who would be entirely unable to attend trial if it were held in this District, let alone specify what those unidentified witnesses might say were they to be called. Both showings are necessary for this factor to support transfer. *See, e.g.*, *Kolfage*, 2020 WL 7342796, at \*3 (concluding that

---

[9] Although the Government has not finalized its witness list, it expects to also call witnesses who are located in places other than California, including New York.

witness location did not support transfer where the defendant did not "identify the witnesses or their testimony, nor [did] he offer any details as to why they cannot travel to New York other than that their 'travel expenditures will be costly and burdensome'"); *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2019 WL 4640232, at *3 (S.D.N.Y. Sept. 24, 2019) ("[T]ransfer is unwarranted based on the mere possibility that unnamed, purported character witnesses will be unable to testify because of the location of the trial."); *Christian*, 2012 WL 1134035, at *2 (reasoning that witness location did not support transfer where defendants "address[ed] the convenience of the witnesses with conclusory averments" that trial in this district would be less convenient and "d[id] not put forward any evidence that potential witnesses would be unwilling and unable to travel to the Southern District of New York").

***Location of Events.*** While many actions in this case took place in California, Rinsch ignores the relevant events that occurred here. For instance, as explained above, Rinsch sent a number of wire communications in furtherance of his scheme to Streaming Company-1 executives while those executives were in the Southern District of New York (Count One); Rinsch's criminal proceeds were laundered through bank accounts in this District (Counts Two and Three); and Rinsch conducted numerous transactions involving his fraud proceeds with a counterparty in this District or using an exchange based in this District (Counts Four through Seven). This factor therefore does not support transfer.

***Location of Documents and Records.*** As a result of subpoenas, search warrants, and voluntary productions, the relevant documentary and electronic evidence has already been brought to this District. In such circumstances, the location of documents is at most a neutral consideration. *See Kolfage*, 2020 WL 7342796, at *4. And, in any event, "it is well settled that given the conveniences of modern transportation and communication, the location of the documents is a

minor concern." *Id.* (cleaned up); *see also United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008) (explaining that "the location of documents and records is not a major concern in these days of easy and rapid transportation"); *United States v. Layne*, No. 05 Cr. 87 (HB), 2005 WL 1009765, at *4 (S.D.N.Y. May 2, 2005) (similar). This factor does not support transfer.

**Disruption of Rinsch's Business.** Rinsch admits that he is currently unemployed (Dkt. 29 at 12), meaning that he has no business to disrupt. This factor therefore does not favor transfer. *See Calk*, 2020 WL 703391, at *4 (reaching this conclusion in a case where the defendant was unemployed).

**Expense to the Parties.** The expense to the parties of transferring this case weighs against transfer. As for Rinsch, he has provided nothing to conclude that defending this case will be less costly for him in California than in New York. To the contrary, he has been appointed counsel in this District, and his travel expenses have been paid for using public funding methods. From his perspective, then, the cost of defending the case is no different here than it is in California. From the Government's perspective, however, a transfer would be incredibly costly, involving relocating several Assistant United States Attorneys, paralegals, and law enforcement officers. Those costs are real and weigh strongly against transfer. *See United States v. Canale*, No. 14 Cr. 713 (KBF), 2015 WL 3767147, at *4 (S.D.N.Y. June 17, 2015) (denying transfer where it "would require the Government to transport and house two prosecutors, as well as a paralegal and several case agents"); *Ebbers*, 2004 WL 2346154, at *2 ("It would impose an enormous burden on the government to move the prosecutors, investigators, support staff, court staff, and others familiar with this case . . . to another jurisdiction"); *United States v. Carey*, 152 F. Supp. 2d 415, 422 (S.D.N.Y. 2001) (denying transfer where, among other things, the effect would be "merely to shift

the economic burden to the government"); *Brooks*, 2008 WL 2944626, at *3; *Spy Factory*, 951 F. Supp. at 459. And of course, a transfer would have the added expense of requiring the appointment of yet another set of counsel to defend Rinsch, who would need to become acquainted with the case. This factor weighs against transfer.

**Location of Counsel.** The seventh *Platt* factor, the location of counsel, does not favor transfer. Rinsch's lawyers, like the Government's lawyers, are based here in New York.

**Accessibility of Place of Trial.** The eighth *Platt* factor, the relative accessibility of place of trial, does not favor transfer. It is not reasonably subject to dispute that Manhattan is one of the most accessible locations in the United States. *See United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *17 (S.D.N.Y. Dec. 11, 2017) ("New York City is clearly an accessible transportation hub"); *Christian*, 2012 WL 1134035, at *2 ("New York is easily accessible by air with three major airports, as well as a variety of other public transportation"). So to the extent that any witnesses are required to travel from outside of New York to testify, the inconvenience will be minimal.

**Docket Conditions.** The ninth *Platt* factor, the docket conditions of the district courts involved, also does not support transfer. Rinsch puts forward no argument as to how conditions in the Central District of California compare to those in the Southern District of New York. Moreover, were the case to be transferred now, it would almost certainly require adjourning the December trial date set by this Court, as it is unlikely a new court would be able to accommodate scheduling a multi-week trial on such short notice, particularly one in which new counsel will also need to be appointed. Such an adjournment is yet one more reason that transfer should be highly disfavored here.

## II. The Court Should Deny Rinsch's Vagueness Motion

Rinsch asserts that the Court should dismiss Counts Three through Seven because the statute charged in those counts, 18 U.S.C. § 1957, is unconstitutionally vague. (Dkts. 24, 25). There is no merit to this argument.

### A. Applicable Law

As relevant here, Section 1957(a) makes it a crime for a person to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." A "monetary transaction," under the statute, means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument." 18 U.S.C. § 1957(f)(1). "[C]riminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* § 1957(f)(2). "Specified unlawful activity" includes wire fraud. *Id.* §§ 1956(c)(7)(A), 1957(f)(3), and 1961(1)(B).

The Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020) ("The void-for-vagueness doctrine springs from the Fifth Amendment's due process clause."). The Second Circuit "typically evaluate[s] vagueness challenges to statutes not threatening First Amendment interests . . . in light of the facts of the case at hand, *i.e.*, only on an as-applied basis." *United States v. Requena*, 980 F.3d 30, 40 (2d Cir. 2020).

In the context of an as-applied vagueness challenge, "one whose conduct is clearly proscribed by a statute cannot challenge it as void for vagueness." *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020); *United States v. Nadirashvili*, 655 F.3d 114, 122 (2d Cir. 2011) (same);

*United States v. Blarek*, Nos. 98-1291, 98-1292, 1998 WL 907429, at *3, 166 F.3d 1202 (2d Cir. Dec. 23, 1998) (summary order included in table) (same) ("It is, of course, settled law that a challenger who engages in some conduct that is clearly proscribed . . . cannot complain of the vagueness of the law as applied to the conduct of others."); *United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997) (same)); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 23 (2010) (same). Thus, "even if there might be theoretical doubts regarding" the scope of a statute, a "defendant's vagueness challenge fail[s]" where "his case present[s] no such problem." *Humanitarian Law Project*, 561 U.S. at 23.

**B.     Discussion**

Rinsch argues that Section 1957 is unconstitutional both as applied to him and on its face because it lacks guidelines to direct its application, is overbroad, invites arbitrary enforcement, and permits asset seizures and excessive financial penalties without due process. (Dkt. 25 at 1). Those arguments are without merit. Rinsch cites no cases finding that Section 1957 is unconstitutionally vague, either as applied or facially, and the Government has not located any such cases. To the contrary, every court to have considered the issue, including the Second Circuit in an unpublished decision and other Circuits in published decisions, have rejected materially identical vagueness challenges to Section 1957. *See, e.g.*, *Blarek*, 1998 WL 907429, at *3; *United States v. Bazazpour*, 690 F.3d 796, 801 (6th Cir. 2012); *United States v. Baker*, 19 F.3d 605, 614 (11th Cir. 1994); *United States v. Gabriele*, 63 F.3d 61, 65 (1st Cir. 1995).

*First*, because Rinsch has asserted no infringement of his First Amendment rights, the Court should evaluate his motion on an as-applied basis only. *See Requena*, 980 F.3d at 40. Evaluated on that basis, Rinsch's vagueness challenge plainly fails.

Count One of the Indictment alleges that Rinsch committed wire fraud by falsely

representing that he would use Streaming Company-1's funds to produce a show, in order to obtain approximately $11 million, which he ultimately used for his own personal benefit. After Streaming Company-1 transferred the funds to a business bank account under Rinsch's control, Rinsch quickly transferred the funds through other bank accounts under his control before consolidating approximately $10.5 million of the funds in a personal brokerage account. He then used proceeds of his fraud to make extremely risky purchases of securities and speculate on cryptocurrency, eventually using some of the proceeds on luxury items, such as expensive furniture. Counts Three through Seven, which allege that Rinsch knowingly transferred or caused to be transferred proceeds of the wire fraud charged in Count One out of bank accounts (Counts Three and Seven) and a brokerage account (Counts Four through Six), concern certain of these transactions.

Rinsch does not dispute that wire fraud is covered by Section 1957, and the transactions charged here—transfers of $8.5 million from one bank account into another (Count Three); tens and hundreds of thousands of dollars out of a brokerage account to purchase securities (Counts Four through Six); and approximately $150,000 from a bank account to purchase high-end furniture (Count Seven)—plainly constitute "monetary transactions" under Section 1957, defined to include the "deposit, withdrawal, transfer, or exchange . . . of funds or a monetary instrument . . . by, through, or to a financial institution." The defendant does not—and cannot—argue otherwise.

Furthermore, just as in *Blarek*, here "there is no doubt that [Rinsch was] aware that the [funds he] received [as a result of his wire fraud] was 'criminally derived property.'" 1998 WL 907429, at *3 (rejecting challenge to Section 1957 as unconstitutionally vague, explaining "even if a phrase in a statute might be vague as applied to extreme situations, that fact does not make the statute void for vagueness" where "a defendant's conduct falls within the core of the statute").

Indeed, the funds Rinsch transferred were derived directly from his own corrupt actions, of which he unquestionably had direct knowledge. *See Baker*, 19 F.3d at 614 (Section 1957 "clearly proscribed" the defendants' conduct of "deposit[ing] into their bank accounts funds that they had derived from their own criminal fraud activities").

Rinsch's claim that he "could not and would not have been on notice that openly transferring" money he stole among his accounts would constitute a separate crime (Dkt. 25 at 5–6) is belied by the language of the statute, which plainly criminalizes doing exactly what he did—knowingly engaging in monetary transactions in criminally derived property that was derived from specified unlawful activity, a term that is clearly defined to include wire fraud. Given Second Circuit authority, he was also on notice that he could not insulate such transactions from criminal liability simply by intermingling his fraud proceeds with other money. *See United States v. Silver*, 864 F.3d 102, 115 (2d Cir. 2017).

Furthermore, Rinsch's claim that the statute is unconstitutional as applied to him because the Government could "potentially seize and freeze" his money "that happens to have been commingled with the alleged fraud proceeds . . . without adequate notice or due process" is frivolous. (Dkt. 25 at 6). The Government's authority to seize assets and the process by which it may do so is governed by detailed statutes that Rinsch does not appear to challenge. (*See, e.g.*, Ind. ¶¶ 29–31 (citing 18 U.S.C. § 981, 982; 21 U.S.C. § 853; 28 U.S.C. § 2461)). Among other things, Section 981 provides notice that "[a]ny property . . . involved in a transaction . . . in violation of section . . . 1957" is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(A). It also, sets forth the processes by which the Government may accomplish such forfeiture, such as by obtaining a warrant. *See* 18 U.S.C. § 981(b). In any event, the Government has not seized or frozen any of Rinsch's assets.  As such, the statute has in no way been applied to him in this way.

In sum, the Indictment plainly alleges that Rinsch "engage[d] in some conduct that is clearly proscribed" by Section 1957, and accordingly he "cannot complain of the vagueness of the law." *Amer*, 110 F.3d at 878. The vagueness challenge should therefore be rejected.

*Second*, in the event this Court considers Rinsch's facial challenge to Section 1957 notwithstanding that his own conduct is clearly proscribed, such a facial challenge also fails. *See Requena*, 980 F.3d at 40 ("Despite [the Second Circuit's] baseline aversion to facial challenges, [it is] permitted to consider them in appropriate cases, and [it has] done so in the past to facilitate a challenge's definitive rejection.").[10]

As an initial matter, "[i]n the ordinary case, a facial vagueness challenge carries a significant burden: the challenger must establish that *no set of circumstances exists* under which the Act would be valid." *Id.* at 39 (emphasis added). While "[t]he Supreme Court has recognized three circumstances in which a statute that is not necessarily vague in all applications may nonetheless be void for vagueness on its face," *id.*, none of these circumstances applies in this case: Section 1957 does not "implicate[] rights protected by the First Amendment"; is not "a criminal law lacking a *mens rea* requirement and burdening a constitutional right" where "vagueness permeates the text of such a law"; and does not "require[] courts to evaluate . . . the idealized ordinary case of a criminal offense." *Requena*, 980 F.3d at 39.[11]

---

[10] "Neither the Supreme Court nor [the Second Circuit] has definitively resolved whether facial vagueness challenges not based on the First Amendment may proceed against statutes that can constitutionally be applied to the challenger's *own* conduct." *Requena*, 980 F.3d at 40 (emphasis in original).

[11] With respect to the second circumstance, Section 1957 is not "a criminal law lacking a *mens rea* requirement and burdening a constitutional right," *Requena*, 980 F.3d at 39, because the statute requires knowingly engaging in a monetary transaction involving property that the defendant knows involves the proceeds of a criminal offense. 18 U.S.C. § 1957(a); *see also United States v. Thomas*, No. 22-1508, 2025 WL 2202512, at *4 n.3 (2d Cir. Aug. 4, 2025).

Rinsch has made no attempt to show that "no set of circumstances exists," *Requena*, 980 F.3d at 39, under which Section 1957 is not vague, and he cannot do so because, as just discussed, the phrase is not vague as applied to his own conduct in this case.

Finally, even if Rinsch were not required to show that the statute is vague in all applications to mount a facial challenge, his facial challenge still would fail. Section 1957 specifically defines each of its key phrases: "monetary transaction," "criminally derived property," and "specified unlawful activity." *See Humanitarian Law Project*, 561 U.S. at 21 (rejecting vagueness challenge where "Congress . . . took care to add narrowing definitions to the [relevant] statute"). Taking these definitions together, Section 1957(a) criminalizes knowingly engaging in monetary transactions involving funds constituting or derived from proceeds of a criminal offense, where the criminal offense at issue is one of those referenced by the statute—including wire fraud. There is nothing indeterminate about a statue that criminalizes this conduct.

Moreover, Section 1957's knowledge requirement "destroy[s] any force in the argument that application of the [statute] would be so unfair that it must be held invalid." *Boyce Motor Lines*, 342 U.S. at 342; *see also Humanitarian Law Project*, 561 U.S. at 21 (explaining that "the knowledge requirement of the statute further reduces any potential for vagueness"). Furthermore, contrary to Rinsch's assertion that Section 1957 gives "virtually unfettered discretion to law enforcement and prosecutors" (Dkt. 25 at 4), "[b]y attaching such a knowledge requirement to the 'monetary transaction,' the statute defines 'the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited'" by the statute and avoids its "arbitrary and discriminatory enforcement." *Bazazpour*, 690 F.3d at 801 (quoting *Kolender*, 461 U.S. at 357). Indeed, Rinsch "fails to cite a single instance of this statute being enforced in a way that allows policemen, prosecutors, and juries to pursue their personal predilections." *United States v.*

*Holloway*, No. 20-578, 2022 WL 453370, at *3 (2d Cir. Feb. 15, 2022), *cert. denied*, 143 S. Ct. 255 (2022).

In resisting this conclusion, Rinsch mischaracterizes the scope of Section 1957 and entirely disregards the relevant authority interpreting the statute. As for the scope of Section 1957, the defendant contends that the statute "sweeps within its scope *any transaction* of more than $10,000 involving the direct or indirect proceeds of numerous and varied criminal offenses" (Dkt. 25 at 2 (emphasis added)) and that "a defendant engaging in a legitimate, above-board transaction, *with no criminal intent*, and with his own lawful funds, can still violate the statute" (Dkt. 25 at 5 (emphasis added)). But that is not so: the statute makes it a crime for a person to "knowingly" engage in a monetary transaction in criminally derived property, thus ensuring the statute only extends to those individuals who act with the requisite criminal intent in circumstances specified by the statute. *See Bazazpour*, 690 F.3d at 801. Contrary to Rinsch's suggestion otherwise (Dkt. 25 at 4–5), Second Circuit precedent that the Government is not required to trace criminal funds that are commingled with legitimate funds to prove a violation of Section 1957 does not somehow lessen this criminal intent requirement.

Likewise, Rinsch's hypothetical application of the statute to transactions involving properties previously held by Al Capone and Jeffrey Epstein does not render it unconstitutional. (Dkt. 25 at 3–4). As the Second Circuit explained in *Blarek*, "even if a phrase in a statute might be vague as applied to extreme situations, that fact does not make the statute void for vagueness" where "a defendant's conduct falls within the core of the statute." 1998 WL 907429, at *3.[12]

---

[12] Rinsch's other hypotheticals about someone who commingles $100 of proceeds with lawful funds to purchase a car and someone who commingles his own money with "even a fractional amount of illicit funds" (Dkt. 27 at 5) further ignore that Section 1957 is limited to transactions in criminally derived property of a value greater than $10,000.

Finally, the Court should swiftly reject Rinsch's claim that Section 1957 is somehow unconstitutional because it enables the Government "without any process [to] effectuate a seizure and freeze on an uncapped portion of a defendant's assets, regardless of whether those assets themselves were involved in or derived from criminal activity." (Dkt. 25 at 5). Section 1957 does no such thing. As noted above, the Government's authority to seize assets is governed by other statutes, which limit forfeitability to property involved in transactions in violation of Section 1957 and require that the Government follow specified processes to effect seizure of such property. *See* 18 U.S.C. §§ 981(a)(1)(A), 981(b). Furthermore, that Section 981 could theoretically result in a forfeiture that runs afoul of the Excessive Fines Clause does not somehow invalidate Section 1957. Indeed, in the case that Rinsch relies upon, *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court did not invalidate a statute relied upon to impose a forfeiture amount that was found to be excessive. Here, there has been no seizure at all.

In sum, the Court should reject Rinsch's vagueness challenge to Section 1957, just as the Second Circuit did in *Blarek*, and as other Circuits did in *Bazazpour*, *Baker*, and *Gabriele*, when faced with similar challenges.

## III.     The Motion for a Bill of Particulars Should be Denied

Rinsch's motion for a bill of particulars with respect to Count One of the Indictment should be denied. (Dkts. 26, 27). Rinsch already has far more information about the Government's case than he would typically be entitled to in advance of trial, including a detailed indictment, extensive Rule 16 materials, early production of certain Section 3500 materials, and a detailed letter from the Government listing communications that reflect misstatements made by the defendant or his agents in order to obtain and keep the March Payment, and other communications in furtherance of that scheme. As a result, he has ample notice of the charged conduct, and he is not entitled to the granular information he requests or to bind the Government's proof at trial.

## A.  Applicable Law

Federal Rule of Criminal Procedure 7(f) permits a defendant to seek a bill of particulars where necessary to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (*per curiam*). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Murphy*, No. 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022). "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574.

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and the acquisition of evidentiary detail is not its function. "It is not enough that the information [sought in a bill of particulars] would be useful to the defendant." *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *8 (S.D.N.Y. Mar. 17, 2022). The question is whether the particulars sought are "necessary for the preparation of the defense." *United States v. Chalmers*, 410 F. Supp. 2d 278, 286-87 (S.D.N.Y. 2006). "The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003); *see also United States v. Parris*, No. 13 Cr. 17 (DAB), 2014 WL 2745332, at *5 (S.D.N.Y. June 17, 2014) ("The Second Circuit and courts in the Southern District routinely have denied requests for bills of particulars concerning the 'wheres, whens, and with whoms' of the crime charged"); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569

(S.D.N.Y. 2001) (denying request for bill of particulars as to "each act of 'fraud, neglect, connivance, misconduct, and violation of law' upon which the Government will base its case"); *Mandell*, 710 F. Supp. 2d at 385 (denying request for bill of particulars for additional "information regarding material misstatements" as "completely unfounded" in light of other information provided to defense).

"Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

Moreover, the existence of substantial documentary evidence does not entitle a defendant to a bill of particulars where the indictment, discovery, and other information adequately notify the defendant of the charges against him. *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). In short, courts "must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery, and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001)

(citing *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000)); *see also United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018) ("[C]ourts' decisions to grant bills of particulars are not predetermined by the nature of the charges filed, but dependent upon the complexity of the facts at issue and degree of disclosure already offered.").

### B.    Discussion

Rinsch asks the Court to order the Government to provide a bill of particulars "identifying which misrepresentations it believes support the indictment's [] wire fraud count." (Dkt. 27 at 1; *see also id.* at 3 (requesting that the Court order the Government to "specify which of the statements he is alleged to have made, or caused to have been made, give rise to the indictment's wire fraud count")). The defendant's request should be denied. From early on, Rinsch has had extensive information about the Government's case. The information available to the defendant includes the following:

- the detailed, twelve-page Indictment setting forth Rinsch's scheme;

- the extensive Rule 16 material, much of which is text searchable;

- records from an arbitration that provide a substantial roadmap to certain of the facts of this case, including testimony from Rinsch and various executives of Streaming Company-1 about the negotiation around and intended purpose of the $11 million payment at the heart of the wire fraud charge;

- a chart tracing many of the financial transactions at issue;

- an email identifying several documents of importance, including email negotiations around the payment of the $11 million and Rinsch's statements to executives of Streaming Company-1 about the status of *White Horse*'s production following the payment;

- early production of certain Section 3500 material; and

- a detailed letter from the Government listing communications or statements from both before and after the $11 million payment that reflect misstatements made by Rinsch or his agents or statements that were otherwise made in furtherance of Rinsch's fraudulent scheme (*see* Dkt. 27 at Ex. A).

That is far more information than the typical defendant receives in cases far more complex than this one, and it is far more information than the Government is required to provide. Through these materials, the factual basis for the wire fraud charge in Count One is clear, and Rinsch knows what allegations he must prepare to meet at trial. As alleged, from at least in or about October 2019 through at least in or about November 2020, Rinsch engaged in a fraudulent scheme during which he convinced Streaming Company-1 to send him approximately $11 million in early March 2020, through numerous representations and discussions—both oral and written—that he was going to continue working on the completion of *White Horse*, that this money was necessary to send to Rinsch to do that work, and that the money would be spent exclusively on a discrete list of production-related tasks. (*See, e.g.*, Ind. ¶ 9 (alleging that the defendant agreed with Streaming Company-1 that the $11 million would be used for certain pre- and post-production tasks such as "storyboarding; art, makeup, and costume design; paying actors, artists, and crew members; and editing footage that had already been shot")). Then, after he caused Streaming Company-1 to send him the money, Rinsch continued to make numerous statements to Streaming Company-1 in order to retain that money, which statements were intended to lull Streaming Company-1 into believing that the production was moving forward as planned, that nothing was amiss, and to preserve the relationship between Rinsch and his victim. (*See, e.g.*, Ind. ¶ 12 (alleging that, after receiving the $11 million payment, the defendant "falsely informed [Streaming Company-1] that White Horse was 'awesome and moving forward really well'")).

In his motion, Rinsch essentially claims that the Government has provided *too much* material to him. (*See, e.g.*, Dkt. 27 at 4–5). But a defendant cannot "use the vastness or complexity of the alleged [crime] and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately

notify Defendants of the charges against them." *See Rigas*, 258 F. Supp. 2d at 305 (citing *Panza*, 750 F.2d at 1148); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). And here, as described above, Rinsch has received ample guidance as to the charge against him in Count One, such that he cannot use the volume of discovery to demand a bill of particulars.

In particular, the Indictment goes far beyond a simple recitation of the statutory elements and instead explains over several pages how Rinsch persuaded Streaming Company-1 to wire him $11 million for pre- and post-production projects, such as storyboarding, and then, after receiving the funds, misrepresented that the show was "awesome and moving forward really well" while he was actually in the process of losing much of the money on risky investments. (*See* Ind. ¶¶ 9–15). Furthermore, unlike most cases, the discovery materials here include records from an arbitration, which provide a substantial roadmap to facts at the heart of Court One, including testimony from Rinsch and executives of Streaming Company-1 about the negotiation around and intended purpose of the $11 million payment.

In addition, the Government provided Rinsch with a four-page, single-spaced letter that described the Government's theory of the case and identified, with Bates numbers and dates, more than 20 specific communications and statements that support that theory. (Dkt. 27 at Ex. A). The Government explained in the letter that the listed communications "reflect misstatements made by the defendant or his agents or were otherwise made in furtherance of the defendant's fraudulent scheme." (Dkt. 27 at Ex. A at 2). To assist Rinsch's review, the letter separated communications made before he received the $11 million payment and other communications made after his receipt of the payment, providing a brief description of each with date, time, and Bates number. (*Id.* at 2–4 (e.g., "Text messages that Rinsch exchanged with Cindy Holland between December 20, 2019

31

and December 21, 2019, to set up a discussion about the future of White Horse's production, USAO_RINSCH_RELATIVITY_00081174"; "Rinsch's March 6, 2020 text messages at 1:57:29 PM and 1:57:58 PM, USAO_RINSCH_RELATIVITY_00080309")).

Moreover, despite the volume of discovery, the charge in Count One is not especially complex—it alleges an approximately one-year scheme perpetrated by a single individual against a single victim involving the theft of a lump sum of approximately $11 million. The relative lack of complexity combined with the ample disclosure of information to date undercut completely Rinsch's assertion that he is "in the dark" (Dkt. 27 at 1), and reveal that Rinsch's request is in fact no more than an attempt to bind the Government's proof and "pin the Government to particular evidentiary details." *United States v. Akhavan*, No. S3 20-CR-188 (JSR), 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (denying request for list of specific misrepresentations allegedly made in furtherance of a bank fraud conspiracy). The Court should reject that attempt.[13]

Several cases cited by Rinsch undercut his request. (Dkt. 27 at 2). For example, in *Barrett*, the court explained that the limited duration of a scheme lasting two years counseled against ordering a bill or particulars and denied a defendant's request for details about allegedly unauthorized prescriptions and refills where "the information provided in the indictment coupled with the information provided in discovery appear[ed] more than adequate to permit [the defendant] to mount an effective defense." *United States v. Barrett*, 153 F. Supp. 3d 552, 571–73 (E.D.N.Y. 2015). Likewise, in *Kahale*, the court rejected a request for the particulars of allegedly unlawful transactions, representations, and misappropriations because such information was not "necessary" to the defense. *United States v. Kahale*, 789 F. Supp. 2d 359, 375–77 (E.D.N.Y. 2009).

---

[13] The amount of data produced in discovery in this case is not a good proxy for complexity given that a substantial share of the data consists of video files—which are often quite large files—related to the television show Rinsch was hired to create.

Other cases Rinsch relies upon are readily distinguishable. (Dkt. 27 at 3). For example, in *Silver*, the defendant was charged with "wide-ranging crimes," and the evidence included an "exceptional volume of mailings and wire transmissions." *United States v. Silver*, 117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015); *see also United States v. Vaid*, No. 16 Cr. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (involving "over 500,000" potentially fraudulent claims); *United States v. Connolly*, No. S1 16-CR-00370 (CM), 2017 WL 2537808, at *5 (S.D.N.Y. May 24, 2017) (involving "millions of transactions" and alleged conduct spanning seven years); *United States v. Hanratty*, No. 24 CR. 153 (LGS), 2024 WL 4892742, at *8 (S.D.N.Y. Nov. 26, 2024) (involving materials listing over 40,000 potentially improper assets). Here, as described above, the scheme was of both limited duration and scope.

If the Court denies Rinsch's request for a comprehensive list of misrepresentations, he alternatively asks the Court to direct the Government to identify 60 days in advance of trial "all communications it intends to introduce at trial to demonstrate a misstatement, omission, or wire communication" in support of Count One, relying on *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *22 (S.D.N.Y. Jan. 18, 2017). (Dkt. 27 at 6). That request should also be denied.

In *Wey*, the court denied a request for a bill of particulars because, like here, "the combination of the materials available to [the defendant] is sufficient to provide notice of the crimes with which he is charged and to allow him to prepare his defense." No. 15-CR-611 (AJN), 2017 WL 237651, at *22 (S.D.N.Y. Jan. 18, 2017). Nevertheless, because *Wey* involved a "complex conspiracy" that involved "a sprawling scheme running four years or more and implicating three publicly traded stocks and dozens of co-conspirators on at least three continents," the court ordered "early identification of certain subsets of the Government's trial exhibits,"

including documents demonstrating a misstatement, omission, or wire communication in support of securities fraud and wire fraud charges. *Id.* This straightforward case involves no such complexity, and in any event, the Government has already identified for the defense a number of specific misrepresentations and other statements made in furtherance of the fraud. The Court adopted the parties' jointly proposed schedule requiring that the Government disclose its initial exhibit list and Section 3500 material on November 3, 2025, approximately one month before trial. Nothing in Rinsch's motion justifies revisiting that agreed-upon schedule now.

In sum, Rinsch has received much more than the "the specific acts of which he is accused"—he has a detailed Indictment, discovery that includes materials outlining the conduct at issue in Count One, early production of certain witness statements, and a detailed letter specifying particular communications made in furtherance of his scheme. *Murphy*, 2022 WL 1270958, at *3. Accordingly, no bill of particulars is necessary. His motion should be denied.

## IV. The Search Warrants Should be Upheld

Rinsch seeks to suppress two search warrants issued by United States Magistrate Judges, one for the contents of his Google account and another for the contents of electronic devices seized from his home at the time of his arrest. The defendant argues that the warrants lacked probable cause and particularity and were overly broad. According to Rinsch, the good faith exception additionally does not apply. Rinsch is wrong on all counts. The suppression motion is without merit and should be denied.

### A. Background of the Warrants

#### 1. The Google Warrant

On February 26, 2024, the Honorable James L. Cott, United States Magistrate Judge, authorized a warrant (the "Google Warrant") to search several electronic accounts, including the

defendant's Gmail account (the "Gmail Account"). The Google Warrant specified wire fraud and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349, as the subject offenses. (Dkt. 23-2 at 5). The Google Warrant narrowly delineated three categories of evidence that constitute evidence, fruits, and/or instrumentalities of the subject offenses, which law enforcement personnel were authorized to search for and seize: "a. Communications regarding the television series known as 'White Horse' or 'Conquest'; b. Communications regarding the disposition of funds provided by [Streaming Company-1]; c. Location of other evidence (e.g., emails reflecting registration of other online accounts potentially containing relevant evidence)." (*Id.* at 5-6). The Google Warrant contained a temporal limitation of August 22, 2017, approximately three months before a talent agency pitched *White Horse* to Streaming Company-1 on Rinsch's behalf, through July 26, 2022, on or about the date on which Rinsch's counsel transmitted a demand for payment to Streaming Company-1 that resulted in an arbitration between Rinsch and Streaming Company-1. (Dkts. 23-2 at 4, 23-1 at 59).

In support of the Google Warrant, Special Agent Nicholas DiMarino, a Special Agent with the FBI, submitted an affidavit (the "Google Affidavit") setting out probable cause to believe that the Gmail Account contained evidence of the subject offenses, giving multiple examples of the defendant using the Gmail Account to conduct business related to *White Horse*. (Dkt. 23-1 at 24). For example, on July 14, 2020, Rinsch, using an email account (the "Runbox Account") hosted by Runbox, an email provider, emailed a Streaming Company-1 executive and asked the executive to email Rinsch at the Gmail Account. (Dkt. 23-1 at 24). Moreover, Rinsch received multiple other emails at the Gmail Account related to the subject offenses, including:

- An email chain between Rinsch, his then-wife, and a talent agency in the summer and fall of 2020 regarding a potential actor for *White Horse*. (*Id.* at 25). On September 14, 2020, Rinsch's then-wife forwarded that email chain to a Streaming Company-1 executive, and, later that day, the executive replied to set up a call. (*Id.*).

- An email from a Streaming Company-1 executive dated November 12, 2020. (*Id.*). The Streaming Company-1 executive wrote that, "With regard to continuing production on [*White Horse*], I do think it is accurate to say we have come to the end of the road in terms of supporting any extension or additonal [sic] production beyond the scope of the original contract. I understand there have been prior conversations about giving you the ability to take the project elsewhere, which we are totally on board with." (*Id.*).

- An April 2021 email chain between a Streaming Company-1 executive and Rinsch in which Rinsch threatened to sue Streaming Company-1 over *White Horse*. (*Id.*).

Special Agent DiMarino further noted that, based on his "training and experience and involvement in the investigation . . . [,] a sophisticated and long-running fraud such as the Subject Offenses would necessarily have involved the use of email," in particular: "(i) representations made by RINSCH to [Streaming Company-1] and others about White Horse in order to obtain funds; (ii) internal communications between RINSCH and his associates revealing the true status of the White Horse production and RINSCH's intentions as to the funds; and (iii) information about how RINSCH spent the funds he obtained from [Streaming Company-1]." (*Id.* at 28). Importantly, Special DiMarino explained that, because he was submitting the Google Affidavit for the limited purpose of establishing probable cause to search the Gmail Account, the Google Affidavit did not include every fact that Special Agent DiMarino had learned about the investigation. (*Id.* at 3).

### 2.    The Electronic Devices Warrant

On March 18, 2025, law enforcement searched the defendant's person and apartment (the "Apartment") in Los Angeles pursuant to search warrants. On April 2, 2025, the Honorable Barbara Moses, United States Magistrate Judge, authorized a warrant (the "Electronic Devices Warrant") to search electronic devices (the "Electronic Devices") seized from the Apartment— two phones, two laptops, and three hard drives/thumb drives. The Electronic Devices Warrant specified wire fraud, in violation of Title 18, United States Code, Section 1343, money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), and engaging in monetary

transactions in property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957, as the subject offenses. (Dkt. 23-3 at 7). The Electronic Devices Warrant also narrowly delineated the specific types of evidence that constitute evidence, fruits, and/or instrumentalities of the subject offenses, tying the material to be seized to specific events or actions by the defendant. For example, the Electronic Devices Warrant permitted seizure of "[e]vidence concerning the negotiation and execution of Carl Rinsch's agreements with [Streaming Company-1], including but not limited to the November 2018 term sheet and the March 2020 amendment." (*Id.* at 24). Similarly, the Electronic Devices Warrant permitted seizure of "[e]vidence concerning Carl Rinsch's misuse of funds received from [Streaming Company-1] in or about March 2020, including but not limited to information regarding Rinsch's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses." (*Id.*).

In support of the Electronic Devices Warrant, Special Agent DiMarino submitted an affidavit (the "Electronic Devices Affidavit") setting out probable cause to believe that the Electronic Devices contained evidence of the subject offenses. To begin, Special Agent DiMarino cited evidence that Rinsch was living at the Apartment alone at the time of the search, therefore supporting the inference that the Electronic Devices seized belonged to the defendant and not someone else. This evidence included location information for Rinsch's cellphone and food delivery records placing him at the Apartment and the fact that the defendant was found by himself in the Apartment at approximately 6 a.m. at the time of the search and there were no indications anyone else lived in the Apartment. (Dkt. 23-3 at 14). Moreover, the manager for the Apartment's building said the defendant was the only person on the lease for the Apartment. (*Id.*).

Special Agent DiMarino gave specific examples of Rinsch using electronic devices to commit the subject offenses. With respect to the seized cellphones and laptops, Special Agent DiMarino noted that Rinsch "repeatedly sent emails and text messages to [Streaming Company-1] employees to request additional funding for White Horse, . . . and to offer reassurances that the show's production was moving forward as planned after he had already stolen [Streaming Company-1]'s money." (*Id.* at 14-15). Moreover, the defendant had "correspond[ed] with his financial advisors over email to discuss the investments he would ultimately make with the money that he stole from [Streaming Company-1]." (*Id.* at 15).

Special Agent DiMarino was careful to disclose records from Apple Inc. and AT&T Corporation indicating that Rinsch had changed cellphones since committing the subject offenses. (*Id.*). Special Agent DiMarino nevertheless concluded that evidence of the subject offenses would be found on the Electronic Devices for at least two reasons.

*First*, he cited his training and experience that "many people back up files from their cellphones or laptop and can upload those files to a new device." (*Id.* at 15). Because the defendant had been using Apple iPhones to communicate with Streaming Company-1 executives and the cellular phones seized from the defendant were iPhones, it was reasonable to conclude that the old and new phones had been "synced using online accounts like iCloud." (*Id.* at 15–16.) Moreover, Special Agent DiMarino indicated that Rinsch had been using the same cellphone number over the years—although the cellphone device itself may have changed—and that, in his experience, people often take advantage of such syncing services when changing devices as doing so makes the process of setting up a new phone "less disruptive." (*Id.*)

*Second*, Special Agent DiMarino noted that Rinsch's seized cellphones may have been "logged into online accounts that RINSCH was using while commit[ing] the Subject Offenses."

(*Id.* at 16). For example, the defendant's two primary email accounts were hosted by Google and Runbox, respectively. (*Id.*). The contents of those email accounts would be accessible to law enforcement if the defendant had accessed the accounts using his cellphones. (*Id.*) The prospect that Rinsch would have done this was further supported by Special Agent DiMarino noting that Rinsch's Runbox email was associated with his Apple account. (*Id.*).

Finally, with respect to the hard drives and thumb drives, Special Agent DiMarino noted that "people will often store large files, such as video files, including video files that are in the process of being edited" on such devices. (*Id.* at 17). Special Agent DiMarino explained that this "sort of footage would be relevant to the Government's investigation of the Subject Offenses for numerous reasons, including because it may be relevant to showing what work, if any, RINSCH did on White Horse after receiving the $11 million from [Streaming Company-1]." (*Id.*).

Special Agent DiMarino additionally made clear that, because he was submitting the Electronic Devices Affidavit for the limited purpose of establishing probable cause to search the Electronic Devices, the Electronic Devices Affidavit did not include every fact that Special Agent DiMarino had learned about the investigation. (*Id.* at 3).

## B. The Warrants Were Amply Supported by Probable Cause

The defendant does not contend that the Google and Electronic Devices Warrants contained any misstatements. Instead, he argues that they were not supported by probable cause. That argument—which disaggregates the totality of circumstances supporting probable cause, ignores concrete examples of the defendant using the Google Account and Electronic Devices in committing the fraud, and rests on a view of probable cause that fundamentally conflicts with settled law—is meritless. As discussed above, two different federal judges independently issued the Google and Electronic Devices Warrants, yet according to Rinsch, each grossly

misapprehended well-settled law on probable cause. As explained below, it is Rinsch who is wrong.

### 1. Applicable Law

The legal standards for determining whether a warrant application is supported by probable cause is well-established. Starting with first principles, "[p]robable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citations and quotation marks omitted). When presented with a warrant application, the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Silva*, 146 F.4th 183, 189 (2d Cir. 2025) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Sosa*, 379 F. Supp. 3d 217, 220 (S.D.N.Y. 2019) (quoting *Gates*, 462 U.S. at 232). Crucially, "a search warrant does not require probable cause of the *use* of the property in furtherance of criminal conduct, so long as there is probable cause that the location to be searched contains relevant evidence of the criminal conduct." *Silva*, 146 F.4th at 189.

Thus, the training and experience of law enforcement agents can bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances on a case-by-case basis, and their training and experience can all support a probable cause finding. *Id.* at 231-32; *accord id.* at 231 (describing the probabilities to be assessed as "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act"). This is particularly true where law enforcement agents' training and experience "is combined with enough

other specific factual allegations that tend to link the alleged criminal conduct to the place to be searched." *Silva*, 146 F.4th at 189. Ultimately, "[t]he quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 235).

With respect to a post-issuance challenge by a defendant, a warrant issued by a neutral and detached judicial officer is "entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'" *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quoting *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983)). In "accord[ing] substantial deference to the finding of an issuing judicial officer that probable cause exists," as it must, the reviewing court's determination is "limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). Moreover, the magistrate judge's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *Travisano*, 724 F.2d at 345. This deferential standard reflects the reality that "[r]easonable minds frequently may differ on the question whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Accordingly, the Supreme Court has directed that "courts should not invalidate [a] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109 (1965). Instead, even in cases where the existence of probable cause is marginal, resolution "should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quotation marks and citations omitted).

### 2. Discussion

Rinsch's motion ignores the reams of evidence supporting probable cause found in the Google and Electronic Devices Warrants, while also somehow managing to ignore nearly every aspect of the Supreme Court's jurisprudence that probable cause does not contemplate a high bar, but only a *fair probability* based on a *totality* of the circumstances. The warrants were amply supported by probable cause, and the Court should reject the motion to suppress.

As Magistrate Judge Cott found, the Google Affidavit established a fair probability that evidence of the defendant's commission of the subject offenses would be found in the Google Account. The Google Affidavit was not some conclusory recitation of Special Agent DiMarino's training and experience. Contrary to Rinsch's assertions, the Google Affidavit cited numerous communications with the Google Account involving *White Horse* and business with Streaming Company-1. For example, the Google Account received a November 12, 2020, email from a Streaming Company-1 executive stating that Streaming Company-1 had "come to the end of the road in terms of supporting any extension or additional [sic] production" of *White Horse*. (Dkt. 23-1 at 25). The Google Account was also copied on emails that would help establish Rinsch's intent to defraud Streaming Company-1. For example, in summer and fall 2020, the Google Account was copied on an email chain regarding a potential actor for *White House*. This was highly relevant to the Government's investigation: the extent to which Rinsch was (or was not) making good faith efforts to hire actors would help establish whether Rinsch was attempting to live up to his promise to complete *White Horse*.

According to Rinsch, the fact that the Google Affidavit did not include examples of the defendant "ever directly email[ing] [Streaming Company-1] from his Gmail account" is dispositive. (Dkt. 23 at 13). That is not the law. The question is not whether the Google Account

was "*use[d]* . . . in furtherance of criminal conduct," but whether there was probable cause to believe the Google Account "contain[ed] relevant evidence of the criminal conduct." *Silva*, 146 F.4th at 189. The answer to that question is unambiguously yes. Rinsch himself asked Streaming Company-1 executives to communicate with him at the Google Account—showing he expected business communications with Streaming Company-1 to be routed through the Google Account. (Dkt. 23-1 at 24).

As Magistrate Judge Moses found, the Electronic Devices Affidavit also established a fair probability that evidence of Rinsch's commission of the subject offenses would be located in the Electronic Devices. As with the Google Affidavit, the Electronic Devices Affidavit was not some conclusory recitation of training and experience. It included multiple, concrete examples of the defendant using text and emails in relation to the fraud.

To take one category of communications, Rinsch sent Streaming Company-1 executives messages falsely reassuring them that the March Payment was being used to complete *White Horse*. For example, on March 8, 2020, Rinsch emailed Executive-1, "We are moving forward with preproduction and at 100% effectively." (Dkt. 23-3 at 12). And on April 20, 2020, Rinsch texted that same executive, "By the way, don't worry about the show. It's awesome and moving forward really well." (*Id.*). In reality, Rinsch was gambling the $11 million in the stock market, acknowledging in emails that these trades were "highly speculative" and that he was "enter[ing] [them] fully accepting to lose it all." (*Id.*).

Rinsch's primary attack on the probable cause for the Electronic Devices Warrant is that Rinsch was not using the same cellphone he owned at the time he committed the fraud. But Special Agent DiMarino was upfront with this fact. And, contrary to the defendant's assertions, the Electronic Devices Warrant did not merely rely on Special Agent DiMarino's training and

experience in establishing that Rinsch's new cellphones likely contained data from the defendant's older devices. The cellphones and laptops seized were Apple devices, and the cellphone was linked to the same phone number that Rinsch had been using for years. And, during the commission of the fraud, the defendant was similarly using an Apple device to communicate with Streaming Company-1. (*Id.* at 16). This connection is critical because Apple provides a service, iCloud, allowing users to sync their Apple devices across devices. (*Id.*). As Special Agent DiMarino noted, "based on experience, [] it is common for people to sync data in this fashion, as it makes changing devices less disruptive." (*Id.* at 15).

Based on Second Circuit precedent, the evidence that the defendant used an Apple device to commit the fraud, and the association between Rinsch's Runbox email address and his Apple account, combined with Special Agent DiMarino's experience that users of Apple devices frequently sync their devices, was plainly sufficient to establish probable cause. *Silva*, 146 F.4th at 189 ("An officer's affidavit in support of a warrant must establish a sufficient nexus between the criminal activities alleged and the place to be searched. Importantly, a showing of nexus does not require direct evidence and may be based on a reasonable inference from the facts presented based on common sense and experience.").

Rinsch finally argues that there was insufficient probable cause to support searching the hard drives and thumb drives seized from the Apartment, arguing "it is unclear why undelivered *White Horse* footage would constitute evidence of a crime." (Dkt. 13 at 15). But the Government is certainly entitled to seek evidence that goes to an essential element of the charged crime— namely, Rinsch's intent to defraud Streaming Company-1. The existence of undelivered footage— and the state, level of development, and nature of that footage—would go directly to whether the

defendant had been using the March Payment to develop *White Horse*.[14]  Ultimately, the "Fourth Amendment does not require probable cause to believe evidence will *conclusively* establish a fact before permitting a search, but only 'probable cause . . . to believe that the evidence sought *will aid* in a particular apprehension or conviction." *Messerschmidt v. Millender*, 565 U.S. 535, 552 n.7 (2012) (cleaned up) (emphasis and alterations in original). The evidence sought in the hard drives and thumb drives—*i.e.*, undelivered footage—went directly to Rinsch's intent.

In sum, Magistrate Judge Cott and Magistrate Judge Moses each had far more than a substantial basis to find probable cause to authorize the search of the Google Account and Electronic Devices.  *Wagner*, 989 F.2d at 72.  The warrants should be upheld.

### C.      The Warrants Were Sufficiently Particular

Rinsch argues that even if they were supported by probable cause, the Google and Electronic Devices Warrants lacked particularity and were, in effect, "general warrants." (Dkt. 23 at 19).  He contends that the warrants grant "the government unbridled discretion to conduct a broad, exploratory search for anything it considers to be of evidentiary value."  (*Id.* at 20). These claims are gross exaggerations and completely baseless.

#### 1.      Applicable Law

"To satisfy the Fourth Amendment's particularity requirement, a warrant must meet three criteria." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020). It must (1) "identify the specific offense for which the police have established probable cause," (2) "describe the place to be searched," and (3) "'specify the items to be seized by their relation to designated crimes.'"  *Id.* "The Fourth Amendment does not require a perfect description of the data to be searched and

---

[14] Indeed, Rinsch's argument on this point is at odds with correspondence from Rinsch's counsel expressly asking that the Government seek production of unfinished *White Horse* footage from Streaming Company-1.

seized." *United States v. Ulbricht*, 858 F.3d 71, 95 (2d Cir. 2017). Indeed, given the nature of electronic evidence, "[s]earch warrants covering digital data may contain 'some ambiguity.'" (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). "[A] search warrant does not necessarily lack particularity simply because it is broad." *Purcell*, 967 F.3d at 179.

The purpose of requiring warrants to specify the items to be seized is to prevent "general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley*, 906 F.2d 841, 844–45 (2d Cir. 1990). But to achieve this purpose, a warrant need not describe the items to be seized in such detail as to eliminate the executing officer's discretion completely. *See United States v. Folks*, No. 20-3267-cr, 2021 WL 5987009, at *1 (2d Cir. Dec. 17, 2021); *see also United States v. Levy*, No. 11 Cr. 62 (PAC), 2013 WL 664712, at *5 (S.D.N.Y. Feb. 25, 2013) ("The Fourth Amendment does not require that every item or document to be seized be specifically identified in the warrant.").

Rather, a warrant's description of the items to be seized need only be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *Folks*, 2021 WL 5987009, at *1 (quoting *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000)). When a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular. *Folks*, 2021 WL 5987009, at *1; *Riley*, 906 F.2d at 843-45 (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision also allowing seizure of "other items that constitute evidence of the offenses" identified); *United States v. Young*, 745 F.2d 733, 759–60 (2d Cir. 1984) (warrant allowing seizure of listed items plus "other evidence of" the crimes specified was sufficiently particular); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227–28 (S.D.N.Y. 2014) (warrant permitting seizure of all "evidence, fruits, or instrumentalities"

of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

### 2. Discussion

The Google and Electronic Devices Warrants were plainly sufficiently particular to "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. McDarrah*, 351 F. App'x 558, 561 (2d Cir. 2009) (summary order) (quoting *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992)). Indeed, the warrants easily satisfied each of the three components of particularity outlined in *Purcell*.

*First*, the Google and Electronic Devices Warrants identified the specific offenses for which probable cause had been established, as Rinsch does not appear to dispute. The Google and Electronic Devices Warrants limited the items to be seized to evidence of the subject offenses.

*Second*, the Google and Electronic Devices Warrants described "the place to be searched," *Galpin*, 720 F.3d at 446; here, the subsets of electronic data associated within the Google Account and each of the Electronic Devices and laid out in some detail in Attachment A to each of the warrants. *E.g.*, *United States v. Ray*, 541 F. Supp. 3d 355, 377 398 (S.D.N.Y. 2021) (second component met where warrant "identified the email and iCloud accounts to be searched").

*Finally*, the Google and Electronic Devices Warrants listed specific categories that constitute evidence, fruits, and instrumentalities of the subject offenses, with those categories tailored to the specific facts of this case. The Google Warrant called for the seizure of three

categories of documents narrowly tailored to the defendant's commission of the subject offenses: (1) "Communications regarding the television series known as 'White Horse' or 'Conquest,'" (2) "Communications regarding the disposition of funds provided by [Streaming Company-1]," and (3) "Location of other evidence (e.g. emails reflecting registration of other online accounts potentially containing relevant evidence)." (Dkt. 23-2 at 19). The Electronic Devices Warrant was similarly narrowly delineated, permitting, for example, seizure of "[e]vidence concerning Carl Rinsch's communications, representations, and omissions with respect to his contractual relationship with [Streaming Company-1] regarding White Horse," "[e]vidence of any work or lack of work performed on White Horse, including but not limited to audio or video footage; photography; sketches or drawings; costumes; props; storyboarding; or records of payments to actors, artists, and crew members," and "[e]vidence concerning the negotiation and execution of Carl Rinsch's agreements with [Streaming Company-1], including but not limited to the November 2018 term sheet and the March 2020 amendment." (*Id.* at 24).

According to Rinsch, these categories were too broad. (Dkt. 23 at 19). Nonsense. Courts have recognized that "[s]earch warrants covering digital data may contain 'some ambiguity,'" particularly where the categories of evidence the Government sought were tailored to the defendant's commission of the subject offenses. *See Ulbricht*, 858 F.3d at 95 (quoting *Galpin*, 720 F.3d at 446)).

To begin, the Government's core allegation—which Rinsch does not deny was supported by probable cause—was that Rinsch's claim that the March Payment would be used to fund the production of *White Horse* was illegitimate, and that Rinsch further lied about how much progress he had made on the show. In light of that allegation, seizure of all communications related to *White Horse* was appropriate. To take an example, emails between the defendant and the people who

worked on the show (*e.g.*, editors, production assistants), no matter how mundane, would potentially reveal the extent to which the defendant was, or was not, working on *White Horse*.

Similarly, evidence of Rinsch's use of funds provided by Streaming Company-1 and the work he was or was not doing on *White Horse* was highly relevant. Rinsch had told Streaming Company-1 he would use the $11 million only to fund the production of *White Horse*. To the extent Rinsch was using the March Payment for other purposes would therefore go squarely to his intent to defraud his victim.

Finally, Rinsch's claim that certain terms were undefined or too broad is belied by the actual wording of the warrants. The Second Circuit has made clear that, "[i]n upholding broadly worded categories of items available for seizure, . . . the language of a warrant is to be construed in light of an illustrative list of seizable items." *See, e.g.*, *Riley*, 906 F.2d at 844.[15] The Government repeatedly qualified and clarified the meaning of broad terms in the warrants through illustrative lists. To take one example, Rinsch claims that the Google Warrant included an undefined catch all category, permitting the seizure of any and all "other evidence." (Dkt. 23 at 19). Not true. The Government made clear, in a parenthetical that the defendant does not mention, that "location of other evidence" meant "emails reflecting registration of other online accounts potentially containing relevant evidence." (Dkt. 23-2 at 19). Similarly, the defendant claims that the

---

[15] *See also, e.g.*, *United States v. Pugh*, No. 15 Cr. 116 (NGG), 2015 WL 9450598, at *22 (E.D.N.Y. Dec. 21, 2015) ("In general, warrants that limit a search to evidence relating to a particular crime, and which provide a list of examples as a means of limiting the items to be seized, are upheld when confronted with a particularity challenge."); *Lustyik*, 57 F. Supp. 3d at 227-28 (finding sufficiently particular warrants that "broadly describe[] the items to be seized as 'evidence, fruits, or instrumentalities' of specified federal crimes" and where "each also sets forth an illustrative list of items to be seized," even where "modified by the phrase, 'including but not limited to'"); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) (finding sufficiently particular warrants that "authorized the seizure of 'evidence, fruits and instrumentalities' of particular federal crimes, and also enumerated ten illustrative categories of items").

Electronic Devices Warrant permitted the seizure "of any work or lack of work performed on White Horse" without "defining what would constitute 'work or lack of work.'" (Dkt. 23 at 20). But the Government made clear—in language Rinsch also ignores—that "work or lack of work performed on White Horse, includ[ed] but [was] not limited to audio or video footage; photography; sketches or drawings; costumes; props; storyboarding; or records of payments to actors, artists, and crew members." (Dkt. 23-3 at 24). In sum, the Google and Electronic Devices Warrant were "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *Folks*, 2021 WL 5987009, at *1 (quoting *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000)).

Rinsch has not cited a single case where a court has invalidated a warrant like the ones here for not being sufficiently particularized. In *Ray*, the defendant challenged email and iCloud warrants that limited the agents to seizing items "only if they are related to the Subject Offense." 541 F. Supp. 3d at 399. In rejecting that challenge, Judge Liman noted that the warrants in question were, as here, "modelled on warrants routinely approved in this Circuit." *Id.*

In contrast, all the cases cited by Rinsch involved a true grant of unfettered discretion to law enforcement, unmoored from the subject offenses in question. In *United States v. Buck*, for example, the warrant simply allowed law enforcement "to seize any papers, things or property of any kind relating to previously described crime." 813 F.2d 588, 590 (2d Cir. 1987). The problem for the Court there was that, unlike here, there was no caveated list of illustrative items that would provide an "implicit limitation on the scope of the search" to guide executing officers. *See id.* at 591–92. And in *United States v. George*, the warrant at issue had a catch-all for "any other evidence relating to the commission of a crime." 975 F.2d at 74. As Judge Liman found in upholding warrants similar to those here, *George* is "off point": in *George* the warrants had "'mere

reference to evidence of . . . general criminal activity,' which "provide[d] no readily ascertainable guidelines for the executing officers as to what items to seize.'" *Ray*, 541 F. Supp. 3d at 399 (quoting *George*, 975 F.2d at 76). The same is true for the other cases cited by the defendant. *See Galpin*, 720 F.3d at 441 (rejecting warrant that allowed for seizure of "physical property and electronic equipment" for evidence of violations of "NYS Penal Law and or Federal Statutes"); *VonderAhe v. Howland*, 508 F.2d 364, 366 (9th Cir. 1974) (rejecting warrant that allowed seizure of all business records despite the government having "known exactly what it needed and wanted and where the records were located"); *United States v. Wey*, 256 F. Supp. 3d 355, 384 (S.D.N.Y. 2017) (rejecting warrants that "fail[ed] to set forth the crimes under investigation" and did not tie the objects to be seized to crimes).

In sum, because the Google and Electronic Devices Warrants carefully delineated specific categories of types of evidence to guide the officers in their execution, the warrants were sufficiently particular.

### D.    The Warrants Were Not Overbroad

Rinsch also argues that the Google and Electronic Devices Warrants should be suppressed because they are "hopelessly overbroad." (Dkt. 23 at 16). Once again, Rinsch's arguments are rich in rhetoric and hyperbole but devoid of any basis in the case law or record.

### 1.    Applicable Law

The probable cause and particularity requirement intersect in the doctrine of overbreadth. "[A warrant] is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (internal quotation marks and citations omitted).  In examining a claim for overbreadth, however, "it is important not to confuse the separate context

of the seizure of an item . . . with the search itself." *United States v. Ulbricht*, 14 Cr. 68 (KBF), 2014 WL 5090039, at \*14 (S.D.N.Y. Oct. 10, 2014), *aff'd*, 858 F.3d 71 (2d Cir. 2017). That is:

> It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized. For instance, warrants have long allowed searching a house high and low for narcotics—indeed, it is rare that drug dealers point out the hidden trap in the basement—or reviewing an entire file cabinet to find files that serve as evidence of money laundering activity, which might be intermingled with files documenting lawful and irrelevant activity.

*Id.*; *accord Riley*, 906 F.2d at 845. Applying this rationale to the context of electronic evidence, "[c]ourts in this Circuit . . . have uniformly held that law enforcement need not rely upon an email host company or any other private party to sift through emails to determine what is relevant and that it may obtain a warrant to request all emails from an account." *Ray*, 541 F. Supp. at 399 (citing *United States v. Redzepagic*, No. 17 Cr. 228 (DRH), 2020 WL 5232066, at \*7-10 (E.D.N.Y. Sep. 2, 2020); *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020); *Ulbricht*, 2014 WL 5090039, at \*13–15; *United States v. Blakstad*, 19 Cr. 486 (ER), 2020 WL 5992347, at \*7–8 (S.D.N.Y. Oct. 9, 2020)); *see also In the Matter of a Warrant for all Content and Other Information Associated with the Email Account xxxxx@gmail.com Maintained at a Premises Controlled by Google, Inc.* ("*In re Google Warrant*"), 33 F. Supp. 3d 386, 393 (S.D.N.Y. 2014) ("[W]e view it as well established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government.").

### 2. Discussion

#### i. Temporal Scope of the Warrants Was Proper

Rinsch argues that the Google and Electronic Devices Warrants "allowed searches that far

exceeded any reasonable temporal limitations." (Dkt. 23 at 16). Not so. The temporal scope of the Google Warrant was appropriately limited to the period corresponding to the beginning and end of the defendant's relationship with Streaming Company-1: August 22, 2017, approximately three months before Rinsch pitched *White Horse* to Streaming Company-1, to July 26, 2022, on or about the date when Rinsch initiated an arbitration proceeding against Streaming Company-1. (Dkt. 23-1 at 28). Only a holistic examination of this entire period would reveal the extent to which Rinsch was (or was not) legitimately creating *White Horse*. At the time the Government sought the Google Warrant the following was apparent: beginning in 2018, Streaming Company-1 had committed approximately $60 million in total to the creation of *White Horse*; and, despite all this money, the defendant failed to provide Streaming Company-1 with a completed show, gambling millions of dollars that Streaming Company-1 sent to him in or about March 2020 in the stock market. (Dkt. 23-1 at 14, 21-22). Examining the early communications and understanding when Rinsch developed his intent to defraud Streaming Company-1 was critical. Moreover, it was reasonable to assume that the very earliest communications, at the time Rinsch first pitched *White Horse* to Streaming Company-1, would reveal at least some indication of Rinsch's views towards Streaming Company-1 and his willingness, ability, and desire to complete *White Horse* generally.

As for the Electronic Devices Warrant, it is true that some categories of evidence to be seized did not explicitly contain a temporal limitation. But each of those categories were implicitly tied to specific events in time that would necessarily have limited the Government's review. For example, Items One and Two of the Electronic Devices Warrant were focused on the contractual relationship between Rinsch and Streaming Company-1 (Dkt. 23-3 at 24), meaning the Government's search would have been limited to the period in which the defendant began negotiations with Streaming Company-1—*i.e.*, around early 2018. Similarly, Items Four, Five,

and Seven were all focused on Rinsch's use of the March Payment (*Id.*), meaning the Government's review would be focused on what happened after March 2020.

More fundamentally, the Second Circuit has never held that the lack of a specific time frame in a warrant renders it overbroad or lacking in particularity. In *Jacobson*, for example, the court noted that there is no consensus in this Circuit as to when a temporal limitation is required in a warrant. 4 F. Supp. 3d at 526. As a result, courts have repeatedly held that warrants lacking *any* temporal limitation were still executed in good faith reliance on the magistrate's authorization. *See, e.g.*, *United States v. Wallace*, No. 24 Cr. 411 (MKV), 2025 WL 1435066, at *5 (S.D.N.Y. May 19, 2025) ("While it is true that the lack of a date limitation in a warrant *may* in certain situations render a warrant insufficiently particular, it is also settled that 'courts in this Circuit routinely deem warrants sufficiently particular that lack any temporal limitation, agreeing that although a time frame is relevant, there is no apparent consensus as to when one is required." (cleaned up)); *Levy*, 2013 WL 664712, at *10–11 (rejecting challenge to warrant that did not include any time frame at all, where "no controlling authority requires a specific time frame"); *United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *12 (S.D.N.Y. Jan. 6, 2010) ("[T]he fact that the precise relevance of the absence of an express time frame on the particularity and breadth of warrant has yet to be settled in this Circuit further supports the idea that agents . . . should be protected by the 'good faith' exception."); *see generally United States v. Clark*, 638 F.3d 89, 105 (2d Cir. 2011) (no bad faith absent controlling precedent). Indeed, as described below, because the warrants were executed in good faith, suppression would not follow regardless of whether this or any other the defendant's arguments described above had merit.

*ii.     The Warrants Properly Allow a Cursory Review of All Material*

Rinsch challenges the manner of the search. Citing no case law, the defendant says the Government must engage in "key word searches" to limit the scope of the review.  (Dkt. 23 at 17-18). Rinsch is wrong. The Supreme Court long ago noted that, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976); *Ulbricht*, 2014 WL 5090039, at *14 ("It has long been perfectly appropriate to search the entirety of a premises or object as to which a warrant has issued based on probable cause, for specific evidence as enumerated in the warrant, which is then to be seized.").

And, in the context of stored electronic data, courts have "afforded [law enforcement] leeway in searching computers for incriminating evidence within the scope of materials specified in the warrant." *United States v. Graziano*, 558 F. Supp. 2d 304, 317 (E.D.N.Y. 2008) (holding that "it was entirely reasonable for [police officer] to engage in a cursory review of files and documents [stored in a computer], by opening them, to determine whether they contained evidence of illegal gambling that was within the scope of the warrant"); *United States v. Raniere*, No. 18 Cr. 2041 (NGG), 2019 WL 1984026, at *4 (E.D.N.Y. May 3, 2019) (same).

So it was entirely proper for Special Agent DiMarino to seek authority to conduct "a cursory inspection of all emails within the Subject Account." (Dkt. 23-1 at 29). As he explained, there was good reason to do so:

> This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as

> scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

(*Id.*). Because of these practicalities, court after court has affirmed similar requests from law enforcement. *See, e.g.*, *Ray*, 541 F. Supp. 3d at 373; *United States v. Garlick*, No. 22-CR-540 (VEC), 2023 WL 2575664, at *9 (S.D.N.Y. Mar. 20, 2023) (affirming warrant substantially similar to the Google Warrant and noting that the warrant "properly allowed the Government to conduct a cursory review of all of the Warrant returns"). Rinsch's attempt to create a sharp break from this precedent should be rejected.

## E. The Warrants Were Executed in Good Faith

Rinsch claims that the Government cannot rely upon the good faith exception to suppression because the Google and Electronic Devices Warrants lacked particularity and "contained practically no basis of probable cause." (Dkt. 23 at 22). These claims are no more than a repackaging of his prior meritless claims, and they should be rejected.

### 1. Applicable Law

Under the so-called "good faith" exception, the exclusionary rule and its remedy of suppression does not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. In announcing this principle, the Supreme Court noted that suppression could have no deterrent effect on law enforcement agents who acted on the objectively reasonable assumption that their conduct did not violate the Fourth Amendment. *Id.* at 918–20. In analyzing the applicability of the good faith exception, the pivotal question is "whether a reasonably well trained officer would have known that the search was illegal

despite the magistrate's authorization." *Id.* at 922 n.23. If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. *See, e.g.*, *Singh*, 390 F.3d at 183. Moreover, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Exclusion should be a "last resort" rather than a "first impulse." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (internal quotation marks and citation omitted). The exclusionary rule should be used only where law enforcement "'exhibit[s] deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" *United States v. Raymonda*, 780 F.3d 105, 117-18 (2d Cir. 2015) (quoting *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013)).

As a result, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (internal quotation marks and citations omitted); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause"). Indeed, the good faith exception is inapplicable only in four narrow circumstances:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

## 2.      Discussion

Even if this Court were to find that any of the Google and Electronic Devices Warrants were lacking in probable cause, insufficiently particular, and/or overbroad—and they were none of these things—the evidence seized pursuant to the warrants should not be suppressed because they were relied upon in good faith.

There is no serious suggestion that the executing agents lacked a good faith belief that the warrants were proper and could be relied upon. Nor could there be. As an initial matter, Rinsch never alleges, nor could he, that Special Agent DiMarino misled any of the issuing judges. Nor is there any suggestion that the issuing judges—both magistrate judges in this District—"wholly abandoned [their] judicial role." *Moore*, 968 F.2d at 222.

For substantially the same reasons, there is no basis to find that the Google and Electronic Devices Warrants "so lacked probable cause" that the agents' "reliance upon them was unreasonable." *Id.*; *Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination . . . ."); *Falso*, 544 F.3d at 129 (declining to hold that agents acted unreasonably in relying on judge's probable cause determination because "the error . . . was committed by the district court in issuing the warrant, not by the officers who executed it"); *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (explaining that any error in issuance of warrant was "attributable to the magistrate who determined that the facts as alleged by the agents established probable cause").

Finally, the warrants themselves plainly were not "so facially deficient" that reliance on them was unreasonable. *Moore*, 968 F.2d at 222. The Google and Electronic Devices Warrants, which were issued after review of affidavits by two independent judges, outlined the specific crime of which evidence, fruits, and instrumentalities was sought and set forth categories of evidence,

tailored to the facts of this case, to be seized that further cabined the scope of the warrants. It cannot seriously be asserted that the warrants here were so obviously, facially flawed that a law enforcement officer had to have known, at the time, that the searches, despite being authorized, were simply illegal.  Indeed, as the Second Circuit has noted, "[t]he example of a facially deficient warrant provided by the *Leon* Court is one that does not 'particularize the place to be searched or the things to be seized.'" *United States v. Stacy*, 802 F. App'x 611, 614 (2d Cir. 2020). The warrants were nothing like that.

Accordingly, the warrants were valid and the motion to suppress should be rejected.

## **CONCLUSION**

For the reasons set forth above, Rinsch's motions should be denied in their entirety.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By:   /s/_____
Timothy V. Capozzi
David A. Markewitz
Adam Sowlati
Assistant United States Attorneys

Dated: New York, New York
September 16, 2025