UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CARL ERIK RINSCH,

Defendant.

Case No.
25 Cr. 85 (JSR)


MEMORANDUM IN
SUPPORT OF DEFENANT'S
POST-TRIAL MOTIONS

Law Offices of Daniel A. McGuinness, PC
Daniel McGuinnes
353 Lexington Ave, Suite 900
New York, NY 10016
(646) 360-0436
dan@legalmcg.com

Zeman & Womble, LLP
Benjamin Zeman
20 Vesey Street, Suite 400
New York, NY 10007
(718) 514-9100
zeman@brooklynattorney.nyc

## Table

Introduction ................................................................................................... 1

Factual Background ...................................................................................... 1

    A.    The Government's Case ................................................................. 1

        1.    Netflix Witnesses ................................................................. 1

        2.    Testimony of Rinsch's Work on the Project ......................... 6

        3.    Banking and Spending Witnesses......................................... 8

    B.    Defendant's Testimony ................................................................. 9

Discussion ..................................................................................................... 11

    A.    Standard of Review for Rule 29 and Rule 33 Motions .......................... 11

    B.    The Evidence does not Support the Jury's Verdict .............................. 14

Conclusion..................................................................................................... 17

# Table of Authorities

### Cases

*United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) ........................................ 13

*United States v. Belloisi*, 164 F.4th 232, 2026
    U.S. LEXIS 1226, at *6 (2d Cir. Jan. 16, 2026)...................................................... 16

*United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). ........................................ 12

*United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ................................. 12

*United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)................................. 11, 12

United *States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) ................................... 13

*United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008)). ..................................... 12

*United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)........................................ 13

*United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021)............................... 12

*United States v. Lorenzo,* 807 F.3rd 508, 515 (2d Cir. 2015).................................... 12

*United States v. Mizrahi*, 2024 WL 3824104, at *3 (S.D.N.Y. Aug. 15, 2024).......... 13

*United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019)..................................... 12

*United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)................................ 12

*United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010)..................................... 12, 16

*United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008)....... 12

*United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) ......................................... 13

### Statutes

Fed. R. Crim. Pro. 29(a). ............................................................................................ 11

Fed. R. Crim. Pro. 33.................................................................................................. 11

## Introduction

The trial record establishes that Netflix transferred $11 million to Carl Rinsch in March 2020 pursuant to a negotiated term sheet and contemporaneous communications in which Rinsch consistently represented that the payment was owed for work already performed and to enable limited, self-funded preproduction and post-production—not as an unconditional obligation to spend the entire sum on ongoing production. The circumstantial inferences relied upon at trial are too attenuated to establish beyond a reasonable doubt the specific intent to defraud required by the charged offenses. Additionally, when the Court weighs the evidence and assesses witness credibility under Rule 33, the verdict is against the weight of the evidence and a new trial or acquittal is warranted.

## Factual Background

### A. The Government's Case

#### 1. Netflix Witnesses

Three of the government witnesses at trial were former Netflix executives: Peter Friedlander, Vice President of Scripted Series; Bryan Noon, Vice President of Original Series; and Cindy Holland, the Vice President of Original Content. Netflix acquired *White Horse* in 2018. These witnesses testified about the acquisition of *White Horse* by Netflix in 2018 and their experiences with the project through September 2020. Friedlander described being impressed by the footage of *White Horse* that Rinsch created prior to the sale to Netflix in 2018. He described the

1

material as "very high quality execution," "impressive" visuals, "really inspiring

ideas," "cinematic." Tr. 127:20–128:1.

In 2018, Netflix and Home VFX, Rinsch's company, entered into a term sheet,

which stated that the first season was to be 110–120 minutes in length. Tr. 331:1-6.

Noon testified that he was "deeply involved in the negotiations to acquire the

project." Tr. 268:7-8. Mr. Friedlander described Netflix's deal with Rinsch as

unique: "I don't know if another deal that was like this that I worked on." Tr.

138:20-21.

Noon summarized the "milestone payments" in the initial Term Sheet

entered between Netflix and Home VFX, stating that the full amount Netflix would

pay for *White Horse* was to be $61.224 million. He described the separate payments,

including $22 million as an initial purchase price and $11 million as a supplemental

purchase price. Tr. 276:7–277:23. The term sheet also granted to Rinsch final cut

rights to the project. Tr. 166:25–167:2. Friedlander described "final cut" as having

the final say at the end of the show's edit. Tr. 167:5-24. Upon entering the term

sheet, six of thirteen episodes were completed. Following the execution of the term

sheet, Rinsch worked with Netflix to expand the show. Tr. 58:19-23.

Principal photography of *White Horse* resumed around August 2019. Tr.

56:10. Cindy Holland testified that they had an understanding that "really great

footage" was being shot, but that there were issues with production. Tr. 602:24-25.

Friedlander similarly recalled concerns about the shooting process of *White Horse*

in 2019, such as the production not having a line producer. Tr. 69:11-21.

In September 2019, Rinsch sent an email (GX[1] 6341) proposing two options: to deliver 110 minutes as per the term sheet, or to continue shooting and raising the budget. Friedlander testified that he did not believe either option to be a real option to take. Tr. 73:4-10. In an email thread between Bryan Noon and Mr. Rinsch, which Mr. Friedlander was copied on (GX 6344), the executives disagreed with Mr. Rinsch's offer to stop shooting at the script's "original length" if Netflix did not want to provide additional funding for production. Tr. 80:21-22. Friedlander and Noon suggested some cuts to the shooting schedule thereafter.

In October 2019, Netflix funded an additional $5.3 million towards the *White Horse* production. Tr. 348:16-18. Noon characterized this as an acceleration of the next installment. Tr. 350:9-12. He did not recall there being an agreement to this money being advanced. Tr. 351:3-6. The same month, Noon discussed absorbing writing down *White Horse*. Tr. 353:2-5.

Production concluded in Hungary, *White Horse's* third location, in December 2019. Tr. 606:3-6. Afterwards, Rinsch and Holland had a one-on-one state of the union meeting in January 2020 at Rinsch's request back in Los Angeles. Tr. 608:7-11. In February 2020, Holland received an email from Rinsch stating that over 300 hours of media was ready for post production (GX 6351) and later that "principle photography is to be considered completed" (GX 6352 at 2). Rinsch wrote that "over 300 hours of raw footage existed for the project that was ready for post-production." Tr. 611:6-7. Noon interpreted Rinsch's February email to be saying that "the

---

[1] "GX" refers to Government exhibits admitted at trial.

milestone for the payment of the $11.218 million had been met." Tr. 298:25-299:1.

Noon, Holland, and Friedlander disagreed with this statement and believed

principle photography was not completed, but none of them had viewed the footage

that was shot to that point.

Noon characterized himself as the lead negotiator for Netflix during a

budgeting negotiation in January to March 2020. Tr. 296:2-7. He testified that

Netflix was "looking for additional transparency around the progress of the project"

in exchange for additional financing. Tr. 297:1-8. Noon proposed to advance other

funds "that were due under the contract to provide Home VFX the time to prepare

budgets and schedules for completing the script that [they] had at that point." Tr.

303:4-7. He testified that he emailed Rinsch's lawyer, Dick Kendall, wanting a

"formal agreement" regarding these advanced funds. Tr. 304:20. Noon stated that

he was negotiating an expansion of the script. Tr. 305:5-16. Kendall responded to

Noon's proposal stating that principal photography was completed (DX 50), and that

the agreed-upon $11.218 million installment should be paid. Tr. 358:17-25. Noon

did not agree with Kendall's position. Tr. 359:24-360:1. Noon's understanding of the

negotiation was, "we did not necessarily agree on which contractual milestones had

or had not been met." Tr. 362:5-6. Noon did not recall there being a separate

negotiation discussion outside of the emails sent between himself and Kendall. Tr.

379:1-10. Holland met with Rinsch in her office on February 20, 2020, in which they

discussed Rinsch buying *White Horse* back from Netflix. Tr. 652:18-19; 653:13-16.

During the negotiations between Noon and Kendall, Rinsch texted Holland about the state of those negotiations, starting around February 27, 2020. Tr. 654:3. On March 4, 2020, Holland texted to Rinsch that she had a solution to Rinsch's funding problem, which "ended up being part of this proposal and funding…in order to allow him to secure future services." Tr. 655:8-15. Rinsch texted clarifying questions about the negotiations and about potentially buying the project back. Tr. 656:4-15. He also wrote that he was "a little unclear about this proposal." Tr. 657:2-3. Holland testified that she approved $11 million to Rinsch for *White Horse*. Tr. 620:12-14.

Friedlander testified that he did not receive work product from anyone on the *White Horse* team showing that the tasks listed on the March 4, 2020 email were being worked on. Tr. 108:15-19. Holland testified that there were attempts to follow-up on Rinsch's progress after March 5, 2020. Tr. 667:21-24.

Rinsch met with Friedlander and Holland at the Four Seasons to discuss the project in May 2020. Tr. 113:14-20. At the Four Seasons meeting they "didn't talk about" what Rinsch was doing with "the money Netflix gave to him in March" (Tr. 116:14-17). Holland described a production bible (GX 6372), which was also shown to Friedlander and Noon, as a "book related to production that had already taken place." Tr. 645:18-21. She did not recall a DropBox link from Rinsch with images related to the production in the summer of 2020. When shown images from the link, she could not recall when they were created. Tr. 644:6-7.

Noon and Holland left Netflix in the fall of 2020. Netflix "wrote down" the show as a tax loss in the fourth quarter of 2020. Tr. 117:25. Friedlander explained that Netflix "no longer perceived [the show] to be an asset." Tr. 117:19.

### 2. Testimony of Rinsch's Work on the Project

Five of the government's witnesses were individuals who had worked on *White Horse* in some capacity. Gabriella Roses, Rinsch's former spouse, had developed and worked on *White Horse* as a producer since 2014. Ethan Weiner, one of Rinsch's assistants, described White Horse as "the biggest project I ever worked on." Tr. 778:19. Weiner recalled working on the project in 2019 that "a lot of progress was made," but it was difficult and that the script was constantly changing and being updated. Tr. 767:18. The crew flew back to Los Angeles in December 2019. Tr. 555:23-25.

Tobia Suhm, an editor for the show, testified that by the end of 2019, the production had shot approximately 200 hours of footage from Brazil, Uruguay, and Hungary. Tr. 677:10-12. He testified that the next step in the editing process was to break down the footage. Tr. 676:20-23.

Mr. Weiner stopped working on the project in January 2020. Tr. 787:14-17. He understood that Rinsch was waiting on a "big 11.218MM payment" that he understood the phrase to mean "the third tranche of money he was owed for post-production." Tr. 773:17.

Skotnikova testified that In the spring of 2020, Rinsch informed the crew that "the project was in limbo because of a dispute had with Netflix." Tr. 467:8-9.

6

Joshua Loney, Rinsch's personal assistant, recalled that the production came to a "screeching halt" in March 2020 due to COVID. Tr. 690:2. Loney continued to work for Rinsch through early 2021 to run errands for him, where he sometimes saw Rinsch or Nick Gindraux working on the visual effects for the show. Tr. 696:1-11. Loney saw Rinsch only about twice a week. Tr. 696:15.

Roses initially claimed that work on the project stopped in the spring of 2020. Tr. 741:18-23. On cross-examination, she admitted working on the show into 2021 Tr. 743:16-18. She also admitted to seeing some work performed by a visual designer for the show during that period. Tr. 756:3-4. She also testified about several transactions seen in the account's bank statements, such as wires for production assistant and wardrobe services for the show through the fall of 2020. Tr. 740:25–741:2. She conceded that she was seeking alimony from Rinsch and had been separately sued by him. Tr. 756:17-20.

Maria Skotnikova worked on budgeting and accounting for the project through 2021. Tr. 458:17; 461:15. In the second half of 2021 she made purchases on Rinsch's behalf by his request. Tr. 561:15-19. She testified that she was in contact with Rinsch weekly. Tr. 464:8. She testified about various purchases she made on Rinsch's behalf, including furniture, watches and cars. Tr. 454:16-21; 490:1, 498:2-4. She stated that she did not make payments on behalf of Rinsch in the year 2020, but only 2021, stating, "I didn't pay attention to 2020 because it wasn't my responsibility." Tr. 563:11-12.

Weiner and Skotnikova also testified about Project Amarna. Mr. Weiner described Project Amarna as a place in Egypt and recalled that Rinsch wanted to change the name of his production company to "Amarna." Tr. 778:6-13. Weiner, who left the project of January 2020, testified that he was not aware of any other connection between Amarna and White Horse. Tr. 778:14-15. Skotnikova described Project Amarna as a "luxury lifestyle company" and claimed that she managed the project. Tr. 452:10-11, 476:4-7. When shown an email from herself to a visual designer, Nick Gindraux (GX 6196), she testified that his work for Amarna did not have anything to do with *White Horse*. Tr. 478:8-10.

### 3. Banking and Spending Witnesses

The third category of witnesses focused on Rinsch's banking and spending. The evidence showed Rinsch received an $11 million transfer from Netflix on March 6, 2020 into a Home VFX Bank of America account no. x6485. Tr. 402:6-7. Of that money, $10.5 million was then moved to his Bank of America account no. x8643 and then moved to his Wells Fargo account no. x4450 (GX 2001). Tr. 402:24-403:12; 403:25-404:1. The Bank of America account no. x8643 was opened on March 9, 2020, and $10.5 million that was transferred into it the same day. Tr. 403:16-21.

Ronald See, a First Vice President Investment Officer at Wells Fargo Advisors, testified that Rinsch did business with Wells Fargo until they placed parameters on his investing. Tr. 261:3-4. Rinsch then asked See to move $8.5 million to a Charles Schwab account No. x3719. Tr. 263:12-13. He then moved his investing to Checchi Capital in April and May of 2020. Tr. 196:9. Through Checchi

8

Capital, Rinsch made a series of options trades that went to zero. Rinsch's total

losses with Checchi Capital, as read aloud by the witness, were $5,866,569.87. Tr.

228:22.

The government presented evidence of numerous purchases from around July

2021 to around December 2022. Tr. 414-415. These purchases included luxury

vehicles and goods, including compendious testimony from a mattress salesman,

Kristofer Eriksson. Tr. 580:13-14. Allen Grove, an FBI agent, testified that Rinsch

represented that Rinsch told him that he "had become wealthy during the pandemic

by investing in dogecoin." Tr. 441:10-11.

### B.    Defendant's Testimony

Rinsch took the stand in his own defense. He identified himself as the

creator, writer, producer, and director of *White Horse*. He explained that the

acquisition deal he had with Netflix was a negative pickup, and explained that a

negative pickup deal meant that he fronted the money and was paid back upon

completion. Tr. 914-915.

He testified that he was paid $11 million to "pay back" for principal

photography that he had shot. Tr. 878:24-25. This was consistent with the term

sheet that granted him $11.218 million upon completion of principle photography.

Tr. 900. The Term Sheet gave Rinsch "final cut" which allowed him to designate

what material would be used. Tr. 901-902. He described final cut rights saying, "It's

to give the artist full control over their work, and that is a non-compromising position" Tr. 902:19-21.

On February 4, 2020, Rinsch emailed Netflix informing them that principal photography was completed and that he was owed the $11.218 million. Tr. 908; GX 6352 at 3. In the same message, Rinsch requested an additional $3.75 for work to be performed towards the next season. Tr. 909; GX 6352 at 3. In a February 27, 2020 email from Rinsch's attorney to Netflix, Rinsch's counsel wrote "if Netflix pays the $11.218 installment, Carl will self-fund the prep necessary…" Tr. 879:10-12, 910; DX 50[2]. At this point, the prep would be "soft-prep" meaning that physical fabrication of sets and designs could not be undertaken since Netflix was not yet committing to a second season. Tr. 911-912.

He understood the agreement to mean that $11 million would be paid upon the execution of the agreement, and that he would be paid the remainder of the supplemental payment – $218,000– after five weeks. Tr. 1001:22-25. He believed that the bulleted items in their email agreement in March 2020 would cost him around $500,000 to complete. Tr. 879:20-22. During the discussion in February and March of 2020, Rinsch never stated or implied that he would use the entirety of the $11 million on the project. Tr. 914:8-20.

In email communications between March 4th and 5th between Rinsch, his attorney and Noon, the parties agreed to the $11 million distribution. GX 6358. A proposal sent on March 4th, sent by Noon stated, "[Rinsch's company] shall

---

[2] "DX" refers to admitted defense exhibits.

perform, and shall use the $11m to fund over a 5-week period…" several bullet items related to the project. GX 6358 at 5. Rinsch understood this proposal to be consistent with his own February 27th proposal that he "self-fund" the pre-production once the installment was made, but not that the entirety of the $11 million would be used for the project. Tr. 916:9-25.

Rinsch testified that he did self-fund further work on the project with a portion of the $11 million. He hired an accomplished line producer. Tr. 923-932; DX 101. He secured an international filming location. Tr. 935; DX 102. He paid location scouts. Tr. 953:5-12; GX 3008 at 57. He contracted an insurance agent for the project. Tr. 947:9–948:1; GX 3008 at 41. He secured actors contracts. Tr. 948:2-22; GX 3008 at 41. He extensively worked with a visual concept designer on art work for *White Horse* throughout 2020 and into 2021. Tr. 935-941; DX 103. Rinsch shared his work with Netflix executives through text messages and Dropbox links. Tr. 941, 945, 949-950; DX 107. Rinsch explained that Project Amarna as a "fictional company" within *White Horse*. Tr. 956:3.

## Discussion

### A.  Standard of Review for Rule 29 and Rule 33 Motions

Under Fed. R. Crim. Pro. 29(a), the Court "must enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction." "The test for sufficiency…is whether a rational jury could conclude beyond reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quotation omitted). The Court

must make this determination with "the evidence ...viewed in a light that is most favorable to the government...and with all reasonable inferences...resolved in favor of the government." *Id.* (quotation omitted). Although a defendant's burden on such a motion is not insurmountable, a judgment of acquittal will only be granted if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005).

The "jury's inferences . . . must be reasonable." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021). "[S]pecious inferences [should] not [be] indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Landesman*, 17 F.4th at 320 (quoting *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008)).

"Where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible," but rather, the Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (internal quotation marks and alteration omitted); *see also United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("[T]he government must introduce

12

sufficient evidence to allow the jury to reasonably infer that each essential element

of the crime charged has been proven beyond a reasonable doubt."); *United States v.*

*Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008). "The standard does

not mean that if there is any evidence that arguably could support a verdict, we

must affirm. In any criminal trial there is always some evidence of guilt, otherwise

there could not have been a prosecution." *United States v. Valle*, 807 F.3d 508, 515

(2d Cir. 2015).

     Rule 33(a) allows this Court "grant a new trial if the interest of justice so

requires." "A motion for a new trial under Rule 33, unlike a motion under Rule 29, does

not require the court to view the evidence in the light most favorable to the

Government." *United States v. Mizrahi*, 2024 WL 3824104, at *3 (S.D.N.Y. Aug. 15,

2024). "The Court may weigh the evidence and evaluate the credibility of the witnesses

on its own, but it may not 'freely substitute [its] assessment of the credibility of

witnesses for that of the jury simply because [it] disagrees with the jury.'" *Id.* (quoting

*United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)). "[W]here the resolution of

the issues depended on assessment of the credibility of the witnesses, it is proper for

the court to refrain from setting aside the verdict and granting a new trial." *Landau*,

155 F.3d at 105. "Only if such deference would result in a miscarriage of justice should

the Court substitute its assessment of a witness's credibility for that of the jury."

*Mizrahi*, 2024 WL 3824104, at *3. A court "[g]enerally ... has broader discretion to grant

a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." United

*States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). But "a district court may not grant

a Rule 33 motion based on the weight of the evidence alone unless the evidence

preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand. *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

### B.  The Evidence does not Support the Jury's Verdict

The evidence at trial did not sustain the conviction. Rinsch did not have the requisite intent to defraud. It is not contested that $11 million was transferred from Netflix to Rinsch in March 2020. It is also not contested that Rinsch used at least a portion of that money for purposes other than work on *White Horse*. Rinsch never intended to convey or create the impression that the entirety of that money would be used on the *White Horse* project. Any such understanding on the part of Netflix was in direct opposition to statements made by Rinsch leading up to the transfer of funds. Rinsch made repeated representations to Netflix executives that he was owed this money pursuant to the Term Sheet for work already performed. Netflix's understanding to the contrary cannot be the basis of a conviction.

The government alleged that Rinsch defrauded Netflix for taking stating that he would use the money to perform work on *White Horse* but never intended to do so. Contemporaneous emails between Rinsch and his counsel and Netflix executives show the agreement reached between the parties. GX 6358. Over the course of these emails, Rinsch through counsel agrees to perform work on the project if the money is paid to him. The parties exchange proposed language through several communications before an agreement is made. The government essentially argued that any ambiguity should be resolved against Rinsch and read to mean that he agreed to spend the entirety of the $11 million on the project.

14

The government also relied heavily on prior arbitration testimony in which Rinsch stated that he agreed to use money for the project. Tr. 1234:19–1235:6. On the stand, Rinsch explained that he did intend to self-fund the agreed upon items, but that it was absurd to expect him to use all $11 million to do so. While Rinsch undoubtedly agreed to perform work on *White Horse*, he testified that he agreed to do that work if paid that $11 million, but never stated or implied that the entirety of the $11 million would be used on the project. Tr. 915:13–917:13. This testimony was corroborated by emails dating back to February 4, 2020 in which he stated that this was money he was owed. *See* GX 6452 at 3.

In the exchanges by email with Netflix that constituted the final agreement, Rinsch's own counsel expressed confusion. *See* DX 6358 at 2 ("Now you have confused me.") Similarly, Rinsch wrote to Holland on March 5, 2020, hours before the final agreement, "Cindy, I'm a little unclear about this proposal and want to make sure we understand each other and do not set ourselves up for disagreements down the road." GX 6368A at 6. The contemporaneous text and emails show confusion and ambiguity, not intent.

Holland testified that based on her conversations with Rinsch she understood that he would use the money to further the project, but did not discuss what else he would do with the money. Tr. 632:1–633:7. She also revealed a lack of memory about her communications at the time. *See* Tr. 656:4–659:14. This hazy testimony is entirely consistent with Rinsch's agreement to self-fund work on the project but

15

that he never communicated that he would use *the entirety of* the funds on the

project.

The government urged the jury to disregard the ambiguity in the

negotiations and find that Rinsch had clear intent to defraud through

circumstantial evidence. The government may use circumstantial evidence and,

indeed, intent is often proved through such evidence, however, where the

government seeks to prove a fact that is also an element of the offense – as it is here

– by circumstantial evidence, the Court "must be satisfied that the inferences are

sufficiently supported to permit a rational juror to find that the element, like all

elements, is established beyond a reasonable doubt." *United States v. Belloisi*, 164

F.4th 232, 2026 U.S. LEXIS 1226, at *6 (2d Cir. Jan. 16, 2026) (quoting, *United

States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010)).

The government argued that the evidence of Rinsch's intent was that he was

"laser focused on COVID and Gilead before he got the money." Tr. 1102:1-2. The

government's circumstantial proof for this position is Rinsch's late February

messages to Weiner and sale of his Netflix stock and his asking for bank wiring

instructions three days after receiving the funds. Tr. 1102:1-11. These inferences do

not support the conclusion of malicious intent. The theory that Rinsch sought funds

for COVID investments is patently false. Rinsch sought the $11 million February

4th, over three weeks before any of the government's circumstantial evidence

existed. *See* GX 6452 at 3.

The evidence adduced at trial demonstrates that Rinsch – rightly or wrongly – believed he was owed $11,218,000 from Netflix for completing principal photography after shooting 200 hours of footage for a two-hour show. The evidence further showed that he proposed and subsequently agreed to "self-fund" additional work on the show if repaid the money he was owed. The evidence demonstrated that he did exactly that. Rinsch never stated or implied that he would spend *all* of the money he was owed on the project and any verdict to the contrary should be overturned.

## Conclusion

For the foregoing reasons, Rinsch respectfully requests the Court to enter a judgment of acquittal on all charges or, alternatively, order a new trial.

Dated: New York, NY
        February 18, 2026

_____
Daniel A. McGuinness
353 Lexington Ave, Suite 900
New York, NY 10016
(646) 360-0436
dan@legalmcg.com

17