UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CARL ERIK RINSCH,

　　　　　　Defendant.

25 Cr. 85 (JSR)

**THE GOVERNMENT'S OPPOSITION TO
THE DEFENDANT'S POST-TRIAL MOTION**

JAY CLAYTON
United States Attorney for the
Southern District of New York

Timothy Capozzi
David Markewitz
Adam Sowlati
Assistant United States Attorneys
　　*Of Counsel*

**Table of Contents**

BACKGROUND ............................................................................................................. 1

A.    Netflix Purchased the Rights to *White Horse* ................................................ 1

B.    Rinsch Seeks Additional Funds from Netflix .................................................. 2

C.    The First Season of White Horse Remained Uncompleted as
      Rinsch Became Desperate for Cash ................................................................. 3

D.    Rinsch Turns His Attention to the Impact of the COVID-19 Pandemic
      on Global Markets ........................................................................................... 5

E.    Rinsch Agrees to Use $11 Million from Netflix to Fund *White Horse* ............ 5

F.    Rinsch Gambles the $11 Million on Risky Market Bets ................................... 6

G.    Rinsch Falsely Assures Netflix that Work was being Done on White Horse ..... 8

H.    Rinsch Buys Millions of Dollars of Luxury Goods with Netflix's Money ........ 9

I.    Rinsch Convicted After Seven Day Jury Trial .............................................. 11

LEGAL STANDARD ................................................................................................... 11

A.    Rule 29 Motions ............................................................................................ 11

B.    Rule 33 Motions ............................................................................................ 12

ARGUMENT ............................................................................................................... 13

CONCLUSION ............................................................................................................. 17

## Table of Authorities

**Pages**

**Cases**

*Jackson v. Virginia*,
  443 U.S. 307 (1979) .................................................................................................... 11

*Romero v. United States*,
  28 F.3d 267 (2d Cir. 1994) ......................................................................................... 12

*United States v. Abelis*,
  146 F.3d 73 (2d Cir. 1998) ......................................................................................... 12

*United States v. Coplan*,
  703 F.3d 46 (2d Cir. 2012) ......................................................................................... 11

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) ....................................................................................... 11

*United States v. Ferguson*,
  246 F.3d 129 (2d Cir. 2001) ....................................................................................... 12

*United States v. Gambino*,
  59 F.3d 353 (2d Cir. 1995) ......................................................................................... 12

*United States v. Gaskin*,
  364 F.3d 438 (2d Cir. 2004) ....................................................................................... 11

*United States v. Goffer*,
  721 F.3d 113 (2d Cir. 2013) ....................................................................................... 11

*United States v. Gole*,
  158 F.3d 166 (2d Cir. 1998) ....................................................................................... 15

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999) ....................................................................................... 12

*United States v. Hassan*,
  578 F.3d 108 (2d Cir. 2008) ....................................................................................... 11

*United States v. Ng*,
  934 F.3d 110 (2d Cir. 2019) ....................................................................................... 11

*United States v. Persico*,
  645 F.3d 85 (2d Cir. 2011) ......................................................................................... 11

*United States v. Sabhnani*,
  599 F.3d 215 (2d Cir. 2010) ....................................................................................... 11

*United States v. Sanchez*,
  969 F.2d 1409 (2d Cir. 1992) ..................................................................................... 12

*United States v. Santos*,
  541 F.3d 63 (2d Cir. 2008) ......................................................................................... 12

**Rules**

Fed. R. Crim. P. 29 ........................................................................................................... 11
Fed. R. Crim. P. 33 ........................................................................................................... 12

The Government respectfully submits this opposition to defendant Carl Erik Rinsch's motion for a judgment of acquittal or new trial (the "Motion") following his conviction on December 11, 2025, of one count of wire fraud, in violation 18 U.S.C. §§ 1343 and 2, one count of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2, and five counts of engaging in a monetary transaction in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2. For the reasons set forth below, the Motion should be denied in its entirety.

## BACKGROUND

### A.    Netflix Purchased the Rights to *White Horse*

Carl Erik Rinsch is a writer and director. Around 2013, he began to film a television show that he created called *White Horse*. Tr. 883:20–21(Rinsch).[1] Rinsch spent the next approximately four years filming numerous episodes of *White Horse*, using both his own money and early investments from others. Tr. 884:2–21 (Rinsch). By late 2017, Rinsch had shot around six episodes totaling around one hour. *See* Tr. 47:23–48:13 (Friedlander); Tr. 886:5–7 (Rinsch).

With around half the first season shot, Rinsch began looking to sell the *White Horse* project to a distributor. Among the reasons motivating this sale, Rinsch wanted to secure funding to be able to finish shooting the remaining episodes for the first season. *See* Tr. 45:12–23, 47:23–48:19 (Friedlander). This sale process led Rinsch to connect with Netflix. By around March 2018, after just a few months of negotiations, the parties reached a high-level agreement for Netflix to acquire the project. *See* Tr. 272:10–11 (Noon).

Thereafter, the parties worked to reduce their preliminary agreement to a more formal term sheet, which they signed in November 2018. *See* GX 6336; Tr. 272:12–14 (Noon). Under the term sheet, Netflix agreed to pay a little more than $61 million for the right to acquire and distribute

---

[1] "Tr." refers to the trial transcript and "GX" refers to Government exhibits.

1

*White Horse.* GX 6336 ¶ 7. That money was intended both to reimburse Rinsch for what he had already spent creating the show up to that point, as well as to fund the filming and completion of the remaining episodes planned for the season. *Id.* The money in the term sheet was not going to be paid to Rinsch all at once. Instead, Rinsch would unlock various payments by reaching certain production milestones. *See id.*; *see also* GX 2008 (summary chart illustrating the various payments and the triggers that unlock them).

After reaching agreement with Netflix, Rinsch spent a substantial amount of time preparing to go back into production. *See* Tr. 56:1–13 (Friedlander). Specifically, the plan was to shoot *White Horse* in countries across the world, including Brazil, Uruguay, Hungary, Mexico, and Kenya. *See* GX 6339 at 2–21. Following over a year of planning, the production resumed in August 2019, in Sao Paolo, Brazil. Tr. 69:17–24 (Friedlander).

**B.    Rinsch Seeks Additional Funds from Netflix**

Once filming resumed, *White Horse* immediately began to go over budget. Tr. 460:7–23 (Skotnikova). In September 2019, just a few weeks after starting to shoot more footage, Rinsch emailed Peter Friedlander and told him that "the budgets have exploded" and that Rinsch was concerned about being left with "an empty bank account." GX 6341. Rinsch then proposed two alternate solutions: (i) Rinsch would simply shoot only a portion of the story that Netflix had purchased and paid Rinsch to create; or (ii) Netflix had to commit to giving Rinsch an "unpredictably higher" budget. *Id.*

Over the next few weeks, Netflix executives repeatedly sought to secure additional information from Rinsch so that they could determine the source of the budget overruns and figure out what would be needed to film the full story they had purchased. *See* GX 6342; Tr. 74:12–19 (Friedlander). Netflix also looked for ways to trim the show's budget, including proposing various cuts

2

to the shooting schedule. *See* GX 6344; Tr. 81:17–82:1 (Friedlander). Despite Netflix's efforts, however, it was "very difficult" for the streamer to get information out of Rinsch about the show's status. Tr. 77:7–13 (Friedlander). But one thing about which Rinsch was always clear was how additional money would be used. In an email from his then-lawyer to Netflix, Rinsch promised that any additional money Netlix gave him would go "100% on the screen" and would not be paid out to any of the show's producers, including Rinsch. GX 6343 at 1.

Eventually, in late October 2019, Rinsch told Netflix that if they did not give him more money immediately, the show would shut down. *See* GX 6347 at 1–2. So, on October 31, 2019, Bryan Noon, a senior executive in Netflix's business function, agreed to advance Rinsch $5.3 million. *See id.* at 1; Tr. 290:18–291:9, 292:4–6 (Noon). With that infusion of capital, Rinsch returned to shooting.

Around early December 2019, the *White Horse* production ended photography for the year. GX 6348. Although the plan had been for the production to go to many other locations around the world, the decision was made instead to shut down for the holidays and regroup. *See* Tr. 88:10–20 (Friedlander). This was intended to allow the *White Horse* team and Netflix to figure out what next steps to take given the budget issues that had plagued the production thus far. *See* Tr. 88:10–20 (Friedlander); GX 6348.

## C. The First Season of White Horse Remained Uncompleted as Rinsch Became Desperate for Cash

Once Rinsch was back in Los Angeles, he and Netflix spoke about coming up with a detailed plan for shooting the remaining *White Horse* episodes. Tr. 88:10–20 (Friedlander). Part of that plan included trimming the script to reduce the amount of footage that remained to be shot (and thus, lowering the budget). *See* Tr. 91:25–92:11 (Friedlander). But when Rinsch shared a new script with Netflix in early 2020, it had actually *expanded*, growing from its previous 203 pages to

229 pages. *Compare* Tr. 903:23–904:7 (Rinsch) (describing the pre-2020 script as 203 pages), *with* GX 6351 at 9–238 (2020 version of the script). The Netflix team was shocked. *See* Tr. 92:14–93:2 (Friedlander).

On February 3, 2020, shortly after sharing this new, longer script, Rinsch sent Netflix a demand for additional money. Specifically, Rinsch requested $5 million, which he said would be used to fund a specific list of tasks for the show (the "Task List"). *See* GX 6351 at 7. That Task List included things like editing existing footage for the first season of *White Horse* and performing certain pre-production work on the additional footage that needed to be shot in 2020. *Id.* When Netflix did not immediately agree to give Rinsch that money, he then claimed, for the first time, that what he had shot in 2019 was sufficient to complete principal photography on the first season of the show, and that Netflix therefore owed him $11.218 million under the parties' term sheet. GX 6352 at 2.

That assertion was false. Indeed, both Netflix and the *White Horse* production team all agreed that principal photography was nowhere close to done in February 2020. As put by Cindy Holland: "There were multiple filming locations yet to be traveled to, and many, many scenes remained unphotographed." Tr. 614:20–615:3 (Holland); *see also* Tr. 88:21–89:3 (Friedlander) ("we hadn't completed it"); Tr. 769:4–7 (Weiner) (similar). And according to Gabriela Roses, Rinsch's then-wife and production partner, roughly 30% of photography remained unfinished. *See* Tr. 703:20–704:8 (Roses). So in February, Bryan Noon wrote to Rinsch's lawyer, telling him that "the next installment [is not] currently due." GX 6355 at 1.

The reason Rinsch was seeking this money was clear: he was desperate for cash. In February 2020, Rinsch told Roses that they were effectively bankrupt. *See* Tr. 706:4–15 (Roses). Rinsch also sent various messages to his production assistant, Ethan Weiner, in which he described the

4

financial hardships he was facing: "I'm getting financially murdered right now. . . . I'm under water as of right now, actually. Scary but true. . . . I'm at a red line. . . . [T]he project . . . [is] on life support and I'm the life support machine. And I only have enough to get us through the month. Really just three weeks." GX 5086.

**D.      Rinsch Turns His Attention to the Impact of the COVID-19 Pandemic on Global Markets**

As COVID-19 began to grip the globe, Rinsch closely followed the deepening pandemic. For instance, by late February 2020, Rinsch began to focus on the stock market impact of the virus and expressed the belief that the pharmaceutical company Gilead Sciences had a promising treatment for the virus with its drug remdesivir. GX 6354; GX 6191; Tr. 970:12–17 (Rinsch) (admitting he was familiar with and interested in Gilead in February 2020). As Roses explained, Rinsch, at the time, "was very excited about COVID and anything related to COVID." Tr. 710:7–15 (Roses). By March 4, 2020, Rinsch believed that "the markets [were] going to get shattered" due to the pandemic, and that there was "going to be systemic failure." GX 5087. Rinsch made clear, however, that his focus at the time was "get[ting] money secured [from Netflix] before it does." *Id.*

**E.      Rinsch Agrees to Use $11 Million from Netflix to Fund *White Horse***

On March 4, 2020, Bryan Noon sent Rinsch and his attorney a proposal regarding additional funding for the show. GX 6358 at 5–6. Specifically, Noon stated that Netflix would fund Rinsch's production company, Home VFX, $11 million. *Id.* But there were conditions to that funding. Most importantly, Noon stated expressly that Rinsch would have to agree that he would "use the $11M to fund" the same Task List that Rinsch himself had previously proposed in February 2020. *Id.* Noon also stated that this offer "shall not represent an acknowledgment of any of the contractual milestones"—*i.e.*, making clear to Rinsch that Netflix still did not agree that principal photography was complete. *Id.*; *see also* Tr. 626:1–12 (Holland) ("That means we are not

5

acknowledging that milestones in the original term sheet have been met."). Lastly, Noon stated that Rinsch would need to agree to give Netflix weekly updates about the status of the project. GX 6358 at 5.

After some back and forth between the parties about aspects of the proposal other than those described above, both Rinsch and his lawyer agreed to Noon's terms. *See generally* GX 6358, GX 6359. That is, Rinsch promised that if Netflix paid him the $11 million, he would use the entirety of that money to pay for work on *White Horse*. Indeed, when asked about the agreement while under oath during a later arbitration with Netflix, Rinsch did not equivocate or mince words:

> **Q:** And was HVFX agreeing to use the $11 million for the purposes listed here [in the Task List]?
>
> **A:** To answer your question, yes. Yeah. Home VFX shall perform and shall use the 11 million to fund this.

GX 1006C at 5; *see also* 1009B at 5 (similar).

## F.    Rinsch Gambles the $11 Million on Risky Market Bets

Rinsch received the $11 million through a bank wire on Friday, March 6, 2020, into a checking account held in the name of his production company, Home VFX (the "Home VFX Checking Account"). GX 2001. The very next business day—Monday, March 9, 2020—Rinsch opened a new savings account in Home VFX's name (the "Home VFX Savings Account") and transferred $10.5 million of Netflix's money into that account the same day, GX 2001, GX 3026. Also on March 9, 2020, Rinsch sold more than $500,000 of Netflix stock that he owned. GX 3036 at 23.

Rinsch's motives were clear. He had Netflix transfer the money into a business account, rather than a personal account, to avoid alerting Netflix that he was planning to spend the money on himself. But Rinsch's production partner and wife, Roses, was a signatory on the Home VFX

Checking Account. GX 3011. As a result, Rinsch opened a new business account so that he could move the money into an account to which Roses did not have access. GX 3026. Rinsch was careful, however, to make sure that new account—the Home VFX Savings Account—was opened in Home VFX's name so that it would appear to Roses that the money was staying within the business. Indeed, on the very day that Rinsch moved the money from the Home VFX Checking Account to the Home VFX Savings Account, he messaged Roses, reassuring her that the Home VFX Savings Account was a "'safeguard' account" that was set up to "act as a financial firewall" and be a place where Rinsch could "set aside [money] for the production." GX 5005.

Despite what he told Roses, Rinsch had no intention of leaving the money in the Home VFX Savings Account. The very day that Rinsch transferred the $10.5 million into the account and told Roses that the account was intended to be a safeguard location, Rinsch requested and received wire transfer instructions for moving the money out of that account and into his personal brokerage account at Wells Fargo. GX 3046. One week later, Rinsch routed $8 million from the Home VFX Savings Account into that personal Wells Fargo account, without telling Roses. GX 2001.

As these rapid financial transactions were taking place, Rinsch began trading in Gilead securities. Starting on March 9, Rinsch began to buy hundreds of thousands of dollars' worth of Gilead stock. GX 3036 at 23. And then, after wiring $8 million of Netflix's money into his Wells Fargo account, he continued to purchase hundreds of thousands of dollars of Gilead securities, including on March 24. *See id.* at 23–24.

Around that time, Wells Fargo grew concerned about the concentrated nature of Rinsch's investments and placed restrictions on his trading. Tr. 260:13–262:21 (See). That caused Rinsch to hire a new investment advisor, Adam Checchi, and to move Netflix's money from Wells Fargo

into a new brokerage account that Checchi helped Rinsch open at Charles Schwab. Tr. 262:22–25 (See); GX 2001; GX 3047. Rinsch also wired the remaining $2 million of Neflix's money still in the Home VFX Savings Account into the Charles Schwab brokerage, for a total of $10.5 million. GX 3027 at 6.

On March 31, 2020, just one day after moving $10.5 million of the money Netflix paid him into his Charles Schwab brokerage account, Rinsch invested over $6.2 million in the market, mostly on stock options betting on Gilead and shorting the S&P 500. GX 3027 at 61. Within just a few weeks, Rinsch lost nearly all that money. GX 3030 at 7. But that did not come as a surprise to Rinsch. Before making these investments, he had been advised by Checchi that they were "extremely risky." Tr. 222:5–9 (Checchi). Rinsch acknowledged that the investments were "highly speculative and aggressive," but he indicated that he was "comfortable forfeiting [millions of dollars] in the instance these investments are not as fruitful as a I want them to be." GX 6057 at 1.

## G.    Rinsch Falsely Assures Netflix that Work was being Done on White Horse

As this was going on, Rinsch worked to hide what was happening from his victim. Throughout the rest of March 2020, Rinsch sent Netflix various rosy updates about the show's future. Those included assertions like:

- "You will not regret [giving Rinsch more money]. . . . I've got you. 100%." GX 6368A at 7.

- "We are moving forward with preproduction and at 100% effectivity." *Id.*

- "[Q]uietly moving forward[,] [w]hile the craziness swirls overhead." GX 6360.

- "We continue moving forward diligently. I am excited to show you the work we are doing once the dust of this pandemic clears." GX 6361.

- "We're working away on this end." GX 6362.

But those were lies. Rinsch was not actually working on the show at this point. Tr. 736:20–25 (Roses) (testifying that she was "not "aware of anyone working away on *White Horse*" in late March 2020); GX 6194 ("everything on pause, even post-production and editing since the end of December 2019"); Tr. 691:1–4 (Loney) (testifying that he saw no work on *White Horse* between "March 2020 through spring 2021").

Rinsch's lies continued the following month. By late April 2020, Rinsch had already squandered around $4.5 million of what he had been given by Netflix. But rather than come clean about his fraud, Rinsch continued to lie to Cindy Holland about the state of the show:

- "By the way, dont worry about the show. It's awesome and moving forward really well."

- "It's other level."

- "Don't worry. Game changing good. And hasn't stopped (or even slowed down) while I've been handling 'other stuff.'"

*See* GX 6368B at 2, 10.

## H.    Rinsch Buys Millions of Dollars of Luxury Goods with Netflix's Money

In early 2021, Rinsch took what remained of the Netflix money and transferred it to a cryptocurrency trading account he opened with Kraken, a crypto exchange. GX 2010; Tr. 408:23–410:3 (Naccarelli). Then, Rinsch began to invest heavily in the cryptocurrency Doge Coin. Tr. 412:7–11 (Naccarelli). Unlike his earlier investments, this one proved quite profitable, and Rinsch earned even more money than he'd lost in mid-2020. Tr. 410:24-411:2 (Naccarelli); GX 2010.

But Rinsch still refused to spend the money on *White Horse*. Instead, Rinsch spent money on various luxury goods, like hyper expensive cars, antique furniture, watches, and mattresses.

9

Tr. 452:8–18 (Skotnikova). During the trial, the evidence established that this spending was intended to satisfy two goals.

*First*, as Rinsch acknowledged in numerous contemporaneous messages, he was buying many of these luxury goods for himself, either as investments or simply for his own use. *See* GX 5050; GX 5051. That included a $740,000 Ferrari and a $380,000 Vacheron Constantin watch. *Id.*

*Second*, Rinsch wanted to spend $11 million on luxury goods he thought that he could pass off as being related to *White Horse*, such as things he believed he could claim were props or set decorations. His goal with that spending was to be able to convince Netflix and his wife that he'd incurred $11 million in expenses on *White Horse* after receiving the money that Netflix paid him. As it related to Netflix, Rinsch believed this would allow him to cover up that he had misused their money and make it appear as though he'd actually spent the $11 million as promised. *See* Tr. 469:6–9, 486:18–487:3, 488:3–7 (Skotnikova); *see* GX 1011D (Rinsch claiming he spent all $11 million on the show). And as it related to his wife, Rinsch was engaged in a protracted divorce with her, and he believed that passing off this spending as production-related would allow him to hide his money in assets (the luxury goods) that he could claim were owned by the production and so were not part of the marital estate. Indeed, Rinsch submitted a financial declaration as part of that divorce in which he swore under penalty of perjury to that supposed fact. *See* GX 7003 at 1, 5–7.

This was all a lie. Rinsch had no actual plans or intentions to use any of these items to make the show. For example, Rinsch purchased five Rolls Royces and a Ferrari, all of which he told Netflix and the court handling his divorce were for the *White Horse* production. GX 1009E; GX 7003. But Rinsch insured each of those cars in his personal name, not the name of his

production company; and the insurance he purchased was for "pleasure" rather than business. *See* GX 6421 at 10–11. And Rinsch's budgeting assistant, Maria Skotnikova, testified that Rinsch bought a number of these cars because he thought they were "a good investment." Tr. 492:13–17 (Skotnikova).

### I.    Rinsch Convicted After Seven Day Jury Trial

Rinsch was indicted for his crimes in early 2025. The case proceeded to trial before this Court on December 2, 2025. And after seven trial days, the jury returned a verdict finding Rinsch guilty on all counts. *See* Tr. 1140:18–1142:22 (jury verdict).

### LEGAL STANDARD

### A.    Rule 29 Motions

A defendant challenging the sufficiency of the evidence under Rule 29 bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), because the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). This Court reviews the sufficiency of the evidence de novo, *see United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010), but "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Cuti*, 720 F.3d 453, 462 (2d Cir. 2013).

A conviction must be affirmed if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Ng*, 934 F.3d 110, 130 (2d Cir. 2019) ("[A court] may reverse a guilty verdict only if evidence that the defendant committed the crime is nonexistent or so meager that

11

no reasonable jury could find guilty beyond a reasonable doubt."). The jury's verdict "may be based entirely on circumstantial evidence," *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013), and this Court must analyze each piece of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011). The sufficiency test applies "to the totality of the government's case and not to each element, as each fact may gain color from another." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999).

It is not the Government's burden to "disprove every hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). Rather, "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008). A Rule 29 challenge "does not provide the [court] with an opportunity to substitute a determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Guadagna*, 183 F.3d at 129.

## B.    Rule 33 Motions

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." A new trial should be ordered "[s]paringly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *Romero v. United States*, 28 F.3d 267, 268 (2d Cir. 1994). Because "motions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds "a real concern that an innocent person may have been convicted." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

12

**ARGUMENT**

Rinsch premises his motion on a single argument: that the evidence at trial was insufficient to prove that Rinsch "ha[d] the requisite intent to defraud." Def. Mem. at 14.[2] That argument is meritless. The evidence at trial overwhelmingly established Rinsch's specific intent to defraud Netflix and a reasonable jury could certainly have convicted Rinsch upon this trial record.

*First*, Rinsch argues that he "never intended to convey or create the impression that the entirety of the [March Payment] would be used on the *White Horse* project." Def. Mem. at 14. Not so. When asked why she believed Rinsch would use the $11 million to fund *White Horse*, Cindy Holland's answer was simple: "He told me so."[3] Tr. 632:1–12 (Holland). Holland's testimony is entirely consistent with the parties' negotiating history. In September 2019, when Rinsch first sought more money, his lawyer promised Netflix all additional funding would go into the project. GX 6343. In February 2020, Bryan Noon made clear to Rinsch's lawyer that Netflix wanted "a short agreement as to . . . the intended uses of [additional] funding . . . ." GX 6355. And every Netflix executive involved in the project who testified at trial said that the money was provided on the express understanding that it would all go towards making *White Horse*. Tr. 102:6–10 (Friedlander); Tr. 287:14–21, 297:12–20, 304:22–24 (Noon); Tr. 632:1–12 (Holland).

Rinsch's argument is also contradicted by his own words and actions. During his arbitration with Netflix, Rinsch was asked if he had agreed "to use the $11 million for the purposes listed" in the Task List. GX 1006C. Rinsch's answer was clear: "[Y]es. Yeah. Home VFX shall perform and shall use the 11 million to fund this." *Id.*; *see also* GX 1009B (acknowledging that "Home VFX

---

[2] Def. Mem. refers to the memorandum of law that Rinsch submitted in support of his Motion.

[3] Rinsch argues that Holland's testimony "revealed a lack of memory about her communications at the time." Def. Mem. at 15.  But at no time did Holland ever waiver in her recollection of the essential facts of the fraud—that Rinsch represented to Neflix that he would use the $11 million in "completing and delivering the [*White Horse*] project." Tr. 612:1–5 (Holland).

was agreeing that the $11 million would be used on the bulleted items in . . . the March 4th e-mail"). He did not equivocate or say anything to suggest that he had agreed that only a *portion* of the $11 million would fund the Task List. Rinsch's ongoing campaign to lie to Netflix about the status of the show after receiving the March 2020 payment—even as the show sat idle and Rinsch was losing most of the money that Netflix gave him—is also entirely consistent with someone who believed he needed to cover up a fraud that he had committed.

In addition, Rinsch argues that it would have been "absurd to expect him to use all $11 million" to fund the items on the Task List, as those tasks would have cost "around $500,000 to complete." Def. Mem. at 10, 18. Not so. In the arbitration, Risch testified that he actually spent *$12 million* on the Task List. *See* GX 1011D (testifying under oath that he "spen[t] all of the $11 million on the bullet point items in that [Task] [L]ist" "and a million dollars more"). And Rinsch himself initially proposed that Netflix send him $5 million to complete the Task List. GX 6351 at 7.

At base, Rinsch's argument is that the Court should draw inferences in his favor, and credit Rinsch's self-serving testimony about his contemporaneous understanding of the agreement he had reached with Netflix over the other evidence presented at trial. That is wrong for many reasons. As spelled out above, the evidence at trial overwhelmingly proved Rinsch's fraudulent intent, far in excess of the sort of evidence that would be needed to maintain a jury's verdict in light of the "exceeding deferential" standard that applies to the jury's conclusion at this stage. *See Hassan*, 578 F.3d at 126. But even setting that aside, the jury had ample reason to reject Rinsch's self-serving testimony. Beyond the fact that much of his testimony was incredible and contradicted by his previous statements during an arbitration with Netflix, there were numerous examples presented at trial of Rinsch lying or hiding the truth:

14

- Despite claiming during his testimony that the $11 million was income due to him under the contract, Rinsch did not report that money to the IRS. *See* GX 8005 at 2 (claiming $18,374 in total income on Form 1040 for 2020).

- In an effort to explain his spending on luxury goods in 2021 for "Project Amarna," Rinsch testified that "Amarna is a fictional company within [*White Horse*]." Tr. 956:2–3 (Rinsch). But the word "Amarna" does not appear in the *White Horse* script. *See generally* GX 6332 at 3–163 (Mar. 2018 script); GX 6351 at 9–238 (Jan. 2020 script). And no other witness knew of a connection between Amarna and *White Horse*. Tr. 119:25–120:7 (Friedlander); Tr. 648:12–14 (Holland); Tr. 475:1–476:10 (Skotnikova); Tr. 778:4–15 (Weiner).

- Rinsch reported entirely different income figures on a credit application to Ferrari and his tax return. *See* Tr. 994:7–997:13 (Rinsch).

- Rinsch previously testified under oath that he bought a $450,000 mattress for the show because it "retains value" and can be resold for a profit, GX 1006H, even though Rinsch had actually bought that mattress at a massive discount precisely because it was previously used, GX 6251A; *see also* Tr. 584:15–22, 589:5–14 (Eriksson) (used mattresses sell at a discount).

- In February 2020, Rinsch told his assistant, Weiner, that he would "cover [Weiner's] living costs," if he received additional money from Netflix. GX 5086. But despite receiving $11 million from Netflix the following month, he never paid for Weiner's expenses. Tr. 779:5–7 (Weiner).

*Second*, and relatedly, Rinsch argues that he made "repeated representations to Netflix executives that he was owed this money pursuant to the Term Sheet for work already performed." Def. Mem. at 14. That is true, but irrelevant. Even if Rinsch honestly believed he was owed this money (and, as explained below, he did not), Netflix's team made clear that if they paid Rinsch the $11 million in March 2020, it was not for previously performed work: "Such funding shall not represent an acknowledgement of any of the contractual milestones." GX 6358 at 5. Rinsch accepted the money on those terms and the jury was not unreasonable to credit the Netflix witnesses over Rinsch.

And it is no defense to a claim of wire fraud that Rinsch lied to obtain money he believed he was owed. As the Court correctly instructed the jury, "even a genuine belief by Mr. Rinsch that he was legally entitled to the $11 million or that his agreement with Netflix was different from what they understood it to be is no defense if you find that he purposefully made false statements to obtain the $11 million." Tr. 1123:22–1124:1; *see also United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) ("courts have uniformly held that a claim-of-right is not a defense to mail fraud").

In any event, the evidence at trial proved clearly that Rinsch understood this money was not his to do with as he pleased. For instance, in 2021, while on his spending spree, Rinsch told his assistant, Maria Skotnikova, that she had to "[b]uy like mad" or the money would otherwise "go[] bye bye." *See* GX 5058. Rinsch also admitted under oath at the arbitration that it "would [have] be[en] fraud" if he purchased luxury vehicles for himself using the $11 million sent by Netflix. GX 1009E at 3–4. And Rinsch told Roses that his investments in the market were "actually making money for Netfix," Tr. 718:1–10 (Roses), an indication that he knew the money he was risking in the market was earmarked for Netflix's project. Rinsch knew exactly what this money was for and how it was required to be spent.

*Third*, and finally, Rinsch argues that "[t]he theory that [he] sought funds for COVID investments is patently false." Def. Mem. at 16. This is a strawman. The Government's argument at trial was that Rinsch was desperate for money due to his own personal financial situation and sought additional funding from Netflix. By no later than February 2020, while those negotiations were ongoing, Rinsch came up with the idea to use Netflix's money to invest in the market. And that had become Rinsch's plan by the time he made his promise to Netflix in early March 2020 that he would use the money to fund *White Horse*. *See, e.g.*, Tr. 1012:23–1022:15, 1023:19–1025:7 (closing argument).

16

**CONCLUSION**

Rinsch's Motion is nothing other than a rehashing of the same arguments that the jury already considered and rejected. The evidence at trial proved overwhelmingly that Rinsch possessed the necessary fraudulent intent. The Court should deny Rinsch's Motion in its entirety and uphold the jury's verdict.

Dated: New York, New York
March 4, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York


By: /s/_____
Timothy Capozzi
David Markewitz
Adam Sowlati
Assistant United States Attorneys
Southern District of New York