UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X-------------------------------------------------------X

UNITED STATES OF AMERICA,                          Index No. 25-cr-85(JSR)

        -v.-

CARL ERIK RINSCH

        Defendant.
X-------------------------------------------------------X

### CARL ERIK RINSCH'S
### MEMORANDUM IN
### AID OF SENTENCING

LAW OFFICES OF
 DANIEL A. MCGUINNESS, PC
Daniel A. McGuinness
353 Lexington Ave, Suite 900
New York, NY 10016
(646) 360-0436
dan@legalmcg.com

ZEMAN & WOMBLE, LLP
Benjamin Zeman
20 Vesey Street, Suite 400
New York, NY 10007
(718) 514-9100
zeman@brooklynattorney.nyc

## Table of Contents

Introduction ............................................................................................... 1

Discussion .................................................................................................. 1

    A.    Carl's Personal History and Characteristics and the Nature and Circumstances of the Offense. ...................................................................... 1

        1.    Carl's Personal History and Characteristics Show Him to Be a Hardworking Man Raised with Good Values that Faced Extraordinary Pressure to Succeed. ................................... 1

            a.    Carl was Raised with Good Moral Character and Great Expectations. .................... 1

            b.    The Beginning of Carl's Career was Full of Promise and Accomplishment. ............. 3

            c.    The Failure of Carl's Debut Feature Film. ........................................................ 6

        2.    The Nature and Circumstances of the Offense: Carl Strained Under the Immense Pressure of Delivering *White Horse*. ................. 8

            a.    The Pressure for *White Horse* to Succeed was Tremendous. ............................. 8

            b.    ██████████████████████████ .................................. 10

    B.    A Lengthy Prison Sentence is not Necessary for Deterrence. .................................................. 13

        1.    General Deterrence is not Served by a Lengthy Prison Sentence. ................................. 13

        2.    A Lengthy Prison Sentence is not Necessary for Specific Deterrence as Carl does not Pose a Risk of Recidivism. ............................................ 13

    C.    The Guidelines Bear no Relation to an Appropriate Sentence in this Matter. ....................... 15

D.    Restitution ................................................................................ 16

Conclusion ................................................................................................ 20

## Table of Exhibits

**Ex.**

A    Forensic Psychiatric Report of Dr. Alexander Bardey and Dr. Ali Pursel

B    Letter of Support from Maryann Rinsch

C    Letter of Support from Daniel Rinsch

D    Letter of Support from Victor Benady

E    Letter of Support from Michael Crane

F    Letter of Support from Patrick Crane

G    Letter of Support from Tim Crane

H    Letter of Support from Thomas Gray

I    Letter of Support from Derek Lemkin

J    Letter of Support from Cedric Mazzara

K    Letter of Support from Alessandro Pacciani

L    Letter of Support from Gary Powell

M    Letter of Support from Keanu Reeves

N    Letter of Support from Mike Seid

O    Letter of Support from Jesse Warfield

## Introduction

For the first thirty-five years of his life, Carl Erik Rinsch built a steady trajectory of accomplishment, achieving whatever he set his mind to and appearing poised for ever greater success. After his first film's commercial failure, he sought a decisive return and found it in a singular, ambitious new project, *White Horse*. Friedrich Nietzsche warned that artists often deceive themselves by treating their creations as metaphysical truths.[1] In 2019 and 2020, like the Dionysian state described by Nietzsche, Carl Rinsch fell into a kind of ecstatic dissolution of his own abilities and self, losing himself to *White Horse*. Under the enormity of pressure, ███████████████████████████ Carl took the actions that brought him before this Court.

## Discussion

### A. Carl's Personal History and Characteristics and the Nature and Circumstances of the Offense.

  1. <u>Carl's Personal History and Characteristics Show Him to Be a Hardworking Man Raised with Good Values that Faced Extraordinary Pressure to Succeed.</u>

     a. <u>Carl was Raised with Good Moral Character and Great Expectations.</u>

Carl Erik Rinsch was born on August 6, 1977, in Los Angeles, California, the youngest of three sons born out of the union between Charles and Maryanne Rinsch.[2] Fortunate in privilege and stability, Carl reports that his childhood was

---

[1] Friedrich Nietzsche, *The Birth of Tragedy* (Walter Kaufmann trans. Vintage Books 1967)
[2] PSR ¶ 67.

"blessed."[3]  He was raised in a family that "valued exploration, education and personal growth."[4]

His mother remembers Carl as an independent and resilient child who eagerly packed his own suitcase for trips at just four years old. Ex. B at 1. As the youngest of three brothers, Carl pushed himself to achieve beyond his peers to keep up with older children. His brother Dan Rinsch recalls Carl, "wanting to play with the bigger kids and challenging himself to keep up. I remember him keeping up and overtaking the bigger kids."[5] As a youth, Carl participated frequently in the Boy Scouts of America and obtained the highest rank of Eagle Scout.[6]

The values instilled in Carl by his family, friends, education and Eagle Scout training are evident in his selfless willingness to show up for friends in need. When his childhood friend, Tim Crane, was left quadriplegic in a devastating car accident, Carl remained by his side for "countless hours at the hospital" and "stayed close when many young people would not have known how to stay."[7] He kept close to his friend through recovery and assisted in the legal process that followed. *Id.* Gary Powell likewise attests to Carl's character, describing how Carl immediately brought his mother—an occupational therapist—to their home, offering practical advice and unwavering support that changed the course of their family's difficult time. Ex. L.

---

[3] PSR ¶ 68.

[4] Letter of Support from Maryann Rinsch, Ex. B at 1

[5] Letter of Support from Dan Rinsch, Ex. C.

[6] Ex. B at 1; Letter of Support from Michael Crane, Ex. E at 1.

[7] Letter of Support from Michael Crane, Ex. E; Letter of Support from Patrick Crane, Ex. F; Letter of Support from Tim Crane, Ex. G.

Carl spent much of his youth imagining original stories and getting lost in worlds he had created. What began as improvisational vignettes with action figures gradually evolved into written tales and short plays performed by friends. At twelve years old, Carl was "completely dedicated to filmmaking" and "was making films, getting them accepted into festivals, and speaking about cinema not as a hobby but as a calling."[8] By high school, he "possessed an encyclopedic knowledge of film history." Ex. E at 1. To fund his moviemaking, Carl and a friend sold plumbing supplies door to door. Ex. F at 2.

A gifted student, hyperactivity and restlessness notwithstanding, Carl thrived in the rigorous academic environment of Harvard Westlake High School in Los Angeles, where he excelled in his Advanced Placement classes, served as student body president, played on the school's water polo team and was elected as a prefect. Through hard work, natural abilities and the support of his family, Carl earned admission to Brown University from where he earned a double major degree in Art and English.[9] Upon graduation, Carl continued his formal artistic studies, earning credits at Columbia, The Rhode Island School of Design and the New York School of Visual Arts.

      b.  <u>The Beginning of Carl's Career was Full of Promise and Accomplishment.</u>

Carl was steadfast in his pursuit of a professional life in the arts as a storyteller. His brother, Dan Rinsch, writes "[i]t is no surprise that Carl found

---

[8] Letter of Support from Mike Seid, Ex. N at 1.
[9] PSR ¶ 83.

success in the realm of filmmaking and storytelling. Carl was tireless in his pursuits. His work was his play, and each success produced another." Ex. C. After completing his studies, Carl joined Ridley Scott's production company to direct television commercials, quickly earning a reputation for innovative storytelling and cutting-edge visual effects. He brought a meticulous, perfectionistic approach to realizing his vision: "He could spend hours on a single frame, not because anyone was asking him to, but because he could see the difference even when no one else could."[10]  His credits include commercials for BMW, Mercedes, Ford, Heineken, Audi, EarthLink, and Sprite.

As Carl established himself in the industry, he consistently gave his time and created opportunities for others. Cedric Mazzara writes, "Many people in this industry speak about mentorship. Carl actually practiced it." Ex. J at 1. Mazara met Carl while working as a production assistant "at the very bottom of the industry hierarchy" on a commercial shoot Carl was directing. Carl "consistently gave [him] opportunities far beyond the position in which [he] started" and "treated [him] as someone whose ideas and future mattered." *Id.*  Similarly, Carl took a young artist named Chandler Wood "under his wing and had him work on story boards and designs for years, providing steady work, encouragement and mentorship at a moment when it mattered enormously." Ex. N at 2. Alessandro Pacciani also describes Carl as "generous with his time." Ex. K at 2. College friend Thomas Gray recalls Carl offering his time and support for his early projects. Ex. H. Victor

---

[10] Letter of Support from Jesse Warfield, Ex. O.

4

Benady notes that Carl is "someone who would go out of his way for others." Ex. D. Mike Seid states that he is "the writer I am today in no small part because of Carl's mentorship and encouragement during the years we worked together." Ex. N. at 2.

Carl's commercial work later earned him the Gold Film Craft Lion award at the 2010 Cannes Lions International Advertising Festival.[11] Around this time, there was rampant speculation that he would be tapped to direct feature length films that were part of larger, established franchises.[12]

It was announced that Carl would direct a prequel movie for the *Alien* movie franchise and was championed for the role by his mentor and original *Alien* Director Ridley Scott, along with his brother filmmaker Tony Scott.[13] Press coverage questioned whether Carl was capable of the role.[14] Ultimately, Fox, the studio that owned the rights to the franchise, did not want to entrust the massive project to an untested film director and Carl was not given the chance.[15]

---

[11] *See* Peter Sciretta, *Carl Erik Rinsch's The Gift Wins Cannes Lions Advertising Awards*, SLASHFILM (June 28, 2010, 1:00PM), www.slashfilm.com/509835/carl-erik-rinschs-the-gift-wins-cannes-lions-advertising-awards/

[12] Carl was announced to be directing a remake of *Logan's Run* and in discussions to remake *Creature from the Black Lagoon*. *See* Borys Kit, *EXCLUSIVE: Carl Rinsch No Longer Directing 'Logan's Run,'* THE HOLLYWOOD REPORTER (Nov. 12, 2010, 5:14PM), https://www.hollywoodreporter.com/movies/movie-news/carl-rinsch-no-longer-directing-44947/; Michael Fleming, *'Black Lagoon' to feature Rinsch?*, VARIETY (Dec. 14, 2009, 7:55PM), https://variety.com/2009/film/markets-festivals/black-lagoon-to-feature-rinsch-1118012760/.

[13] *See* Steven Weintraub, *Exclusive: Tony Scott Confirms Carl Rinsch is Directing New ALIEN Movie. And it's a PREQUEL!*, COLLIDER (May 29, 2009, 6:37 PM), https://collider.com/exclusive-tony-scott-confirms-carl-rinsch-is-directing-alien-and-its-a-prequel/.

[14] "At first glance, this does indeed sound like a terrible idea. The planned director is Carl Rinsch, a commercial advert director, which doesn't exactly bode well." The article continues to note the promising nature of his work. *See* Ben Child, *Should Alien be Resurrected?*, THE GUARDIAN: THE WEEK IN GEEK, (May 29, 2009, 7:09AM), www.theguardian.com/film/filmblog/2009/may/29/ridley-scott-alien-remake/.

[15] *See A Prequel to Alien is in the Works but Who is Going to Direct it?*, ENTERTAINMENT WEEKLY: THE LATEST NEWS FROM HOLLYWOOD (Jun. 5, 2009, 4:00am), www.ew.com/article/2009/06/05/latest-news-hollywood-73/.

c. The Failure of Carl's Debut Feature Film.

As the *Alien* opportunity fell apart in 2009, Carl made a deal with Universal Studios to direct *47 Ronin*, a big-budget samurai movie starring Hollywood A-lister Keanu Reeves.[16] Initial reports of the deal noted, "[I]t is unusual to see a first-timer entrusted to helm a film with a large budget and tentpole aspirations."[17] Others pointed out the pressure on Carl to deliver after the high profile loss of the *Alien* project: "Rinsch is a guy with something to prove and should *47 Ronin* reach theaters, we'll discover if Fox made the right decision in denying Rinsch his chance at the Alien franchise."[18]

Carl brought had a specific, expansive vision for *47 Ronin.* Producer of the movie Pamela Abdy said, "I've worked with first-time directors before, not on this scale, but he just had a vision for this movie that was undeniable… he was very passionate, and had a great strong angle on the story, and what the world he wanted to create was."[19] The intensity and focus brought to each frame that had made Carl's earlier work so spectacular proved incredibly difficult to sustain for a feature film, and it took a toll on him. He said at the time, "I wish I could say it was

---

[16] *See* Steven Zeitchik, *Carl Rinsch to Helm '47 Ronin'*, THE HOLLYWOOD REPORTER (Nov. 17, 2009, 2:45PM), https://www.hollywoodreporter.com/news/general-news/carl-rinsch-helm-47-ronin-91454/.
[17] *See* Michael Fleming, *Universal Circles Rinsch for '47 Ronin',* VARIETY (Nov. 17, 2009, 3:46PM), https://variety.com/2009/film/markets-festivals/universal-circles-rinsch-for-47-ronin-1118011491/.
[18] *See Matt Goldberg, Would-Be ALIEN 5 Director Carl Rinsch to Instead Count 47 RONIN with Keanu Reeves*, COLLIDER (Nov. 17, 2009, 8:40PM), https://collider.com/would-be-alien-5-director-carl-rinsch-to-instead-count-47-ronin-with-keanu-reeves/.
[19] *See On Set: Carl Rinsch's Ambitious Blockbuster '47 Ronin' Starring Keanu Reeves*, THE PLAYLIST (Nov. 4, 2013, 12:00PM), https://theplaylist.net/on-set-carl-rinschs-ambitious-blockbuster-47-ronin-starring-keanu-reeves-20131104/.

a marathon. It's like being beaten with a sledgehammer every single day. It has all the intensity of a commercial, but it just takes four months, six months."[20]

Reporting emerged that the production had turned into a "nightmare" and that Carl had "buckled under the pressure of the ambitious shoot of '47 Ronin,' and the studio had to step in to micromanage the latest round of reshoots from half a world away."[21] The film's release was delayed multiple times to over a year past its original opening date and was reported to be $20 million over budget.[22]

The film was a commercial flop.[23] The studio lost an estimated $175 million.[24] Although Carl's work on the film was "visually dazzling," that praise was drowned out by the endless reporting of the troubled production and financial loss.[25] The setback was catastrophic for a career built on consistent wins. From outpacing older classmates to achieving Eagle Scout status, winning the student-council presidency, completing two majors at an Ivy League university, and earning praise for commercial work, Carl's record was spotless—until this. His reach had finally

---

[20] *Id.*

[21] *See* Peter Sciretta, *Universal Removes Director Carl Erik Rinsch from '47 Ronin' Editing Room?*, SLASHFILM (Sep. 19, 2012, 10:54PM), https://www.slashfilm.com/523054/universal-removes-director-carl-erik-rinsch-from-47-ronin-editing-room/; Ben Child, *Universal 'Removes' Director of Keanu Reeves Film 47 Ronin*, THE GUARDIAN (Sep. 20, 2012, 7:17AM), www.theguardian.com/film/2012/sep/20/director-keanu-reeves-47-ronin.

[22] *See* Ben Fritz, *Keanu Reeves' '47 Ronin' Delayed for Second Time – to Christmas 2013*, L.A. TIMES (Aug. 15, 2012, 12:00AM), https://www.latimes.com/entertainment/envelope/la-xpm-2012-aug-15-la-et-ct-47-ronin-delay-20120815-story.html.

[23] *See* Dave McNary, *Keanu Reeves' '47 Ronin Bombing: Universal Prepares for Major Loss*, VARIETY (Dec. 26, 2013, 4:26PM), https://variety.com/2013/film/news/keanu-reeves-47-ronin-bombing-universal-prepares-for-big-loss-1201001065/

[24] Juliet Kahn, *The Biggest Box Office Bombs of the Last Decade*, YAHOO! ENTERTAINMENT (May 18, 2026 6:35AM), https://www.yahoo.com/entertainment/slideshows/biggest-box-office-bombs-last-103500543.html.

[25] *See* Chris Lee, *Trouble '47 Ronin' May be Headed for a Box Office Reckoning*, L.A. TIMES (Dec. 25, 2013), https://www.latimes.com/entertainment/movies/moviesnow/la-et-mn-47-ronin-troubles-20131226-story.html.

exceeded his grasp. With the world watching he faltered, returned to the smaller stage of commercials, and found feature opportunities effectively closed off.

    2.    <u>The Nature and Circumstances of the Offense: Carl Strained Under the Immense Pressure of Delivering *White Horse.*</u>

    a.  <u>The Pressure for *White Horse* to Succeed was Tremendous.</u>

The public failure of Carl's debut feature did nothing to dim his imagination. On the contrary, while working on *47 Ronin*, he conceived of *White Horse* (later known as *Conquest*) a new world that Carl dove into. He wrote, illustrated, conceptualized and conceived of a tale he dreamed would be broadcast for years. He initially funded the project through his work on commercials, including his anti-smoking PSA, *Straw City.*

As others saw his vision coming to life, investors came aboard. Miraculously, he found himself back in Hollywood's good graces. In 2018, amid the height of the streaming wars, Carl's new project silenced the old bad press. *White Horse* was his impossible second act, his chance to show the world what he could do if given freedom. Netflix provided him tens of millions of dollars, final cut, and complete artistic freedom. What he ultimately had to contend with were his own limitations. Under the deal, he would be paid in stages, with each the production first paid by his production company then recouped through the next stage of funding from Netflix.

His vision expanded even as he planned to shoot the script he had written. The script became longer and the show expanded even beyond itself. It was not just a show, it was a franchise in his mind, his own *Star Wars*. And with the increased

vision came greater importance for every scene, every shot, every frame to be perfect.

In August of 2019, he resumed filming in Brazil. He had already completed six episodes but now the crew was bigger, the production more expensive, the expectations immeasurably higher. As had happened in the past, his expansive vision and need for perfection clashed with the cost of reality. The "sledgehammer" of production again took its toll. To keep total control he held on to more rolls than he could manage–director, producer, line producer, editor, actor, etc. Hundreds of people looked to him for guidance, for paychecks as he struggled to bring the universe in his head into reality. The budget ballooned out of control as he brought his exacting visuals to life.[26] Netflix encouraged him to pursue his vision but would not commit to paying for it would cost. He believed he was receiving mixed signals and struggled to find a way through. He limped into 2020, barely surviving the grueling production to that point.

At the same time the project fell apart, his marriage also neared its end. Gabriela Roses, his then-wife, had been with him since 2010 and married since 2014. She was not only his wife, but his co-producer and had worked with him since the beginning of *White Horse.* The marriage ended with escalating conflicts and led to an incredibly contentious divorce.

---

[26] His ex-wife and co-producer states of this period: "Rinsch would change things or take 70 takes of something that should have been one take." 3525-001 at 3.

b.





██████████████████████████████████████████

████████████████████████████

### B. A Lengthy Prison Sentence is not Necessary for Deterrence.

1.   <u>General Deterrence is not Served by a Lengthy Prison Sentence.</u>

A lengthy prison sentence is not necessary for either specific or general deterrence and is not necessary to send a strong message as general deterrence to any potential offenders. This Court has noted, "common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not [therefore] a relatively modest prison term should be 'sufficient, but not more than necessary,' for [general deterrence purposes]." The Court's reasoning is solidly founded on ample academic literature. *see, e.g.*, A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Leg. Stud. 1, 12 (1999) ("less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" in white collar context, where "the disutility of being in prison at all may be substantial and the stigma and loss of earning power may depend relatively little on the length of imprisonment").

2.   <u>A Lengthy Prison Sentence is not Necessary for Specific Deterrence as Carl does not Pose a Risk of Recidivism.</u>

Any prison sentence will be felt acutely by Carl, who never saw the inside of a jail cell before this case. Additionally, the collateral consequences of this case–the devastating reputational and professional fallout–have already specifically deterred any future similar conduct.

13

The conduct at issue in this case–obtaining $11 million from a global streaming company to deliver a creative project with no oversight–will certainly not reoccur. Even before his arrest, Carl Rinsch was pilloried in the press[27] and effectively blacklisted from the industry he dedicated his life to. Hopefully, one day in the future, Carl will find an avenue to again share his unique and remarkably imaginative vision with a wide audience. If that day comes, however, there is no chance it will be given with the same lack of oversight and trust in Carl to manage a budget.

Aside from the fact that a similar opportunity will no longer arise, the enormous, devastating consequences that he will bear because of this conviction serve as deterrence enough. All federal convictions come with severe collateral consequences that themselves constitute significant punishment. *See e.g. United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y). The consequences to Carl include the likely end of his career. In *United States v. Stewart*, 590 F.3d 93 (2d. Cir. 2009), the sentencing court varied 58 months below the bottom of the Guidelines in part because the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and therefore the need for further deterrence and protection from the public is lessened because the conviction itself already visits substantial punishment on the defendant." *United States v. Stewart*, 590 F.3d 93, 114 (2d Cir. 2009) (internal quotations and citation to sentencing transcript omitted). A similar downward variance is appropriate here.

---

[27] *See e.g.*, John Carreyrou, *The Strange $55 Million Saga of a Netflix Series You'll Never See*, N.Y. TIMES (Nov. 22, 2023), www.nytimes.com/2023/11/22/business/carl-rinsch-netflix-conquest.html.

### C.  The Guidelines Bear no Relation to an Appropriate Sentence in this Matter.

Pursuant to the fraud Guideline, U.S.S.G. § 2B1.1(b)(1), the PSR's proposed loss amount rockets Carl's offense level from a base of 6 by 20 levels, to level 26. (PSR ¶¶ 49-50). His Guidelines range is enhanced further by the piling on of "Specific Offense Characteristics." Two points are added pursuant to USSG §2S1.1(b)(2)(B) because he was convicted under 18 U.S.C. § 1956. Two more are added pursuant to USSG §2S1.1(b)(3) because the offense involves "sophisticated money laundering." Carl receives two points more for obstruction, and a two-point reduction as a first-time offender. In total, his Guidelines offense level is 30, which equates to a range of 97-121 months imprisonment.

This Court's seminal and oft-quoted decisions in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) and *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), have led a local judicial consensus that the loss Guideline should not be followed when, as here, its loss-driven calculation and enhancements propel a recommended sentence beyond reason. *See, e.g.*, *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (loss enhancement policy is a "grievous wrong," and its "problems . . . have been evident since the inception of the Guidelines"); *United States v. Mair Faibish*, No. 12 Cr. 265 (E.D.N.Y. Mar. 10, 2016) (Vitaliano, J.) (sentencing) (observing, like "a whole host of judges who have said so publicly and scores of others who have . . . grumbled about it privately," that "the Guidelines even with its slight revisions, are mindlessly accelerated once you have numbers of any size added in the loss or gain

15

table"); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (Block, J.) (departing downward by 300 months from advisory fraud Guidelines because "the Sentencing Guidelines for white-collar crimes [are] a black stain on common sense").

The defense respectfully submits that the Guidelines lead to an absurd recommendation and should be given no weight by the Court at sentencing. A sentence far below the Guidelines is substantial to achieve the ends of justice in this matter.

### D. Restitution

The defense acknowledges that restitution of the $11,000,000 that Netflix transferred to Rinsch is mandatory.

The defense objects, however, to the additional $4,445,131.81 added by Netflix for attorneys' fees and expenses. *See* PSR ¶43. Netflix claims it incurred $3,261,175.84 in attorneys' fees and $183,059.15 in costs defending against an arbitration between Netflix and Rinsch. Additionally, it claims that it should be reimbursed $500,448.41 in attorneys' fees and costs "that were necessary to assist in the government's investigation and prosecution of the matter. *Id.*

The Defense objects to the $3,444,234.99 in attorney's fees and costs that Netflix incurred in the arbitration. The Supreme Court has held the MVRA's "other expenses" provision narrowly, holding that it does not permit recovery of attorneys' fees unless those fees were incurred during participation in "government investigations and proceedings." *Lagos v. United States,* 584 U.S. 577 (2018). This

16

has been interpreted to preclude recovery under the MVRA for costs associated with civil proceedings addressing liability. *See United States v. Smerling*, Case No. 21-cr-317 (DLC), 2022 U.S. Dist. LEXIS 98429, at *3-4 (S.D.N.Y. Jun. 1, 2022). *See also United States v. Mullins*, 971 F.2d 1138 (4th Cir. 1992) ("We hold that an award of restitution… cannot include consequential damages such as attorney's and investigators' fees expended to recover the property").

In *United States v. Barany*, 884 F.2d 1255, 1257 (9th Cir. 1989), before being indicted, the defendant had filed a civil action against one of the insurance companies for breach of contract and bad faith in delaying action on her claim, which was fraudulent. Following the defendant's insurance fraud conviction, the district court ordered the defendant to pay restitution to the insurance company for its expenses incurred defending the civil action. *Id.* The Circuit reversed, holding "the amount of resources [the insurance company] chose to expend in defending the civil suit [was] only tangentially related to the defendant's original offenses." *Id.* at 1261. Further, it stated, "the district court in the criminal case was clearly without authority to award attorney's fees in a wholly separate civil suit." *Id.* This case presents substantially similar facts and much reach the same result. Attorneys' fees in a wholly separate civil suit are not appropriately added to restitution.

Moreover, while the arbitration between Netflix and defendant addresses substantially similar issues, that arbitration was broader than the criminal matter and addressed several issues not part of the criminal case, including additional

17

portions and consequences of the Term Sheen and to whom international rebates were owed. Tellingly, less than $11,000,000 was awarded to Netflix in that litigation.

The Defense also objects to the $500,448.41 in attorney's fees and costs as unnecessary and unreasonable. To support Netflix's contention that they should be paid over half a million dollars for assisting the government in Carl's prosecution, it cites *United States v. Afriyie*, 27 F.4th 161, 173 (2d. Cir. 2022).[28]  The victim in *Afriyie* was a financial firm who contracted outside counsel, Sullivan & Cromwell, to provide legal assistance in complying with the government's investigation and prosecution of an employee of the firm. The firm submitted billing records comprising over a hundred of page documenting legal services that were billed and paid. *Id.* at 169. In responding to a defense argument regarding administrative burden, the *Afriyie* Court noted, "To the extent a district court must review a law firm's timesheets during restitution proceedings, this is a requirement mandated by the MVRA itself–no different from the court's obligation to review a victim's parking or child care receipts." *Id.* at 170. Here, the defense is not aware of any billing records or other supporting documentation other the brief statement listed in the PSR stating the total sums owed. That statement fails to even specify who the half-

---

[28] Defendant acknowledges that that *Afriyie* is controlling law in the Circuit, but objects to its holding that attorneys' fees are recoverable under 18 U.S.C. § 3663A(b)(4). The Third Circuit's recent decision in *United States v. Abrams*, 165 F.4th 784 (2026) reaches the contrary result by observing, *inter alia*, the noticeable absence of the phrase "attorney fees" despite several references to the types of expenses covered, including other professional services. The Defendant respectfully submits that the Third Circuit's approach in *Abrams* is correct and that attorneys' fees should not be calculated as recoverable in an order of restitution.

million dollars was paid to, much less substantiate the necessity and reasonableness of the fees.

To recover attorney's fees under the MVRA, there must be a showing that the work was necessary. "[N]ot every category of attorney work product meets the essential burden in our circuit that the government show all charges were 'required to incur to advance the investigation or prosecution of the offense.'" *United States v. Cuti*, 708 F. App'x 21, 24 (2d Cir. 2017) (summary order) (*quoting Maynard*, 743 F.3d 374, 381 (2d Cir. 2014) and *citing United States v. Hatfield*, No. 06-CR-0550 (JS)(AKT), 2015 U.S. Dist. LEXIS 190029, at *13 (E.D.N.Y. Mar. 27, 2015) (denying restitution for legal fees for "attendance at proceedings, reviewing trial transcripts, generating memorand[a] and summaries of motion practice, and drafting press releases")).

Netflix must also show the work was performed at reasonable rates and staffing levels. The billing records are necessary to allow this Court to determine the appropriateness of the amount charged. *See United States v. Gupta*, 925 F. Supp. 2d 581, 587-88 (reducing billing by ten percent noting, *inter alia*, "the number of attorneys staffed on a task -- while perhaps perfectly appropriate on the assumption that Goldman Sachs wished to spare no expense on a matter of great importance to it -- exceeded what was reasonably necessary under the MVRA"). *See also e.g. United States v. Napout*, Case No. 15-CR-252(PKC), 2018 U.S. Dist. LEXIS 198206, at *16-17 (E.D.N.Y. Nov. 20, 2018).

The defense additionally objects on Eighth Amendment grounds to nearly four-and-a-half million dollars of attorneys' fees being added to his restitution judgment where the defendant has been deemed indigent and is represented by assigned counsel.

## Conclusion

For the foregoing reasons, Carl Rinsch respectfully submits that a non-incarceratory sentence would be sufficient but not greater than necessary to achieve the ends of justice.

Dated: New York, NY
      May 26, 2026

Daniel A. McGuinness
353 Lexington Ave, Suite 900
New York, NY 10016
(646) 360-0436
dan@legalmcg.com

Benjamin Zeman
20 Vesey Street, Suite 400
New York, NY 10007
(718) 514-9100
zeman@brooklynattorney.nyc

20

# EXHIBIT A

# EXHIBIT B

May 20, 2026

The Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312


Dear Honorable Judge,

I am writing to you as the mother of Carl Rinsch, with deep respect for this Court and the seriousness of these proceedings. I appreciate the opportunity to share my perspective on my son's life and character as you consider sentencing.

I first met Carl nearly fifty years ago, in a hospital room in Los Angeles. From the very beginning, he brought warmth, curiosity, and a sense of connection to those around him. Over the years, I have watched him grow into a man with a deep desire to understand the world and engage with it fully.

Carl is the youngest of three boys, raised in a family that valued exploration, education, and personal growth. From a very early age, he demonstrated independence and resilience. At just four years old, he eagerly packed his own suitcase and joined our family on a trip to San Francisco—an early sign of what would become a lifelong curiosity about the world. As a child, he was friendly, outgoing, and naturally drawn to others. He especially loved young children and had a way of connecting with people that brought joy to those around him.

Academically, Carl was a capable and motivated student. He earned solid grades throughout his schooling and attended a structured private elementary school that emphasized both individual development and responsibility to the group. He carried those values forward as he grew older.

During his youth, Carl was deeply involved in scouting, ultimately achieving the rank of Eagle Scout. This accomplishment required dedication, leadership, and a commitment to service. One of his projects involved organizing the construction of a basketball court for underserved children in Los Angeles—an effort that reflected both initiative and compassion. He also developed strong and lasting friendships during this time, many of which were centered around a shared passion for filmmaking.

From an early age, Carl showed creativity and determination in pursuing his interest in film. As a teenager, he worked collaboratively with friends to produce short films, one of which received recognition and led to an award ceremony in New York. He also demonstrated empathy and loyalty—for example, when a close friend was severely injured in an accident, Carl shaved his own head in support.

The Honorable Jed S. Rakoff
Page 2 of 3

Carl's resourcefulness and independence were evident in many ways. During a scouting trip abroad as a young teenager, he became separated from his group in a foreign country. Through quick thinking and determination, he found his way back safely, arriving at his destination even before the rest of the group. This experience, among others, reflected his ability to navigate challenges and adapt under pressure.

In high school, Carl was active in both athletics and the arts. He participated in theater productions and was a member of the water polo team. At one point, when faced with a conflict between academic responsibilities and athletics, he made the difficult decision to prioritize his studies—demonstrating his understanding of long-term goals and personal discipline. His peers recognized his leadership qualities, electing him to a student leadership position of honor and responsibility.

Carl went on to attend Brown University, where he graduated with honors, majoring in both Art and English. He continued to pursue his passion for filmmaking, demonstrating creativity and perseverance in overcoming obstacles along the way. Early in his career, he earned opportunities in commercial filmmaking, eventually working with highly respected professionals in the industry. His work was recognized for its originality and promise, including receiving an award at the Cannes Film Festival as a young director.

Throughout his adult life, Carl has shown both ambition and dedication to his craft. His career demanded long hours and intense commitment, which he met with determination. At the same time, he remained an important part of our family. After my husband passed away in 2002, Carl was a source of support to me during an extremely difficult period, even while managing the demands of his work.

In more recent years, our family has experienced distance, both geographically and personally. Carl has lived in different parts of the world, and while our contact has at times been limited, I have always continued to care deeply for him and to value the moments we have shared. I have also witnessed periods of personal struggle in his life, including health challenges and the difficulties surrounding the COVID-19 pandemic. During that time, we spoke more frequently, and I saw firsthand that he was facing significant hardship.

As his mother, I want to speak honestly while also expressing what I know to be true about his character. Carl is an intelligent, creative, and deeply feeling person. He has a strong sense of conviction, which can at times be perceived in different ways, but which has also been the driving force behind his accomplishments and his persistence through adversity.

It has been very difficult for me to reconcile the son I know with some of the allegations and portrayals presented in this case. While I understand that the Court must consider all evidence carefully and impartially, I ask that you also consider the full context of Carl's life—his upbringing, his achievements, his relationships, and the many positive qualities he has demonstrated over decades.

I respectfully ask the Court to show compassion and balance in its consideration of his sentence. I believe that Carl is capable of growth, reflection, and positive contribution, and I hope that the

The Honorable Jed S. Rakoff
Page 3 of 3

Court will take into account not only the present circumstances but also the broader arc of his life
and character.

Thank you for your time, your service, and your thoughtful attention to this matter. I am deeply
grateful for the opportunity to share these reflections with you.

Respectfully,

*Maryann Rinsch*

Maryann Rinsch

# EXHIBIT C

**Daniel Rinsch**

███████████████████

May 19, 2026

The Honorable Jed S. Rakoff
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**RE: Carl Erik Rinsch, Case No. 1:25-cr-00085-JSR**

Dear Judge Rakoff:

My younger brother, Carl Erik Rinsch, is scheduled to appear for his sentencing hearing in June
of this year.

I have known Carl his entire life. We grew up in the same house. He is almost four years
younger. This gap in time sometimes provided me with just enough wisdom to recognize some
of his early transitions in life. I remember him as a little boy, wanting to play with the bigger
kids and challenging himself to keep up. I remember him keeping up and overtaking the bigger
kids. I remember being impressed.

It is no surprise that Carl found success in the realm of filmmaking and storytelling. Carl was
tireless in his pursuits. His work was his play, and each success produced another. In a very short
space of time, Carl was living in an atmosphere of elevated expectations and alternate realities,
where it seemed like anything was possible. Arguably, it was.

Carl's first breakthrough into the world of filmmaking was an epic with a blockbuster budget.
When the film was not well received, he shared his disappointment but immediately threw
himself back into work, writing and pitching his next project. By 2018, Carl's perseverance paid
off again when Netflix bought his pitch.

Carl was back at work, but by late 2019, the toll on Carl's psyche was clear. His emails had
become strange and troubling, suggesting that he was no longer reasoning clearly. ███████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

The circumstances that brought Carl before this Court are profoundly sad and troubling to me. What remains difficult for me to reconcile is the dramatic contrast between the Carl I knew throughout my life and the conduct that ultimately brought him before this Court. Beginning in 2019, family members, friends, and colleagues observed significant changes in his thinking, communication, and behavior. ████████████████████████████████

████████████████████ I can say that the changes we observed were profound and unlike anything I had seen in him before.

I am turning to you for help. I respect the Court, the jury's verdict, and the legal process. I understand that Carl has been convicted of serious offenses and that sentencing requires consideration of many important factors. Any substantial sentence will have profound consequences for Carl's future relationships, opportunities, and ability to rebuild his life. My purpose in writing is not to challenge those findings but to share what I observed as someone who has known Carl his entire life.

Before the period described above, I was not aware of any history of criminal conduct, dishonesty, or behavior resembling the actions that brought him before this Court. The Carl I knew throughout my life was hardworking, creative, ambitious, and deeply committed to his work. The changes that emerged beginning in 2019 were dramatic, painful to witness, and unlike anything I had previously seen.

Regardless of the sentence imposed, Carl will continue to have the support of his family. We remain committed to helping him regain stability, maintain meaningful relationships, and rebuild a productive future.

I respectfully ask the Court to consider Carl's personal history, the extraordinary behavioral changes observed by those closest to him, and his capacity for rehabilitation when determining a fair and appropriate sentence.

Sincerely,

**Daniel Rinsch**

# EXHIBIT D

Victor Benady





25 May 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: United States v. Carl Erik Rinsch, No. 25 Cr. 85 (JSR)

Dear Judge Rakoff:

I have known Carl Rinsch for over 20 years. We first met professionally soon after I launched my own business in the field of digital design. Carl approached me to undertake work on several projects with which he was involved. As someone just starting out in business, I was always extremely grateful for Carl's generosity, trust, and support. We worked together over a number of years and across a number of projects.

During that time, I came to know Carl very well. I was deeply impressed by his extraordinary creativity, intensity, and work ethic. We also became friends and spent time together socially. The Carl I knew was generous, loyal, compassionate, and deeply committed to his work. He was someone who would go out of his way for others, and certainly not someone I understood to be intentionally harmful. I remember going through a difficult time myself during that period, and Carl was compassionate and supportive toward me.

We lost touch for a number of years, although I continued to follow Carl's developing career from afar. We reconnected around 2020 and stayed in intermittent contact through social media. I was not aware of the full situation involving Carl until more recently, but I have now come to understand the seriousness of what occurred.

This has affected me deeply because I was once in a loving relationship with someone who suffered a severe psychotic break, which led to a long period of hospitalization and ultimately to her taking her own life. What I learned from that experience is that serious mental illness can be devastating, isolating, and extremely difficult for others to understand. People may act in ways that are completely inconsistent with who they had been before. Loved ones and friends may struggle to comprehend what is happening, and that lack of understanding can sometimes deepen the person's isolation and despair.

I do not offer this as an excuse for harm caused to others. I offer it because, from my own experience, I know that a serious mental-health crisis can radically alter a person's judgment, behavior, and sense of reality. When I think of the Carl I knew over many years, the events now described appear profoundly out of character.

Having spoken with Carl at length, I believe he is genuinely trying to understand what happened, to confront it honestly, and to seek the help necessary to make sure it never happens again. He has expressed horror and regret about the impact that his actions have had on others, and I believe he is taking the situation seriously.

I respectfully urge the Court to consider the full person before it: not only the events at issue, but the decades of character, creativity, generosity, loyalty, and compassion that preceded them, and the serious possibility that Carl was experiencing a profound mental-health crisis during the relevant period.

Carl has a long road ahead of him. But I believe he deserves the opportunity to receive appropriate help, to continue confronting what happened with clarity, and to rebuild his life in a responsible and constructive way.

Respectfully submitted,

Victor Benady

# EXHIBIT E

To the Honorable Judge Rakoff:

I am writing in support of my lifelong friend, Carl Rinsch, and to respectfully ask the Court to consider leniency in determining his sentence.

I have known Carl since I was in preschool and he was in kindergarten. We attended school together from our earliest years through the end of college. Over that time, he became like a member of my family. We acted in plays together, and beginning when we were about fourteen years old, Carl started making short films with my brother. He joined our family on vacations and spent countless hours at our home.

The first thing I would say about Carl is that he has a genuinely good heart. He is an extraordinarily intelligent, creative, charismatic, and talented person who has always had a remarkable ability to inspire those around him.

Carl was also, in many ways, an older brother figure to me throughout my life. At every stage of school, he looked out for me and offered guidance. He always took the time to listen carefully and help me think through problems, whether they were personal, academic, or creative. When I ran for student council, Carl helped me think seriously about how I wanted to present myself to the student body and how I could genuinely contribute to the community. He would spend hours talking through difficult assignments with me, whether analytical papers or creative projects. Even recently, just a few weeks ago, while facing challenges far greater than my own, Carl patiently listened as I discussed some financial difficulties I was dealing with and thoughtfully asked questions that helped me think toward solutions. That instinct — to listen, guide, encourage, and help — is deeply characteristic of who he is.

From a young age, Carl was singularly focused on filmmaking. He was obsessed with movies and storytelling. Unlike many people drawn to the entertainment industry, he was never motivated by money or fame. What drove him was a deep desire to create meaningful and memorable films. He wanted to be Fellini or Kurosawa. Even in high school, he already possessed an encyclopedic knowledge of film history.

Carl was also an Eagle Scout, which reflects the discipline, commitment, and sense of service that were part of his character from an early age. In high school, we served on student council together. During his senior year, Carl was elected as one of only a handful of prefects — a reflection of how deeply service-oriented, respected, and well-liked he was, even then, and has remained throughout his life.

In college, while many of our friends were doing what college students typically do— socializing and partying—Carl was often the elusive one, taking life more seriously even

then. He devoted himself to studying, writing, and working tirelessly on artistic projects, including independent studies he designed himself with the guidance of his professors.

One of the clearest examples of Carl's loyalty and generosity came after my brother was rendered a quadriplegic in a devastating car accident. My brother spent nine months in the hospital, much of that time in a coma, and the remainder fighting to recover from a broken neck and a traumatic brain injury. Carl was a constant presence during that period. He spent countless hours at the hospital and was often there when I arrived to visit my brother each day.

Carl was also instrumental in helping my brother pursue a legal settlement and testified on his behalf, as his collaborator and artistic partner. His efforts helped ensure that my brother would have the financial resources needed to live the rest of his life with security and dignity. My family has never forgotten Carl's loyalty and generosity during one of the most difficult periods we have ever faced.

Nothing in my decades of knowing Carl suggests that he is a malicious or fundamentally dishonest person. To the contrary, he has always been thoughtful, idealistic, and deeply committed to his creative work. I believe the conduct that brought him before the Court occurred during a period of severe psychological instability and does not reflect his true character.

Carl remains a person of exceptional intelligence, imagination, and humanity. He has much to offer the world, and I believe he is capable of rehabilitation and of making meaningful contributions in the future.

I respectfully ask the Court to consider Carl's lifelong character, his history of kindness and loyalty, and the mental and emotional circumstances that appear to have played a significant role in these events. I hope the Court will see fit to show leniency to someone who has always been a good friend, a tremendous creative force, and, above all, a person with a good heart.

Thank you for your time and consideration.

Respectfully,

Michael Crane

# EXHIBIT F

Patrick Crane



May 25, 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: United States v. Carl Erik Rinsch, No. 25 Cr. 85 (JSR)

Dear Judge Rakoff:

I write in support of Carl Rinsch, whom I have known for approximately three and a half decades, since he was ten years old. Carl grew up with my sons, Mike and Tim. Over time, he became more than a friend of the family. He became part of our family.

My sons can speak to the Court from their own relationships with Carl. I write from a different perspective: as their father, as someone who watched Carl grow from a boy into an adult, and as someone who has spent much of his life building businesses and making judgments about people — their discipline, their reliability, their sense of responsibility, and their character.

I was one of the founders of a manufacturing company in the wastewater industry in 1973 and helped guide that business until I sold it in 2015. I have since built a substantial real estate portfolio and have consulted with businesses in the hospitality industry and other real estate matters.

I mention this not to emphasize my background, but to explain the lens through which I have learned to evaluate people. In business and in life, I have had to distinguish talk from work, ambition from discipline, and loyalty from convenience.

From the time I first knew him, Carl was a bright, serious, unusually driven young person. As he grew older, it became clear that he had a purpose. He wanted to make films. He was not casual about it. He and my son Tim were always writing, shooting, planning, and imagining what they could create next. They were children at first, but they approached their work with a seriousness that stood out even then.

One of my earliest memories of Carl as a young man was giving him and Tim a job selling plumbing supplies door to door for my company. They wanted to earn money to make films. That memory has stayed with me because it says something simple and important about Carl. He was willing to work. He was willing to do ordinary, unglamorous jobs in order to pursue something difficult. He was not waiting for life to hand him anything. He was trying to build his own path.

Carl's relationship with my sons was deep. With Mike, he shared school, college, theater, and a long friendship that extended through nearly every stage of their young lives. With Tim, he shared an especially close creative partnership. They were best friends, collaborators, and in many ways like brothers.

As Tim's father, what stays with me most is not Carl's talent or ambition. It is how he acted when our family was in crisis. When Tim was severely injured in a car accident and became quadriplegic, all of our lives changed. Tim can speak for himself about what the accident meant. What I can offer is a father's view of Carl's actions afterward.

Carl did not pull away. He stayed close during the long hospital period. He saw Tim in pain, fear, anger, and grief, and he did not treat him as less than the person he had always been. He treated Tim with dignity. He encouraged him. He helped him continue to believe that his life mattered and that his future was still worth fighting for.

When the legal process followed, Carl showed up again. He gave time and testimony because he understood what those proceedings would mean for Tim's ability to live with stability after the accident. My family has never forgotten that. As a father, I cannot forget it.

That experience showed me something essential about Carl. He was loyal when loyalty was hard. He stayed close when many young people would not have known how to stay. He helped my son at a time when there was no advantage to Carl in doing so. He did it because Tim was his friend, because Tim was family to him, and because Carl understood that some obligations are human obligations.

Over the decades, I have known Carl as a hardworking, loyal, and deeply committed person. He could be intense. He could be consumed by his work. But that intensity, as I saw it, came from his desire to create and to carry responsibility. He cared about his work, his friends, and the people who had become part of his life.

I know Carl must be sentenced for the conduct before the Court. I am not asking the Court to ignore it. I am asking only that the Court also weigh what I have seen from

him over many years. I cannot offer a medical explanation for everything that happened during the period addressed in this case. I can only speak from the perspective of someone who has known Carl since childhood. The events of 2020 and 2021 are very difficult for me to reconcile with the person I watched grow up, work, create, and stand by my son when our family needed him.

I know this has shaken Carl deeply. He has spoken with me about trying to understand what happened, to face it honestly, and to address the issues that may have contributed to this period. I believe he understands that he must face the consequences of this period and that any trust he hopes to regain must be earned through his conduct going forward.

I am grateful for the opportunity to write this letter because I would want to stand beside Carl at one of the hardest moments of his life, just as Carl stood beside our family when Tim was injured.

I respectfully ask the Court to consider the whole measure of Carl's life: the boy I first knew, the young man who worked ordinary jobs to fund his first films, the friend who stood by my injured son, the artist who dedicated his life to his work, and the person who still has something meaningful to contribute. I ask the Court to sentence the whole person I have known, not only the worst and most troubling period of his life.

Thank you for your time and consideration.

Respectfully,

Patrick Crane

# EXHIBIT G

Tim Crane


May 25, 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: United States v. Carl Erik Rinsch, No. 25 Cr. 85 (JSR)

Dear Judge Rakoff:

I am writing in support of Carl Rinsch, whom I have known since the fourth grade.

Carl and I grew up together. We were friends as children, and before long we were making short films, commercials, and whatever else we could figure out how to shoot. Even then, Carl had a seriousness about filmmaking that was unusual. He could imagine images, sequences, and worlds before the rest of us could see them. More importantly, he was willing to do the work required to make them real.

We kept collaborating as we got older. For Carl, filmmaking was never a casual interest. It was the center of his life. I saw that before there was any professional success, before Hollywood, and before anyone outside our small circle had any reason to pay attention. He was already committed to the work.

But the most important thing I can tell the Court is not about Carl's talent. It is about what he did for me after my accident.

Years ago, I was in a devastating car accident that left me quadriplegic. My life changed completely. I was in the hospital for a long time, trying to understand what had happened and what my life would become.

Carl came to see me. He did not treat me as if I had disappeared into my injury. He spoke to me as the same person he had always known. That mattered more than I can easily explain. At a time when I was facing pain, fear, and a future I could barely understand, Carl remained present in my life.

Later, during the legal proceedings that followed my accident, Carl testified on my behalf. That was not a small thing. He put himself into a difficult and serious process because he knew what the outcome meant for me. His testimony helped me obtain resources that have allowed me to live with greater security, independence, and basic human dignity after an injury that took away so much.

I have never forgotten that. I never will.

That is the Carl I know from my own life: the friend who stayed close after my accident, who treated me as a person rather than a tragedy, and who helped me fight for the means to live after everything changed.

I know the Court has to take the conduct in this case seriously. I am not trying to excuse it, and I do not pretend that my experience answers for what happened. I am writing because my own life gives me a different window into Carl. I know what he did when someone close to him was broken, frightened, and in need of help. He did not turn away.

I respectfully ask the Court to consider that part of Carl as well. He has been my friend since childhood. He has done real good in my life. I believe the good I have known in Carl remains real, and I hope the Court will allow room for accountability, repair, and mercy.

Thank you for your time and consideration.

Sincerely,

Tim Crane
Producer, Allegiance Theatre

# EXHIBIT H

Thomas C. Gray



May 25, 2026

Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007

Dear Judge Rakoff:

I knew Carl Rinsch in college, where we became friends. And I write in the hope that you will have a full picture of his life.

Carl, who I met at age 19, was profoundly driven to tell big, beautiful stories. He was witty and eccentric. And powerfully creative. At the start of semesters he would linger in the dining hall after meals or late into the evening in the apartment I shared with friends. We all talked and laughed about our ideas for plays or movies, or about our present situations. Then mid way through most semesters Carl would disappear from gatherings for several weeks, reemerging at the end of the semester to tell about the intensity of his work on a project. He certainly impressed me with his focus and ambition.

Carl was not just ambitious for himself. He was ambitious for all his friends and, I think, anyone with whom he engaged about ideas.  I recall spending an afternoon with Carl in our senior year. I had done some writing, part of a screen play. Carl was interested. He had read what I wrote and spent a couple of hours with me, talking about my work and my ideas about storytelling. Carl encouraged me. And rejoiced in my effort. He urged me to keep going with my writing. I would not recall this afternoon from over 25 years ago had such encouragement come from a teacher. But Carl was a only friend, with no obligation to help. I had never before received such support from a peer.

And I know that I was not the only person whose work Carl encouraged. Carl was ambitious for the projects he worked on. But he was most interested in being part of a community of storytellers. I know that Carl's grace for others played a role in the subsequent creative achievements of some who were part of our community while in college. It was easy for me to understand how Carl found success as a film director so soon after college, as one of Carl's strengths was in his ability to help bring the strongest ideas and efforts out of others.

I am saddened, and surprised, to be writing this letter. Carl is one of the last people I would have predicted to be standing before a court as a defendant. I know from my recent conversation with Carl that he is striving to understand what changed to lead him to this juncture. I know that his greatest want is to be the person that I became friends with when we were young. Please know that I am happy to provide any additional information and answer any questions that the Court may have in weighing an appropriate outcome.

Respectfully,

Thomas C. Gray

# EXHIBIT I



## DEREK S. LEMKIN
### ATTORNEY AT LAW

March 23, 2026

The Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**RE:  Carl Erik Rinsch, Case No. 1:25-cr-00085-JSR**

Dear Judge Rakoff:

I write to share my personal knowledge of the character of Carl Erik Rinsch, who is scheduled to appear for his sentencing hearing on April 17, 2026.   I have known Carl since we were twelve years old, and our friendship has continued for over three decades.

By way of background, I am an attorney and have been a member of the California Bar in good standing since 2005.  My perspective is based on my long-standing personal relationship with Carl and my professional experience.

Carl has always been a charismatic, driven, intelligent and deeply creative person.  Ever since I met him, Carl has been singularly focused on becoming a film director. Throughout high school and college he consistently devoted himself to that goal with remarkable dedication.  He wrote scripts, created film projects, entered competitions and worked to establish himself in the industry.  I always admired Carl's unwavering focus and I have often pointed to him as an example of commitment and perseverance.

Even though we have lived in different places over the years, we have remained in contact.  In the spring of 2020, I became concerned about Carl based on the content of his social media posts, which were markedly out of character.  I felt compelled to contact him to find out what was happening.  When we spoke, he expressed beliefs that I found difficult to reconcile with the person I had known for so many years.  He appeared to be under significant psychological strain.

I was worried about Carl's well-being and reached out to his family and learned that others close to him were similarly concerned.  While I was not in a position to intervene directly, I remained attentive and continued to check in with him periodically.

When I saw him in person in November 2023, he seemed to have regained stability. His demeanor, thinking and personality were consistent with the person I grew-up with.

**DEREK S. LEMKIN**
**ATTORNEY AT LAW**

The Honorable Jed S. Rakoff
March 23, 2026
Page 2 of 2

Based on my observations, the concerning behavior I witnessed in 2020 had substantially subsided.

Carl's criminal conviction came as a genuine shock to me. Throughout our decades of friendship, I have known him to be a fundamentally decent and law-abiding person. I have never known him to intentionally cause harm to others or engage in unlawful conduct. While he is ambitious and willing to take risks in pursuit of his professional goals, I have always believed he possesses a strong moral foundation.

I fully recognize and respect the seriousness of his criminal conviction. At the same time, based on my decades of experience with Carl, I believe the conduct underlying this case is inconsistent with his longstanding character. I also believe the mental health challenges he appeared to experience in or around 2020 may provide important context for the Court's consideration, although I defer entirely to the evidence and findings before the Court on that issue.

In my view, Carl does not pose a danger to the community and is unlikely to reoffend. He is a talented and capable individual who, if given the opportunity, can contribute positively to society. I remain proud to call him a friend and believe he has the capacity to learn from his experience and move forward in a constructive and responsible way.

I respectfully ask the Court to consider these observations in determining a fair and appropriate sentence.

Thank you for your time and consideration.

Sincerely,

Derek S. Lemkin

# EXHIBIT J

Cedric Mazzara



May 24th , 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: United States v. Carl Erik Rinsch, No. 25 Cr. 85 (JSR)

Dear Judge Rakoff:

My name is Cedric Mazzara. I worked with Carl Rinsch for many years. I first met Carl as a production assistant on a commercial shoot. At that time, I was at the very bottom of the industry hierarchy, trying to find my footing and simply stay employed.

Carl did something that changed the course of my life.

Over time, he brought me closer into his work, first as an assistant, then as a trusted collaborator on multiple projects. He consistently gave me opportunities far beyond the position in which I started. He treated me as someone whose ideas and future mattered. The confidence and responsibility he placed in me ultimately helped me grow professionally into becoming a producer myself, something that genuinely made him proud and happy to see.

That progression did not happen because Carl was obligated to help me. It happened because he genuinely believed in developing the people around him.

What always stood out to me about Carl was that he was never someone who guarded opportunity for himself. He wanted the people around him to grow creatively and professionally. He pushed people hard because he believed they were capable of more than they believed themselves. Many people in this industry speak about mentorship. Carl actually practiced it.

During one of the most difficult periods of my life, ████████████████ Carl continued to support me professionally and personally. At a moment when I felt uncertain about my future and my place in the world, he treated me with dignity and belief instead of distance or pity. I have never forgotten that.

Because of my years working closely beside him, I have genuine difficulty reconciling the conduct in this case with the person I knew over such a long period of time. I never experienced

Carl as dishonest, exploitative, or motivated by greed. I knew him as someone intensely devoted to his work, loyal to the people around him, fiercely protective of his creative ideas, and deeply invested in helping others build meaningful creative lives.

I also believe the public narrative surrounding this case oversimplifies both Carl and the environment he operated inside. The entertainment industry can be psychologically unhealthy, financially reckless, and deeply exploitative behind the scenes, especially when conflicts emerge between individual creators and large corporate systems. While I cannot speak to the legal issues before the Court, I do not believe the full complexity of what happened around Carl is captured by the simplified public narrative.

I understand the seriousness of the Court's responsibility and I do not write to excuse or minimize anything before the Court. I write only to offer my own firsthand experience of a man who had a profound and positive impact on my life and career, and whose belief in me changed the trajectory of my future.

Respectfully,

Cedric Mazzara

# EXHIBIT K

Alessandro Pacciani



April 20, 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re: United States v. Carl Erik Rinsch, No. 25 Cr. 85 (JSR)

Dear Judge Rakoff:

My name is Alessandro Pacciani. I am a commercial director and filmmaker, and I have spent much of my career directing advertising campaigns and visual content for major international brands. I write in support of Carl Erik Rinsch based solely on my own firsthand knowledge of him and the impact he has had on my life, my work, and my understanding of filmmaking.

I understand that it is not my place to address the legal merits of this case, to question the jury's verdict, or to minimize the seriousness of the Court's task. I write for a narrower and more personal reason. My perspective may be useful because I came to know Carl after the period that is now understood to have involved serious illness and erratic behavior, and because my relationship with him developed naturally from professional admiration into genuine friendship.

For more than twenty years, I followed Carl's career with great respect. His work represented, for me, a standard of directorial vision, ambition, and commitment to visual storytelling that I aspired to reach in my own work. He was not simply a director whose work I admired from a distance. He was one of the filmmakers who shaped my understanding of what was possible in our field.

When I later realized, through common professional connections, that I might have the opportunity to know him personally, I considered it an honor. The person I came to know was intelligent, thoughtful, articulate, grounded, and generous with his time. He was serious about art and filmmaking, but also open, reflective, and human in the way he related to me. My opinion of him was formed in the ordinary way one comes to know another person: through conversation, consistency, shared experience, and observation over time.

Only later did I come to understand more fully the details of his earlier struggles, the public disgrace that followed, and ultimately the federal conviction. By then, however, I had already formed my own substantive view of Carl as a person. What confronted me was a profound distance between the man I had personally come to know and the harsh public narrative that had attached itself to what had occurred.

It would have been easy, reasonable, and entirely understandable for me to distance myself at that point. Carl himself, I suspect, would have understood if I had. There was nothing to gain by remaining his friend. If anything, there was only the possibility of discomfort, reputational risk, or the appearance of poor judgment on my part. Yet I did not withdraw.

I did not remain because I was blind to the seriousness of what had happened, or because I took it lightly. I remained because my own firsthand knowledge did not permit me to believe that the worst chapter of Carl's life was the fullest truth about who he is as a human being. The man I continued to know was not someone I experienced as cynical, malicious, or fundamentally dishonest. He was someone I experienced as rational, serious, reflective, and worthy of trust in our personal interactions.

My respect for Carl is not sentimental. It is grounded in what I have witnessed directly. When someone shows you who they are through sustained behavior, conversation, and genuine human connection, you learn to trust your own judgment. That is what happened with Carl.

I appreciate that friendship does not erase consequences, and I do not suggest otherwise.

The legal system has rendered its judgment, and I respect the gravity of that determination. I mean only to say that, from the perspective of someone who came to know Carl after the crisis period had passed, and who chose to remain present even after public disgrace and conviction, I cannot reconcile the whole of his character with the idea that this episode represents his essential nature.

There is a meaningful difference between standing by someone out of sentiment and standing by someone because one's own experience demands a more complete and honest judgment. My continued support for Carl is of the latter kind. I stayed because I trusted what I had seen for myself, and I still do.

I respectfully ask the Court to consider that whatever the law has determined about the conduct in question, the man himself is not exhausted by that determination. The Carl I have come to know is capable of reflection, growth, and human decency. I do not ask the Court to overlook the seriousness of his conduct. I ask only that the Court consider, in fashioning a sentence, that there is another dimension to Carl's character: a dimension I know to be real because I have experienced it directly, because I continue to choose it, and because I am willing to place my own credibility behind its truth.

Respectfully submitted,


Alessandro Pacciani

# EXHIBIT L

Gary Powell



25 May 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: United States v. Carl Erik Rinsch, No. 25 Cr. 85 (JSR)

Dear Judge Rakoff,

My name is Gary Powell. I have worked in the film industry for many years, following in the footsteps of my father, uncle, and brother. I began my career as a stunt performer and worked hard over the years to become a stunt coordinator and second unit director.

I first met Carl Rinsch when we worked together on *47 Ronin* in 2012. We have remained friends ever since, for approximately fourteen years.

Personally, I have observed Carl to be a genuine person with humility. I have seen how he treats the people around him, both at work and in his personal life. I can honestly say that I believe Carl is a decent person with integrity. He has a strong work ethic, he is reliable and generous, and he has always managed himself and his responsibilities with kindness and good intention.

Carl has always given me his time over the years. Creatively, I have a great deal of respect for him. But beyond the work, there is one occasion in particular that has stayed with me.



Carl and I had a conversation about this, and he brought his mother over to speak with us. His mother was an occupational therapist. That meeting with Carl's mother was invaluable. They acted to help us without hesitation. She gave us so much information, and it helped us tremendously. I cannot express how truly grateful I am to both of them.

I now understand that Carl has been dealing with a serious health and mental-health crisis. From what I know of Carl, what has happened appears very far removed from the person I knew over many years. It is also my understanding that he is now doing better, taking the matter seriously, and working to address his health in a responsible way. I have no doubt that, with the right support and opportunity, Carl can come back with the same energy, positivity, creativity, and determination that I knew in him before.

For that reason, I am very willing to help and support Carl in any way I can. But I do not support him only because he helped me. I support him because I believe Carl is a good man who deserves understanding, fairness, and a real chance to rebuild his life in a positive way.

Respectfully submitted,

Gary Powell

# EXHIBIT M

May 1, 2026

Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re: *United States of America v. Carl Erik Rinsch, 25 CR 85 (JSR)*

Dear Judge Rakoff:

I am writing in support of Carl Rinsch in connection with his upcoming sentencing. I do not know the details of this case. But based upon what I do know about Carl, I did want to take the opportunity to write on his behalf, in the hope that his sentence might be tempered with measures of leniency and mercy as well as justice.

I have known Carl for about fifteen years. He directed me in a film titled "47 Ronin" in 2011, and we stayed in touch after production, later becoming friends.

I attended his wedding in Uruguay in 2014. Over the years I would periodically visit with Carl and his wife at their Los Angeles home and catch up on and discuss life and art. During one of these visits Carl showed me a project he was working on called "White Horse," which he was hoping to bring to market. In my opinion Carl is an exceptional artist, and White Horse, in the form in which I saw it, was a superb and visionary work of art, although unfinished.

I am, of course, not a therapist or psychologist. I write instead as an artistic peer of Carl's, and as a friend. In my opinion, Carl can self-sabotage by amplifying the scale, scope and landscape of what had been negotiated, accordingly placing himself and his counterparties at odds.

I do not intend to share this as an excuse or diminishment of what he has been found to have done, but offer this solely as perhaps an insight into why.

Docusign Envelope ID: 11BC31BD-08B0-8044-828B-04EACE99AAD0

I have seen Carl bring exceptional joy and warmth to the people around him. I have seen him bring creative inspiration to others through his creativity and vision. I have seen and been a part of wonderful artistic environments where exceptional work was done with him. I hope you are able to find leniency for this man. To the extent you deem appropriate, I believe such leniency would be a healing act, to go along with the punishment he will live with.

Thank you for your consideration.

Respectfully,

Signed by:

*Keanu Reeves*

Keanu Reeves

Submitted via Counsel

Matthew S. Rosengart
Greenberg Traurig, LLP

# EXHIBIT N

The Honorable Jed S. Rakoff

United States District Court

Southern District of New York


Re: Sentencing of Carl Erik Rinsch


Your Honor,


My name is Mike Seid. I am a screenwriter and producer currently working on a television series that I co-created for a major streaming platform in Spain. I write with respect for the Court and for the seriousness of these proceedings, in the hope of offering some perspective on Carl Erik Rinsch, whom I have known for thirty-seven years.


Carl and I met when we were twelve years old, in seventh grade at Harvard School in Los Angeles, now Harvard-Westlake. Even then he stood apart from the rest of us in one obvious way: he was already completely devoted to filmmaking. While most of us were simply trying to get through school, Carl was making films, getting them accepted into festivals, and speaking about cinema not as a hobby but as a calling. He possessed a gift for visualization and storytelling long before most people discover their direction in life.


In high school he directed me in scenes, and even as a teenager he had an unusual seriousness of purpose about the work. Our friendship continued through college while I studied the classics at Harvard and Carl attended Brown, then into our professional lives afterward. When Carl began directing commercials and building a reputation for his striking visual style, he invited me to write with him. For many years we worked side by side. We were not merely collaborators but, in many respects, like brothers. At times we practically, and occasionally literally, lived together while developing projects. Few people, I think, have had the opportunity to observe Carl across so many phases of his life.


What I knew in all those years was a man of extraordinary imagination and intensity. Carl approached filmmaking with a sense of boundless wonder that was intoxicating and infectious. Working with him was exhilarating. He did not pursue the work simply as commerce. He wanted

to make beautiful and meaningful work. To move people, to astonish them, and to push the boundaries of what cinema could express. In those years, he would often quote Shoeless Joe Jackson from the film *Field of Dreams* and say, only half-joking, that he "would have done it for food money." What mattered to him was the work itself, not the financial reward. That attitude, idealistic perhaps to a fault, was fundamental to how he approached his career and his life.

At the same time, Carl was also tremendously funny. He had a mischievous, irreverent wit that could dissolve tension in a room in seconds. That mixture of deep seriousness about art and playful intelligence was one of the qualities that made people gravitate toward him and want to work with him.

Carl also cared deeply about helping other artists find their footing. Over the years he regularly brought young artists and assistants into his orbit and gave them real responsibility when they were struggling to establish themselves. One example that stays with me is a young artist named Chandler Wood, who was trying to get his career started. Carl took him under his wing and had him work on storyboards and designs for years, providing steady work, encouragement, and mentorship at a moment when it mattered enormously. That instinct to build people up rather than treat them as disposable labor was characteristic of him.

I can say personally that I consider myself the writer I am today in no small part because of Carl's mentorship and encouragement during the years we worked together. I learned a great many things from him that would be hard for me to express in this short letter.

Carl was not without flaws, and I do not wish to portray him as a saint. Like many intensely creative people, he could be headstrong and obsessive. His devotion to what he was making bordered on the extreme. That intensity was part of both his brilliance and his difficulty. In time it was one reason I felt the need to step out of his orbit and develop my own voice as a writer. I regret that I did not handle that transition with the grace that it merited.

Because of that distance, I was not closely involved in Carl's life during the period that led to the offenses before the Court. When I did reconnect with him during the COVID period, it was after seeing a series of posts online that struck me as deeply uncharacteristic of him. Dense, cryptic diagrams and assertions that he had solved aspects of the pandemic. Concerned, I reached out, and we began meeting and speaking regularly. What I encountered in those conversations was not the Carl I had known for decades. He spoke with growing conviction about being in direct communication with divine forces, about receiving signals and insights that, to him, felt

undeniable. I had seen Carl immersed in his work before. Singularly focused, even obsessive. But this was different. Over time, it became clear to me that something had shifted in him in a way that was deeply unsettling. I cannot explain what brought this about, but it seemed connected to that period and the broader dislocation of the pandemic. It is the only time in our long friendship that I witnessed him in such a state.

I do not offer that observation as an excuse. I understand that serious wrongdoing occurred, and I do not write to dispute the verdict or minimize the harm that resulted. I write only to say that the man I have known for nearly four decades is not someone defined solely by the worst decisions of his life. In the thirty-seven years I have known Carl, from adolescence and now into middle-age, I never saw him involved in legal trouble or behavior suggesting a disregard for the law. On the contrary, during the many years we worked together I observed him to be meticulous in practical matters such as budgeting and bookkeeping. He was careful about financial boundaries and conscientious about obligations, including taxes and payments to collaborators. For that reason, the conduct described in this case appears to me as an aberration in the character I've known for most of my life.

Another essential part of Carl, at least as I have known him, is his spiritual seriousness. He is a committed Christian and has long been deeply interested in questions of faith, divinity, and transcendence. For him, filmmaking has often been a way of exploring those questions. Asking whether images and stories can help human beings confront mystery, suffering, and grace.

We are living in a moment when technology, artificial intelligence, image-making, and even the nature of truth itself are rapidly changing. Carl has long been fascinated by the relationship between scientific innovation, storytelling, and the human spirit. I have no doubt he still has the capacity to contribute meaningfully to that conversation if given the opportunity to rebuild his life.

I know the Court must weigh many factors in determining a just sentence, and I do not presume to know how those considerations should ultimately balance. I simply hope the Court will consider that Carl is not only the author of the conduct that has brought him before the Court, but also the product of a long life of imagination, mentorship, faith, humor, and creative ambition.

I respectfully hope that whatever sentence the Court imposes leaves room for the possibility of redemption and future contribution.

Thank you for considering my perspective.

Respectfully,

Mike Seid

# EXHIBIT O

Jesse Warfield



May 19, 2026

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: United States v. Carl Erik Rinsch — Character Letter in Support**

Dear Judge Rakoff,

My name is Jesse Warfield. I am writing to you as a former assistant to Carl Erik Rinsch. I have known Carl for over ten years, two of which I spent working directly alongside him on commercial productions and in the early stages of what became the White Horse project, later known as Conquest. As his assistant, I was present across nearly every dimension of his professional life — the creative decisions, the pressures, the relationships, and the day-to-day realities that others rarely see. That closeness, built over a decade, gave me a perspective on Carl that I believe is relevant to this Court, and it is why I feel compelled to write. I write not to minimize the harm caused, but to offer a fuller picture of who Carl is, and to respectfully request that his sentence reflect both accountability and the capacity for rehabilitation.
I first knew Carl as one of the most genuinely passionate creative minds I had encountered in the industry. On commercial shoots and in the early development of White Horse, he was consumed by the craft: by story, by image, by the emotional truth of a scene. What I remember most is that money was almost beside the point to him. He could spend hours on a single frame, not because anyone was asking him to, but because he could see the difference even when no one else could. This commitment extended beyond his work into how he lived his life. Carl drove a modest car and kept modest belongings. He had no interest in luxury or status. Material things simply did not register for him. His drive was artistic, not financial. That is why the conduct described in this case is so deeply inconsistent with the Carl I knew over many years. A man who never spent his own money on extravagance does not fit the profile of someone motivated by greed.
Over the Covid pandemic, I witnessed a change in Carl that was deeply troubling. The focused, collaborative, craft-driven person I had worked alongside became someone I barely recognized. His public Instagram account during this period reflected a profound deterioration, having become a stream of incoherent posts and random scribbles that stood in stark contrast to the precise, visually sophisticated person Carl had always been. I also met with Carl in person several times during this period, and recognized a change. His appearance, his manner, his entire way of engaging with the world had

changed profoundly. What I was witnessing was not eccentricity or stress. It seemed like a break from reality, and I believe that break was at the root of everything that followed. I am relieved to say that in more recent interactions, Carl has seemed much more like himself — the person I knew before the break. That shift matters. It suggests that what happened was a treatable crisis, not a permanent change in who he is. I understand the seriousness of what Carl has been convicted of, and I do not take lightly the impact on those harmed. I offer this letter because I believe the Court benefits from hearing from those who knew him across time, not only at his worst, but at his best. I am grateful for your consideration.

Respectfully,


Jesse Warfield