UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CARL ERIK RINSCH,

Defendant.

25 Cr. 85 (JSR)

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Timothy Capozzi
David Markewitz
Adam Sowlati
Assistant United States Attorneys
    - *Of Counsel* -

**Table of Contents**

I.    Preliminary Statement ................................................................................................... 1

II.   Background ...................................................................................................................... 2

      A.    The Start of the Relationship Between Rinsch & Netflix ...................................... 2

      B.    Production Problems in 2019 ................................................................................. 4

      C.    Rinsch Demands More Money in 2020 ................................................................. 5

      D.    COVID-19 Pandemic ............................................................................................ 7

      E.    Rinsch Promises to Use $11 Million from Netflix to Fund *White Horse* ............... 8

      F.    Rinsch Launders the Money & Lies to Netflix ...................................................... 8

      G.    Rinsch Gambles the $11 Million on Risky Market Bets and Continues to
            Lie to Netflix ........................................................................................................ 11

      H.    Rinsch Buys Millions of Dollars of Luxury Goods with Netflix's Money .......... 12

III.  Procedural History ........................................................................................................ 16

IV.   The Applicable Guidelines Range ................................................................................. 16

V.    A Sentence of At Least 5 Years' Imprisonment is Warranted ....................................... 19

      A.    Applicable Law ..................................................................................................... 19

      B.    Discussion ............................................................................................................. 20

            1.    Seriousness of the Offense and Need for Just Punishment. ....................... 20

            2.    The Need to Afford Adequate Deterrence ................................................. 23

            3.    Rinsch's History & Characteristics ............................................................ 27

VI.   Forfeiture ...................................................................................................................... 30

VII.  Restitution ..................................................................................................................... 31

VIII. Conclusion .................................................................................................................... 33

The Government respectfully submits this memorandum in advance of the sentencing of Carl Erik Risnch, presently scheduled for June 29, 2026, and in response to the defendant's sentencing memorandum, dated May 26, 2026.[1]

## I.     Preliminary Statement

Rinsch was convicted of orchestrating a scheme to defraud Netflix out of $11 million. Rinsch was the creator of *White Horse*, a sci-fi television show that Netflix spent tens of millions of dollars to fund.  It was never released because Rinsch abandoned it. Rinsch promised Netflix that, if it provided him with $11 million, he would finally finish the show in which so many had invested money, time, and effort. But that was a lie. Instead of using the $11 million to create *White Horse*, Rinsch used the money to enrich himself. Within weeks of receiving the money, he laundered it, rapidly routing the money through a series of different bank accounts all in an attempt to hide the millions he would use to gamble on extremely risky stock market bets. And after those bets failed, he then invested the remaining money in cryptocurrency and purchased millions of dollars in luxury goods—Rolls Royces, a Ferrari, a $380,000 watch, and luxury mattresses that cost hundreds of thousands of dollars.

Throughout this fraud, Rinsch lied over and over again. He told Netflix he was finishing the *White Horse* production when he had done no work at all.  Not once did he tell the truth and acknowledge that he had gambled away Netflix's money.  Not once did he admit he had spent millions on luxury purchases for himself.  Instead, he concealed and deceived.  He did that for one reason only: greed.

---

[1] "Def. Mem." refers to Rinsch's sentencing memorandum; "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office"); "GX" refers to Government trial exhibits; and "Tr." refers to the trial transcript.

Rinsch has never accepted responsibility for his actions. He even sued Netflix, frivolously claiming that it owed him money. And when the moment came for him to finally do the right thing, to tell the truth under oath before a jury of his peers and this Court, he perjured himself. Rinsch has never cared about the consequences of his actions. He did not care that he lied to Netflix—a company that trusted him. He did not care about his crew—who lost their jobs and years of work because of his fraud. He did not care when he lied in his divorce proceedings or to the IRS. He did not care when he perjured himself. Rinsch only cares about one person, himself.

Now is the time for Rinsch, at long last, to face justice—an opportunity for the Court to show Rinsch that his actions do, in fact, have consequences. Based on the duration and nature of Rinsch's crimes, the resulting harm that he has caused, his refusal to accept responsibility for his criminal actions, and the need to dissuade others from committing similar crimes, justice warrants a meaningful sentence of at least 60 months' imprisonment.

## II. Background

### A. The Start of the Relationship Between Rinsch & Netflix

Carl Rinsch is a writer and director. PSR ¶ 12. Around 2013, he began to film a television show that he had created called *White Horse* (the show was alternatively titled *Conquest* during its production). PSR ¶ 12. Rinsch spent the next approximately five years filming numerous episodes of *White Horse*, using both his own money and early investments from various production companies and a friend who is a successful actor. PSR ¶ 12. By late 2017, Rinsch had shot around 200 to 300 hours of footage, which he had then edited into approximately six episodes totaling around 45 minutes to one hour. *Id.*

With roughly half the script shot, Rinsch began to shop the *White Horse* project to distributors so that he could secure additional funding. PSR ¶ 13. It was during this sales process that Rinsch first connected with Netflix and its executive team. PSR ¶ 13.

2

Around March 2018, after just a few months of negotiation, Rinsch and Netflix reached a high-level agreement through which Netflix would acquire *White Horse*. *See* Tr. at 272:10–11. The parties then spent most of that year working to reduce their agreement to a more formal term sheet, which was eventually executed in November 2018. PSR ¶ 14; GX 6336 (term sheet). Under the term sheet, Netflix agreed to pay a little more than $61 million for the right to acquire and distribute *White Horse*. That money was intended both to reimburse Rinsch for what he had already spent creating the show, as well as to fund the completion of the remaining episodes. Specifically, although roughly six episodes existed around the time, the parties agreed that the first season of the show would total approximately 13 episodes. PSR ¶ 14; GX 6336 at 1 (defining "First Season" to mean "[a]ll existing scripts and episodes for the first season of episodes of [*White Horse*] comprised of approximately 13 episodes ranging from approximately 4 to 14 minutes in length and totaling 110-120 minutes").

Notably, however, this $61 million would not be handed over to Rinsch all at once.[2] Instead, Rinsch would unlock various payments by reaching certain production milestones. *See* PSR ¶ 15; GX 6336 at 3–4, § 7. Below is a summary of the various payment milestones:

- **$22 Million:** To be paid to Rinsch after the term sheet was executed.

- **$5 Million:** To be paid to Rinsch 10 business days following January 1, 2019.

- **$12 Million:** To be paid to Rinsch upon the start of principal photography on the remaining episodes of *White Horse*.[3]

- **$11.218 Million:** To be paid to Rinsch upon the completion of principal photography of the remaining episodes of *White Horse*.

---

[2] Some of the money was also expected to be passed along to other investors in *White Horse*, as well as Rinsch's advisors.

[3] Of that $12 million, roughly $2.023 million had already been advanced to Rinsch prior to execution of the term sheet.

- **$8.506 Million:** To be paid to Rinsch upon the delivery of a finished season of *White Horse* to Netflix and the execution of contracts with certain talent to ensure they would be available for subsequent seasons of the show if necessary.

- **$2.5 Million:** To be paid to Rinsch after the last episode of the first season was made available to the public on Netflix's website.

PSR ¶ 15; *see also* GX 2008 (summary chart illustrating payment milestones and amounts).

### B.    Production Problems in 2019

After executing the term sheet, Rinsch spent more than half a year preparing to go back into production, putting together plans for an ambitious, international schedule. PSR ¶ 16. Shooting resumed in August 2019, in Brazil. *Id.* Almost immediately, however, significant budget problems emerged. In September 2019, Rinsch emailed a Netflix executive, Peter Friedlander, and told Friedlander that "the budgets have exploded" and that Rinsch was concerned about being left with "an empty bank account." GX 6341; *see also* PSR ¶ 17. Rinsch then proposed two solutions: (i) Rinsch could simply shoot only a portion of the story that Netflix had purchased and paid Rinsch to create; or (ii) Netflix had to commit to giving Rinsch an "unpredictably higher" budget. GX 6341; *see also* PSR ¶ 17.

Unsurprisingly, neither of those options was acceptable. As Friedlander explained at trial, "option one wasn't an option" at all. Tr. at 73:5. And as for option two, Netflix was willing to provide additional money, but needed to "g[e]t under the hood and talk[] about what that would look like." Tr. at 73:5–10. So over the next few weeks, Netflix executives repeatedly sought additional information from Rinsch to help understand the source of the budget overruns and assess what would be needed to film the full story they had purchased. PSR ¶ 18; *see also* GX 6342; Tr. at 74:12–19. Netflix even proposed cutting certain shots to save money. PSR ¶ 18; *see also* GX 6344; Tr. at 81:17–82:1. But Rinsch showed little interest in engaging in this process, and it continued to be "very difficult" for Netflix to get the information it was after. PSR ¶ 18; Tr. at 77:7–

4

13. But despite all that, Rinsch—through his representatives—was always clear with Netflix that any additional funding would go "100% on the screen." GX 6343 at 1; *see also* PSR ¶ 18.

Eventually, in late October 2019, Rinsch threatened to shutter the production unless he received more money. PSR ¶ 19; GX 6347. Concerned about the show falling apart, Netflix agreed to advance Rinsch $5.3 million against the money Rinsch would eventually receive once principal photography was completed. PSR ¶ 19; Tr. at 290:18–291:9, 292:4–6. As a result, Rinsch would get access to funds immediately, but Netflix did not agree to pay Rinsch more than what they had originally contracted to pay back in November 2018.

Around early December 2019, the *White Horse* production ended photography for the year. PSR ¶ 20. Although the show still had many locations left to shoot, a decision was made to shut down for the holidays to allow the production team and Netflix to regroup and figure out next steps given the budget issues that were continuing to plague the show. PSR ¶ 20; *see also* Tr. at 88:10–20; GX 6348. During those discussions, Rinsch indicated that he would spend time trimming the script to reduce the amount of footage that remained to be shot, as that would help to save money. PSR ¶ 20; Tr. at 91:25–92:11.

## C.    Rinsch Demands More Money in 2020

In late January or early February 2020, Rinsch shared with Netflix a new draft of the script. PSR ¶ 21. Contrary to the parties' discussions over the prior months—which were focused on ways to cut costs—Rinsch had actually *expanded* the script, growing it from its previous 203 pages to a new draft that totaled 229 pages. *Id.* Netflix was shocked. *Id.*; *see also* Tr. at 92:14–93:2.

Rinsch quickly followed that surprise with another one: a demand for more money. Specifically, Rinsch requested $5 million, which he said would be used to fund a specific list of tasks related to completing *White Horse* (the "Task List"). PSR ¶ 22. The Task List included things like

5

editing existing footage for the first season of *White Horse* and performing certain pre-production work on the additional footage for the first season that needed to be shot in 2020. *Id.*

When Netflix did not immediately agree to give Rinsch that money, he changed tactics. Rinsch claimed, for the first time, that what he'd shot in 2019 was sufficient to complete principal photography on the first season of the show; as a result, Rinsch asserted that Netflix owed him $11.218 million under the parties' term sheet, which was the amount due upon completion of principal photography.[4] PSR ¶ 22. That assertion was false. PSR ¶ 22. Indeed, witnesses from both Netflix and the *White Horse* production team all agreed that principal photography was nowhere close to done in February 2020:

- **Peter Friedlander:** "[W]e hadn't completed it, and we had much of the story left to tell. There was shooting that still needed to take place even in the earliest episodes, so there was shooting all the way through the story that ha[d]n't been completed." Tr. at 88:21–89:3.

- **Bryan Noon:** "As the $11.218 is not the correct amount of the next installment *nor is the next installment currently due*, Netflix is not, as you can understand, in a position to remit such requested amount." GX 6355 at 1 (emphasis added).

- **Cindy Holland:** "There were multiple filming locations yet to be traveled to, and many, many scenes remained unphotographed." Tr. at 614:20 –615:3.

- **Gabriela Roses:** "We needed another 30 days to be shot in order to finish," which Roses explained was roughly 30% of the total photography planned for the show. Tr. at 703:20–704:8.

- **Ethan Weiner:** Testifying that principal photography was not complete in 2019. Tr. at 769:4–7.

So in February, Bryan Noon, a Netflix executive, wrote to Rinsch's lawyer, telling him that "the next installment [is not] currently due." GX 6355 at 1.

---

[4] Rinsch also requested several million dollars on top of that figure.

Rinsch was simply trying anything he could think of to get more money out of Netflix. The reason for that was simple: Rinsch was desperate for money. PSR ¶ 23. In February 2020, he told his production partner and then-wife, Gabriela Roses, that they were bankrupt. *See* PSR ¶ 24; Tr. at 706:4–15. Rinsch also sent various contemporaneous messages to his production assistant, Ethan Weiner, in which he described the state of his finances:

> I'm getting financially murdered right now. . . . I'm under water as of right now, actually. Scary but true. . . . I'm at a red line. . . . [T]he project . . . [is] on life support and I'm the life support machine. And I only have enough to get us through the month. Really just three weeks.

PSR ¶ 24; *see also* GX 5086.

### D.    COVID-19 Pandemic

As these discussions between the parties were ongoing, the COVID-19 pandemic began to grip the nation's attention. PSR ¶ 25. During the first few months of 2020, Rinsch focused closely on the pandemic and, in particular, how it might impact the economy. *Id.* By early March 2020, Rinsch sent various emails to people discussing how the pandemic was going to cause the stock market to fall. *See id.*; *see also* GX 6354; GX 6191. He also expressed his belief that the pharmaceutical company Gilead Sciences had a promising treatment for the virus with its drug Remdesivir. PSR ¶ 25; GX 6354; GX 61919; Tr. at 970:12–17 (Rinsch admitting he was familiar with and interested in Gilead in February 2020). And Rinsch's then-wife, Gabriela Roses, explained that Rinsch at the time "was very excited about COVID and anything related to COVID." Tr. at 710:7–15.

By March 4, 2020, Rinsch thought that "the markets [were] going to get shattered" due to the pandemic, and that there was "going to be systemic failure." GX 5087 (instant messages Rinsch

sent to his assistant, Ethan Weiner). In the face of those fears, Rinsch's focus was simple: "get[ting] money secured" from Netflix before the market dropped. *Id.*; PSR ¶ 25.

### E. Rinsch Promises to Use $11 Million from Netflix to Fund *White Horse*

On March 4, 2020, Bryan Noon sent Rinsch and his attorney a proposal regarding additional funding for *White Horse*. PSR ¶ 26. Specifically, Noon stated that Netflix would give Rinsch $11 million, but on certain conditions. *Id.* But Noon was clear that Rinsch would have to agree that he would "use the $11M to fund" the same Task List that Rinsch himself had previously proposed in February 2020. *Id.* Noon also stated that this offer "shall not represent an acknowledgment of any of the contractual milestones"—*i.e.*, making clear to Rinsch that Netflix still did not agree that principal photography was complete. *Id.* Lastly, Noon stated that Rinsch would need to agree to give Netflix weekly updates about the status of the project. *Id.*

Following some minor changes to aspects of the offer unrelated to the use of the funding, Rinsch and his lawyer agreed to Netflix's terms. PSR ¶ 27; GX 6358; GX 6359. By accepting this deal, Rinsch made a clear promise to use the entirety of the $11 million to pay for work on *White Horse*. But Rinsch had no intention to use the money to fund the Task List or *White Horse*—he was lying to Netflix. PSR ¶ 27. Instead, Rinsch intended to spend that money on himself. And his first planned expense was millions of dollars in extremely risky stock options based around his views of COVID and Gilead. *Id.*

### F. Rinsch Launders the Money & Lies to Netflix

Netflix wired the $11 million to Rinsch on Friday, March 6, 2020. PSR ¶ 28. Although Rinsch received that money in a checking account held in the name of his production company, Home VFX (the "Home VFX Checking Account"), he quickly went to work to hide that money from those around him. *Id.* The very next business day, Monday, March 9, 2020, Rinsch opened a

new savings account in Home VFX's name (the "Home VFX Savings Account") into which he transferred $10.5 million of Netflix's money. *Id.*

Rinsch's motives were clear. He had Netflix transfer the money into a business account, rather than a personal account, to avoid alerting Netflix that he was planning to spend the money on himself. But this created a different problem for Rinsch; his production partner and wife, Roses, was a signatory on the Home VFX Checking Account, PSR ¶ 29, meaning she would be able to see any expenses out of that account. So Rinsch opened a new business account in Home VFX's name without making Roses a signatory. *Id.* This new account gave Rinsch a way to cut off Roses's visibility into how he was spending the money, without tipping her off to what was going on—after all, even though Roses would be able to see the outgoing transfer from the Home VFX Checking Account into the Home VFX Savings Account, it would look to her like the money was simply moving into another business account. Contemporaneous messages show that this was exactly what Rinsch was counting on. On the very day that Rinsch moved $10.5 million of the $11 million from the Home VFX Checking Account to the Home VFX Savings Account, he sent a message to Roses in which he reassured her that the Home VFX Savings Account was a "'safeguard' account" that was set up to "act as a financial firewall" and be a place where Rinsch could "set aside [the $10.5 million] for the production." PSR ¶ 29.

But that was another lie. Rinsch had no intention of leaving the money in the Home VFX Savings Account. PSR ¶ 30. The very same day that Rinsch both transferred the $10.5 million into the account and told Roses that the account was intended to be a safeguard location, Rinsch requested and received wire transfer instructions for moving the money out of that account and into his personal brokerage account at Wells Fargo.[5] *Id.* One week later, Rinsch routed $8 million from

---

[5] Technically, the account was held in the name of Rinsch's trust.

the Home VFX Savings Account into that personal Wells Fargo account, without telling Netflix or Roses. *Id.*

As these rapid financial transactions were taking place, Rinsch began trading in Gilead securities. Starting on March 9, and continuing on March 11 and 13, Rinsch bought hundreds of thousands of dollars' worth of Gilead stock. PSR ¶ 31. Those transactions continued after Rinsch wired $8 million of Netflix's money into his Wells Fargo account. *Id.*; *see also* GX 3036.

After weeks of Rinsch investing aggressively in Gilead, his investment advisor at Wells Fargo grew concerned about the concentrated nature of Rinsch's investments and placed restrictions on his trading. PSR ¶ 31. But Rinsch had no interest in slowing down. Rather than heed Wells Fargo's warnings, Rinsch instead hired a new investment advisor, Adam Checchi, and moved Netflix's money into a Charles Schwab brokerage account that Checchi helped to establish. *Id.* Rinsch also wired the remaining $2 million of Netflix's money from the Home VFX Savings Account into the Charles Schwab brokerage account, for a total of $10.5 million.



*GX 2001 at 5 (summary of Rinsch's wire transfers)*

10

While laundering the millions he'd stolen from Netflix, Rinsch continued to lie to Netflix to keep them from unraveling the fraud. Rinsch repeatedly reassured Netflix that *White Horse* was moving forward as planned. Below are examples of messages Rinsch was sending to Netflix employees throughout March 2020, to cover up what he'd done (PSR ¶ 33):

| Date | Excerpt of Rinsch's Message |
|---|---|
| 3/6/2020 | "You will not regret it. Funds have landed. . . . I've got you. 100%. |
| 3/8/2020 | "[W]e are prepared and have planned for what I have described as a 'tunnel.' So there is no need to worry. We are moving forward with preproduction and at 100% effectivity. We will be on track to shoot end of July and present in 5 weeks." |
| 3/9/2020 | "We're around. And quietly moving forward. While the craziness swirls overhead." |
| 3/10/2020 | "As it pertains to our business, we continue moving forward diligently. . . . I am excited to show you the work we are doing once the dust of this pandemic clears." |
| 3/24/2020 | "We're working away on this end."[6] |

### G.    Rinsch Gambles the $11 Million on Risky Market Bets and Continues to Lie to Netflix

On March 31, 2020, just one day after moving $10.5 million of Netflix's money into his Charles Schwab brokerage account, Rinsch invested over $6.2 million into the market, mostly on extremely risky stock options betting on Gilead and shorting the S&P 500. PSR ¶ 34. But that investment proved poor. Within just a few weeks, Rinsch lost nearly all the money he'd risked. *Id.*

Rinsch knew full well the risks he was taking. Before investing, Checchi had told Rinsch that he was taking "extremely risky" positions. PSR ¶ 34; *see also* Tr. at 222:5–9. In response to

---

[6] When asked about this email at trial, Rinsch's production partner and then-wife, Gabriela Roses, testified that she was not aware of Rinsch or anyone else "working away on *White Horse*" at the time.  Tr. at 736:7–25.

Checchi's warnings, Rinsch acknowledged that his investments were "highly speculative and aggressive," but he continued that he was aiming for "extreme returns" and was "comfortable forfeiting [millions of dollars] in the instance these investments are not as fruitful as [he] want[ed] them to be." GX 6057; PSR ¶ 34. By April 17, 2020, approximately $4.5 million in stock options expired out of the money. PSR ¶ 34.

Even as those investments failed spectacularly, Rinsch continued to lie to Netflix. On April 20, 2020, just a few days after a large batch of stock options had expired, Rinsch sent numerous false statements to Cindy Holland, a senior Netflix executive, with fake pronouncements about the state of the production, including saying things like (i) "By the way, dont worry about the show. It's awesome and moving forward really well."; and (ii) "Don't worry. Game changing good. And hasn't stopped (or even slowed down) while I've been handling 'other stuff.'" PSR ¶ 35.

Rinsch continued his lies throughout the remainder of the year. For instance, in or about May or June 2020, he met with Cindy Holland and Peter Friedlander at the Four Seasons hotel in Beverly Hills, where he was staying at the time (which he funded with money he'd stolen from Netflix). PSR ¶ 35. At that meeting, Rinsch gave the two executives a coffee table book containing artwork and images of the production from 2019. PSR ¶ 35. That book, which cost approximately $10,000 to make, was created by Rinsch to lull Netflix into a false sense of security, providing them with something to keep them excited about the *White Horse* project. PSR ¶ 35.

### H.      Rinsch Buys Millions of Dollars of Luxury Goods with Netflix's Money

In early 2021, with Netflix still unaware of Rinsch's fraud, Rinsch took what remained of the money he'd stolen and transferred it to a cryptocurrency trading account. PSR ¶ 37. Rinsch

then began to invest heavily in various cryptocurrencies, including Doge Coin. *Id.* Unlike his earlier investments, this one proved quite profitable, and Rinsch earned back essentially all the money he'd lost in mid-2020. *Id.*

But Rinsch still refused to spend the money on *White Horse*. *Id.* Instead, Rinsch began to spend money on various luxury goods, like hyper expensive cars, antique furniture, watches, and luxury mattresses. Rinsch's spending was intended to satisfy two goals.

*First*, as Rinsch acknowledged in numerous contemporaneous messages, he was buying many of these luxury goods either as personal investments or simply as "gift[s]" for himself. That included a $740,000 Ferrari, a $380,000 Vacheron Constantin watch, and a $439,000 Hastens mattress. Below are examples of text messages that Rinsch sent to his bookkeeper, Maria Skotnikova, in or about late 2021, as he was making certain of these purchases (Rinsch's messages are in grey).



GX 5050



GX 5051

*Second*, Rinsch wanted to spend approximately $11 million on luxury goods he thought that he could pass off as being related to *White Horse*, such as things he believed he could claim were props or set decorations. PSR ¶37(b). His primary goal with that spending was to convince

13

Netflix and his wife that he'd incurred $11 million in expenses on *White Horse* after receiving the money that Netflix paid him.

As it related to Netflix, Rinsch believed this would allow him to cover up that he'd misused their money and make it appear as though he'd actually spent the $11 million as promised. *See* Tr. at 469:6–9, 486:18–487:3; *see also* GX 1011D (Rinsch claiming under oath during arbitration with Netflix that he spent all $11 million on the show).

And as it related to his wife, Rinsch was engaged in a protracted divorce with her, and he believed that passing off this spending as production related would allow him to hide his money in assets (the luxury goods) that he could claim were owned by the production, and so were not part of the marital estate. Indeed, Rinsch submitted a financial declaration as part of that divorce in which he swore under penalty of perjury to that fact.

| 4. VEHICLES, BOATS, TRAILERS *(Describe and attach copy of title document.)* None – Respondent contends he is not the owner of any and all vehicles, boats, trailers, etc., purchased in connection with film projects, including but not limited to "Conquest," for Netflix and that Netflix is the holder of any all ownership interests therein. | | | | |

| I declare under penalty of perjury under the laws of the State of California that the information contained on all pages of this form and any attachments is true and correct. |
| Date: 04/19/2022 |
| CARL RINSCH _____ ▶ _____ (SIGNATURE OF DECLARANT) |
| (TYPE OR PRINT NAME)              .              Page 1 of 4 |

*GX 7003 (example disclosure related to the cars Rinsch purchased)*

This was all a lie. Rinsch had no actual plans or intentions to use any of these items to make *White Horse*. PSR ¶ 38. For example, Rinsch purchased five Rolls Royces and a Ferrari, all of which he told Netflix and the court handling his divorce were for the *White Horse* production. *Id.* But Rinsch insured each of those cars in his personal name, not the name of his production company; and the insurance he purchased was for "pleasure" rather than business. *Id.*

14

Rinsch lied to one more entity around this time: the IRS. Although Rinsch filed tax returns in 2020 and 2021, he did not report the money he'd stolen from Netflix or the millions he made trading in cryptocurrency. In 2020, for example, he reported $18,374 in total income. GX 8005 at 2. And in 2021, he reported $1 in total income. GX 8008 at 2. Rinsch did, however, report his investing losses using the money he'd stolen, in order to reduce his overall tax burden in 2020. *See* GX 8005 at 5.

## I.    Rinsch Sues Netflix with Netflix's Own Money

By 2022, it appeared that Rinsch had successfully gotten away with his crime. But that wasn't enough for Rinsch. He wanted even more money. So that year, he took some of what he'd stolen and used it to fund a lawsuit against Netflix, seeking more money from the company. *See, e.g.*, GX 1009E at 5 (testifying under oath that he sold various luxury cars to pay for his arbitration expenses).

During that arbitration, Rinsch was repeatedly forced to admit that the $11 million Netflix paid him in March 2020, was all to be spent on the Task List and *White Horse*. That included the following exchanges:

> Q    And was HVFX agreeing to use the $11 million for the purposes listed here?
>
> A    To answer your question, yes.  Yeah.  Home VFX shall perform and shall use the 11 million to fund this.

> Q    And Home VFX was agreeing that the $11 million would be used on the bulleted items in that e-mail, right, the March 4th e-mail that we looked at?
> A    Yes.  I don't know if there's some gotcha, if I forgot a comma or something, but yeah.

15

That arbitration eventually proceeded to a hearing at which Rinsch testified. Following the hearing, the arbitrator rejected each of Rinsch's claims and ruled in favor of Netflix's counter claims, awarding the company millions of dollars in damages. On top of that, the arbitrator found that an "extensive catalogue of testimony" given by Rinsch—under oath—was not credible. GX 1004 at 2. Netflix is still in the process of attempting to enforce its monetary damages award against Rinsch.

## III.    Procedural History

Rinsch was indicted by a grand jury on or about March 4, 2025. He was arrested at his home in the Central District of California, without incident, on March 18, 2025. A trial in the matter began on December 2, 2025, and concluded with the jury finding Rinsch guilty on all counts on December 11, 2025. Specifically, the jury convicted Rinsch of committing wire fraud in violation of 18 U.S.C. § 1343, money laundering in violation of 18 U.S.C. § 1956, and multiple counts of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

## IV.    The Applicable Guidelines Range

The Government objects to the Guidelines range calculated in the Presentence Report. *See* PSR at 32. Specifically, the Presentence Report underscores the base offense level by one point, starting from a base of 26 points instead of the correct 27.

The base offense level for money laundering is the "offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense . . . and (B) the offense level for that offense can be determined." U.S.S.G. § 2S1.1(a)(2). Here, there is no question that (A) the funds that were laundered were the proceeds of the fraudulent scheme for which Rinsch was convicted; and (B) the Guidelines applicable to that fraud can be determined by reference to U.S.S.G. § 2B1.1. Of particular relevance here, when calculating

the Guidelines range applicable to a fraud offense under § 2B1.1, a crime punishable by 20 years or more of imprisonment and referenced to in § 2B1.1 (like wire fraud) begins with an offense level of 7. After accounting for the 20-point enhancement for the loss amount attributable to Rinsch's fraud, the offense level for his scheme—and thus the base offense level for the money laundering count—should be 27.

The Presentence Report rejects this conclusion on the basis that 18 U.S.C. § 1956, although punishable by 20 years or more of imprisonment, is not referenced to § 2B1.1. As a result, the Presentence Report concludes that § 1956 fails one of the two prongs set forth in § 2B1.1(a)(1), meaning that the offense level calculation must begin at offense level 6, *see* § 2B1.1(a)(2), thereby resulting in a base-offense level for the money laundering crime of 26.

In reaching this conclusion, the Presentence Report mixes apples and oranges. Yes, 18 U.S.C. § 1956 is not referenced to § 2B1.1, but that is irrelevant. The Guidelines section dictating the offense level calculation is § 2S1.1, and § 2S1.1(a)(2) explicitly sets the base offense level for money laundering as the offense level applicable to the "underlying offense" from which the funds were derived. Here, the underlying offense is wire fraud, in violation of 18 U.S.C. § 1343, and wire fraud *is* referred to in § 2B1.1.

As the Second Circuit has explained, "[t]he 'underlying offense' referred to in section 2S1.1(a)(1) is 'the offense which produced the laundered funds,'" and "[t]he total Guidelines offense level for such 'underlying offense,' after being ***independently*** calculated by applying all appropriate adjustments, and considering any relevant conduct under U.S.S.G. § 1B1.3, is ***then*** used as the base offense level for money laundering" under U.S.S.G. § 2S1.1(a)(1) if the two conditions listed therein are met. *United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) (emphasis added); *see also* U.S.S.G. § 1B1.5 ("[a]n instruction to use the offense level from another

17

offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions) . . . .”). Beginning from an offense level of 6 for the underlying wire fraud conduct thus flouts the Second Circuit's interpretation of § 2S1.1's requirement that the base level for the underlying offense must be independently calculated.

Unsurprisingly, given the clear guidance in *Menendez* and § 1B1.5, at least three judges in this district have considered this precise issue and have agreed that the offense level calculation for laundering wire fraud proceeds must begin at 7:

- Sent. Tr. at 21–22, *United States v. Reese*, 24 Cr. 402 (VEC) (S.D.N.Y. Sept. 25, 2025), ECF No. 157;

- Sent Tr. at 5–6, *United States v. Georgiou*, 21 Cr. 189 (JPO) (June 30, 2025), ECF No. 159 (“I believe that the government's calculation [using a base offense of 7, instead of 6,] is the correct interpretation of the guidelines, given the Second Circuit's directive in *United States v. Menendez*, that the offense level for the 'underlying offense' must be independently calculated, including any adjustments. And then that is used as the offense level for money laundering under Section 2S1.1(a)(1) of the guidelines . . . .”); and

- Sent. Tr. at 6–7, *United States v. Xu*, 23 Cr. 133 (JMF) (S.D.N.Y. May 15, 2025), ECF No. 510.

The Government's interpretation of the Guidelines has also been adopted by at least four Courts of Appeals throughout the country:

- *United States v. Abbas*, 165 F.4th 659, 664–666 (1st Cir. 2026) (explaining that “USSG § 2B1.1(a)(1)(A) does not say '*the*' offense of conviction—it says '*an*' offense of conviction . . . . So rather than referring a reader back to the definite money laundering count, USSG § 2B1.1(a) tells a judge that if, (1) *any one* of the defendant's convictions is governed by § 2B1.1 and (2) that offense carries a maximum term of 20 or more years, then the base offense is seven” (cleaned up));

- *United States v. Otunyo*, 63 F.4th 948, 956–57 (D.C. Cir. 2023) (beginning from an offense level 7 for money laundering conviction where laundered funds derived from bank fraud);

18

- *United States v. Capps*, 977 F.3d 250, 255–56 (3d Cir. 2020) (applying a starting offense level of 7 for money laundering conviction where laundered funds were derived from mail fraud); and

- *United States v. Salado*, 590 F. App'x 692, 693 (9th Cir. 2015) (per curiam) (beginning from an offense level of 7 for money laundering conviction where laundered funds derived from mail fraud and bank fraud).

Accordingly, with this adjustment to the base offense level and the application of the additional enhancements cited in the Presentence Report at Paragraphs 50–58, the correct total offense level is 31. Given Rinsch's criminal history category of I, the applicable Guidelines range is 108 to 135 months' imprisonment.

## V.    A Sentence of At Least 5 Years' Imprisonment is Warranted

### A.    Applicable Law

After calculating the applicable Guidelines, the Court must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.    Discussion

The Government believes a significant period of incarceration—of at least 60 months' imprisonment—is necessary.

Carl Rinsch had access to nearly every privilege imaginable. He had a wealthy family, attended elite academic institutions, celebrity friendships, multiple personal assistants attending to various aspects of his life (including procuring his meals), and he maintained connections to the highest echelons of the entertainment industry. But that wasn't enough for Rinsch. In 2020, he committed a brazen fraud, stealing $11 million from Netflix, which he used to go on a spending spree—first betting on the COVID-19 pandemic and then buying all sorts of luxury goods. And to cover up what he'd done, Rinsch lied repeatedly, even perjuring himself at this trial. A sentence of at least 60 months' imprisonment is therefore necessary to account for the seriousness of the offense and to provide just punishment, afford adequate deterrence, and to account for Rinsch's history and characteristics.

### 1.    Seriousness of the Offense and Need for Just Punishment.

Rinsch committed an incredibly serious offense. He put in motion a calculated scheme through which he brazenly lied to Netflix in order to steal $11 million.  As the pandemic began, Rinsch had largely given up on *White Horse*.  Instead of calling it quits, instead of telling Netflix that he wanted to move on to other ventures, he got greedy.  Rinsch knew that Netflix had invested tens of millions of dollars into *White Horse* and would not want to just abandon the show.  Rinsch took advantage of that trust, of that commitment, and lied.

20

Within days of receiving the $11 million, Rinsch had laundered the money. Within weeks, he had gambled millions on incredibly risky stock options. Rinsch took these risks because he wanted to make himself extraordinarily rich, no matter the consequences. In proposing to short the Brazilian economy with Netflix's money, Rinsch explained his goals in a March 29, 2020, email to Adam Checchi:

> This may appear predatory, but I am confident that if these crisis investing strategies are successful, then the world will need the type of charity that is wed to oversize gains. This process should be considered highly speculative and aggressive to yield extreme returns. The money invested represents a small portion of overall worth, and I am comfortable forfeiting it in the instance these investments are not as fruitful as I may want them to be.

GX 6057. By April 2020, Rinsch had lost close to $6 million. Tr. at 230:19-21. Even though Rinsch had lost millions, he at no time reflected on what he had done. He was not chastened. Instead, Rinsch told Checchi that he was not concerned because he had "understood the risk that he was taking." Tr. at 231:6-9. And then he proceeded to gamble the rest of the Netflix money in cryptocurrency.

Throughout, he continued to lie to Netflix. While he was gambling away millions of dollars that Netflix had trusted him to safeguard, to put into productive use, Rinsch lied. In one message, Rinsch told Netflix that he was "quietly moving forward" on the *White Horse* production. GX 6360. In another, he said, "we continue moving forward diligently . . . I am excited to show you the work we are doing." GX 6361. In yet another, Rinsch promised, "We're working away on this end." GX 6362. These were all lies calculated by Rinsch to lull Netflix into a false sense of security. Rinsch even created a $10,000 book chronicling the greatest hits from the *White Horse* production to stoke excitement among Netflix executives. All the while, he had completely abandoned *White Horse*. As he told his assistant, Masha Skotnikova in 2022, "Movies died Masha." GX 5059.

Put simply, this was not a momentary lapse in judgment by Rinsch.  It was a premeditated, calculated, and prolonged fraud. In a text message, Rinsch told Skotknikova that the fraud he had committed "was always the plan." GX 5059. And in 2021, he went on a spending spree, in part to convince Netflix that he had spent money on the show.  In a text message, he told Skotknikova that it was her "job" to spend money as quickly as possible—"We have to do this or else the [Netflix] money goes bye bye."  GX 5058.  Calculated, brazen, and unremorseful, Rinsch spent the money on himself.

Rinsch committed this crime for one reason only: because he wanted to maintain a lifestyle of extreme luxury.  With Netflix's money, he bought himself a Ferrari and multiple Rolls-Royces. GX 5051, 7007.  Rinsch purchased a $380,000 watch—"my big purchase for me," as he described it.  GX 5050, 5062.  He spent almost a million dollars on likely the most luxurious mattresses in the world, which are "massaged" by a "bed doctor."  Tr. at 578:22–24.  At bottom, Rinsch displayed a shocking level of greed.

This was not a victimless crime.  Netflix lost millions of dollars—and that is serious.  But while Netflix has deep pockets, the same is not true for the large crew that worked on *White Horse*, who lost their jobs because of Rinsch's fraud. People like Josh Loney, an assistant on the show, who repeatedly, in vain, encouraged Rinsch to do work on *White Horse*.  As Loney said, "I just wanted the project to succeed and I wanted him to succeed."  Tr. at 691:18-22.  Or take Ethan Weiner, another of Rinsch's assistants.  In February 15, 2020, Rinsch told Weiner he was "getting financial murdered," and would not be able to pay the work expenses Weiner had incurred.  GX 5086.  Rinsch promised that when he received the $11 million from Netflix, he would "reimburse" Weiner.  Tr. 773:15-20.  He never did.  Rinsch placed his greed above all else.  And he was willing

22

to lie, to cheat, and to steal in order to benefit himself.  The seriousness of this fraud in and of itself demands a significant term of incarceration.

### 2.    The Need to Afford Adequate Deterrence

Rinsch's actions during the course of the charged offenses, as well as his actions since he was arrested, further demonstrate that a substantial sentence is necessary both to deter Rinsch from engaging in additional crimes and to promote general deterrence.

Rinsch spent years working to evade responsibility for his crimes and hide his criminal proceeds. Those efforts culminated in his lying under oath while at trial. Indeed, as the Court saw, he lied about multiple distinct and material matters. *See* ECF 86 at 6 (concluding that "[a] jury could . . . conclude that [Rinsch] had repeatedly lied"). Those efforts show not just the lengths Rinsch is willing to go to evade being held responsible, but also a general disdain for the law. A message therefore must be sent to Rinsch that the law and the Court are to be respected. Moreover, failure to sanction someone who perjures themselves at their own criminal trial would send a perverse incentive to the public at large about the importance of the oath that one takes before testifying.

Despite these facts, Rinsch suggests that no term of imprisonment is necessary to achieve specific or general deterrence. Def. Mem. at 13. He is wrong on both fronts.

As to specific deterrence, Rinsch argues that he has already suffered sufficient consequences for his crime that will keep him from recidivating, asserting that he has been "pilloried in the press" and "effectively blacklisted from the industry he dedicated his life to." Def. Mem. at 14. Neither of those are reasons to temper any sentence. Rinsch's actions came to the press's attention only because after successfully defrauding Netflix, he sought *even more money* from his victim through an arbitration that he initiated (and used some of the stolen money to fund). Accordingly, it is due only to Rinsch's own greed that his activities have been covered in the press, and truthful

23

reporting about what he has done is not a stand-in for a criminal sentence. And with respect to his future in the entertainment industry, that was a privilege, not a right—Rinsch's ability to work in the entertainment industry was not a personal possession of his, the loss of which could amount to a deprivation. Rejoining the ranks of the many Americans who are not entrusted with multi-million-dollar film projects may be an unpleasant reality for Rinsch, but it is not adequate punishment for criminal conduct. Indeed, even if Rinsch had not stolen millions of dollars from Netflix, he very well could have been pilloried in the press and blacklisted from the industry for the simple fact that a huge show fell apart under his watch, without a single episode streaming on Netflix. Something more is needed, not only to punish Rinsch, but to ensure that the goal of deterrence is achieved.

Separately, Rinsch argues that specific deterrence is not necessary in this case because he is unlikely to be in a position to engage in additional criminal conduct in the future. Def. Mem. at 14 ("The conduct at issue in this case . . . will certainly not reoccur."). Of course, there is no way to know whether Rinsch will find his way back into the entertainment industry. Rinsch's continued denial of responsibility for his conduct is certainly an effort to preserve that path and discredit the jury's verdict against him. But even setting that aside, simply because Rinsch may not be again entrusted with financing for a Hollywood project does not mean he will not be in a position to engage in fraud or other crimes. During trial the Court saw evidence that Rinsch both attempted to hide assets during his divorce, including filing false or misleading paperwork under penalty of perjury to do so, and knowingly omitted millions of dollars from his tax returns. *See* GX 8005 at 2 (failing to disclose $11 million to the IRS in 2020); GX 8008 at 2 (failing to disclose cryptocurrency investment gains to the IRS in 2021). Even if his conviction may make it less likely that

24

Rinsch will be able to defraud another streaming company in the future, he has shown that that is not a bar on his ability to act fraudulently in other areas of his life.

With the need to achieve specific deterrence clear, the question then becomes what amount of imprisonment is necessary to achieve that goal. The Government respectfully submits that the minimum sentence to achieve that end is 60 months' imprisonment.

That conclusion is supported by empirical analysis. For instance, a June 2022 U.S. Sentencing Commission report considered the outcomes of tens of thousands of federal offenders who were released from prison in 2010. *See Length of Incarceration and Recidivism*, U.S. SENT. COMM'N (June 2022).[7] The study's findings showed that "[f]or offenders sentenced to more than 60 months, there was a statistically significant preventative effect." *Id.* at 19; *see also id.* at 4 ("[T]he odds of recidivism were lower for federal offenders sentenced to more than 60 months incarceration compared to a matched group of offenders receiving shorter sentences."). To be sure, some literature has concluded that fraud offenders have lower recidivism rates than other types of offenders. *Id.* at 12. But a low rate relative to other offense types does not mean that fraud offenders have low recidivism rates in a vacuum. For instance, a 2016 report by the U.S. Sentencing Commission showed that while federal fraud offenders had relatively lower rates of recidivism than other offender types, 34% were nevertheless re-arrested following their conviction.[8]

General deterrence, too, requires a significant prison sentence. Because financial fraud and money laundering offenses can be difficult to uncover and prosecute, significant punishment is necessary to deter others from similar conduct. The Second Circuit and other courts in this District

---

[7]    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf (last visited June 13, 2026).

[8]    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at 20 (last visited June 13, 2026).

have noted the appropriateness of significant sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense where defendant made approximately $11.5 million). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). As the Honorable Colleen McMahon explained in *United States v. Binday*, No. 12 Cr. 152 (CM), a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath." ECF No. 349, Sent'g Tr., at 46; *see also id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable,

26

and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years.").

Here, the leniency Rinsch seeks—a period of no incarceration despite a years' long fraud and perjuring himself during trial—would not meet the ends of sentencing. It would send exactly the wrong message to the public: that fraud and attempting to obstruct justice are not taken seriously. In order both to specifically deter Rinsch, and to deter others, a substantial term of imprisonment of no less than 60 months is necessary.

### 3.    Rinsch's History & Characteristics

Much of Rinsch's history and characteristics do very little to mitigate the severity of his conduct. For most of his life, Rinsch was surrounded by privilege. He wanted for very little, having access to elite academic institutions and a trust fund, the support of a loving family, multiple assistants handling various aspects of his life, and a career that paid him millions of dollars a year. PSR ¶¶ 68, 83, 87, 88. With that background, Rinsch is far differently situated from many of the defendants that this Court sees, whose willingness to engage in crime can be partially understood based on a lack of role models and support while growing up. Rinsch had nearly everything he could ever want or need and yet still turned to crime.

Moreover, while this is Rinsch's first criminal conviction, that fact is far less meaningful given the length of Rinsch's crime and the various steps he took to carry it out. This was not a one-time mistake on an otherwise spotless record. Rather, Rinsch spent at least weeks planning to defraud Netflix. And then after fraudulently obtaining $11 million, he spent years trying to hide what he'd done and keep ahold of his criminal proceeds. The amount of time during which Rinsch was engaged in this criminal scheme—running all the way until trial, when he perjured himself—undercuts significantly the weight that should be given to his lack of a prior criminal record.

27

While Rinsch's claimed ██████████████ could counsel in favor of some mitiga-tion, there is no basis to believe ███████████████ call for the non-incarceratory sentence he seeks.[9]

To start, whatever █████████████████████████, Rinsch clearly understood that what he was doing was wrong. Indeed, Rinsch began lying to Netflix and others about what he was doing with the $11 million immediately, and then continued to keep up those lies both when trying to bilk more money from his victim in a baseless arbitration and when working to hide his criminal proceeds from his wife and the IRS. Those actions—carried out over the course of years—are not indicative of ████████████████████████ ████████ They are instead the behavior of someone motivated by greed. And on top of that, Rinsch's fraud required him to operate with a level of sophistication ████████████ ████████████████████████████████ ████████ ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████

---

[9] The Government has filed a redacted copy of this sentencing memorandum on the public docket, which redacts language on the same topics that were redacted from the defendant's publicly filed memorandum.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ notes of the interview of Adam Checchi, Rinsch's financial advisor, who, among things, noted that in March and April 2020 (*i.e.*, at the same time he committed the fraud), that (i) Rinsch came off as "more sophisticated" than Checchi's other non-finance-industry clients; (ii) Rinsch presented and defended a complex investment thesis tied to bets around the COVID-19 pandemic; (iii) through their discussions, Rinsch modestly modulated his investment plans based on Checchi's advice; and (iv) ████████████████ ███████████████████████████████████. GX 3504-002; *see also* Tr. at 212:4–9.  Surely, Rinsch's ability to discuss complex financial investments with a seasoned investing professional, and willingness to modulate, even slightly, his investment strategy based on that professional's advice is relevant to understanding his mental state at the time.

████████████████████████████████████████████ the Court can (and should) rely principally on its own assessment of Rinsch's mental acuity, capabilities, and culpability. *See United States v. Valdez*, 426 F.3d 178, 186 (2d Cir. 2005) ("[T]he court is not required to accept evidence concerning a defendant's mental and emotional state offered by the defendant's own expert, but rather may rely on the court's own assessment of defendant ... based on its observations."). The Court had the opportunity to observe Rinsch in court over a number of pretrial proceedings and then extensively during the trial. He actively participated in his defense, conferring with counsel at every stage, and testified in his own defense, with extensive direct and cross examination. He had no trouble focusing, recalling events (particularly on direct examination), or engaging with the jurors. ████████████████████████████████████

29

████████████████████████████████████████████████████

████████████████████████████████████.

*    *    *

In sum, the Government recognizes that some mitigating circumstances exist in this case. Most notably, the Government has considered Rinsch's lack of prior criminal convictions, support from family and friends, and, to a much lesser extent, any possible health issues (in part because, as the evidence before the Court makes clear, any such issues were far less significant than portrayed by the defense). But the other aggravating factors are simply too significant to support the non-incarceratory sentence that Rinsch seeks. Rather, considering all the legitimate purposes of sentencing and the facts of this case, the Government respectfully submits that a sentence of at least 60 months is necessary and appropriate.

## VI.    Forfeiture

Attached as Exhibit A is a proposed preliminary order of forfeiture and money judgment that the Government respectfully requests the Court enter at the time of sentencing. The Government is seeking forfeiture of the following:

*First*, Rinsch should be ordered to forfeit the $11 million he stole from Netflix.

*Second*, Rinsch should be ordered to forfeit the luxury goods in his possession that he purchased using the money he made investing his fraud proceeds. That includes (i) two Hastens Grand Vividus mattresses purchased from Damon Capital LLC, one purchased pursuant to a September 12, 2021 quote numbered 19502, and another purchased pursuant to an October 22, 2021 quote numbered 19525, *see* PSR ¶ 89; GX 6251A; GX 6251E; (ii) approximately $43,777 worth of luxury goods purchased from Frette on or about October 2, 2021, in order number 200404730*, compare* PSR ¶ 89, *with* GX 6217 at 5–8, 10–11; and (iii) approximately $87,144 worth of luxury

30

goods purchased from Sferra on or about October 2, 2021, in order number 187321, *compare* PSR ¶ 89, *with* GX 6217 at 4, 14–15.[10]

## VII.    Restitution

Rinsch acknowledges that restitution in the amount of $11 million is mandatory. Def. Mem. at 16.  In addition, the Court should include in the restitution amount "necessary . . . other expenses" incurred by Netflix that arise from Netflix's "participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).

A victim's attorneys' fees are among the types of "other expenses" that may be included in a restitution order.  *United States v. Amato*, 540 F.3d 153, 159-61 (2d Cir. 2008); *United States v. Gupta*, 925 F. Supp. 2d 581, 584 (S.D.N.Y. 2013); *see also United States v. Afriyie*, 27 F.4th 161, 166-70 (2d Cir. 2022). Courts in this Circuit take a broad view of what expenses are "necessary," *United States v. Maynard*, 743 F.3d 374, 381 (2d Cir. 2014), and the Court has "broad discretion" in making a "reasonable estimate" of compensable losses, *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007). Compensable losses, include, for example, fees incurred in having legal counsel participate in preparing employees to testify at a criminal trial, including attending meetings with the Government and counseling those employees separately. *See Afriyie*, 27 F.4th at 173 (upholding award of fees incurred in connection with "prepar[ing] . . . witnesses for trial," explaining that "expenses incurred in preparing witnesses, at the invitation of the [United States Attorney's Office], were "necessary" to [the victim's] participation in [the defendant's] prosecution").

---

[10] The discrepancies between the Presentence Report figures and those listed here for the values of the Sferra and Frette items is the result of the Presentence Report using the total order costs— as opposed to the costs of the items alone—which include tax and/or shipping fees.

31

Compensation should be made at a reasonable rate consistent with market rates charged by similar law firms in New York City. *See Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006); *Restivo v. Hessemann*, 846 F.3d 547, 590 (2d Cir. 2017); *see also Stonex Grp., Inc. v. Shipman*, No. 23 Civ. 613 (JGK) (VF), 2025 WL 1212165, at *3 (S.D.N.Y. Apr. 25, 2025) (noting that Proskauer Rose partner's normal hourly rate was $1,560 and approving request for lower hourly rate of $1,285; and noting that Proskauer Rose associate's normal hourly rate was $1,225 to $1,345 and approving request for lower rate of $800); *ATX Debt Fund 1, LLC v. Paul*, No. 19 Civ. 8540 (JPO), 2024 WL 2093387, at *5 (S.D.N.Y. May 9, 2024) (approving, after a 10-percent reduction, Gibson Dunn & Crutcher hourly rates of $1,535 to $1,975 for partners, $775 to $1,265 for associates, and $595 to $685 for paralegals); *An v. Despins*, No. 22 Civ. 10062 (VEC) (JW), 2024 WL 1157281, at *2, 4 (S.D.N.Y. Mar. 18, 2024) (finding requested hourly rates of $796 to $895 reasonable for Davis Polk & Wardwell associates); *Wells Fargo Tr. Co.*, 2023 WL 8591953, at *6, 9 (listing the usual 2023 billing rates for certain White & Case partners as up to $1,750 per hour, for certain associates as up to $1,240 per hour, and for a legal assistant as up to $544 per hour, and approving those rates after applying a 20-percent discount).

Netflix has appended as Exhibit 2 to its victim impact statement detailed billing statements in support of its request for $535,785.04 in attorneys' fees and costs that it incurred for work related to responding to a grand jury subpoena and preparing witnesses for interviews with the Government and testimony at this trial, and the Government supports Netflix's request for inclusion of such fees and costs in the Court's restitution amount.[11]

---

[11] Netflix additionally requests that the Court include in its restitution order attorneys' fees and costs necessary to defend an arbitration initiated by Rinsch against Netflix. The Government does not join in that request.

Attached as Exhibit B is a proposed order of restitution. The Government respectfully requests that the Court insert the restitution amount that it determines before signing the order.

## VIII.  Conclusion

For the reasons set forth above, the Court should sentence Carl Rinsch to at least 60 months' imprisonment.

Dated:    New York, New York
          June 16, 2026

                                    Respectfully submitted,

                                    JAY CLAYTON
                                    United States Attorney


                          By:    /s/_____
                                    Timothy Capozzi
                                    David Markewitz
                                    Adam Sowlati
                                    Assistant United States Attorneys